## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

D.C. PROFESSIONAL TAXICAB DRIVERS
    ASSOCIATION,
2417 Evarts Street, NE, Second Floor
Washington, D.C. 20018,

    and

DOMINION OF CAB DRIVERS
P.O. Box 15068
Washington, DC 20003,

               *Plaintiffs*,

    v.

DISTRICT OF COLUMBIA
MAYOR VINCENT C. GRAY
1350 Pennsylvania Avenue, N.W.
Suite 316
Washington, DC 20004,

OFFICE OF THE ATTORNEY GENERAL
FOR D.C.
441 4th Street, NW
Washington, DC 20001

RON LINTON,
2041 Martin Luther King Jr. Avenue, S.E.
Suite 204
Washington, DC 20020,

    and

D.C. TAXICAB COMMISSION
2041 Martin Luther King Jr. Avenue, S.E.
Suite 204
Washington, DC 20020

               *Defendants*.

Civil Action No. _____

## NOTICE OF REMOVAL

The District of Columbia, Mayor Vincent C. Gray, Mayor of the District of Columbia, the D.C. Taxicab Commission, and Ron Linton, Commissioner of the D.C. Taxicab Commission, are the Defendants in the case of *D.C. Professional Taxicab Drivers Association, et al. v. District of Columbia, et al.,* Civil Action No. 7477-11, pending in the Superior Court of the District of Columbia. *See* Complaint attached hereto as Exhibit 1; First Amended Complaint attached hereto as Exhibit 2. Pursuant to 28 U.S.C. §§ 1441 and 1446, the Defendants hereby remove this case from the Superior Court of the District of Columbia to this Court because the claims raised in the Complaint and First Amended Complaint plead one or more federal questions appropriate for resolution by this Court. Causes of action "founded on a claim or right arising under the Constitution, laws, or treaties of the United States" are removable without regard to the citizenship of the parties. 28 U.S.C. § 1441(b). In the Complaint and First Amended Complaint, Plaintiffs assert, *inter alia,* claims under U.S. Const., Art. I, Sec. 8, Cl. 3, Amend. IV, V and XIV, for alleged violations of the commerce clause, the right to travel, etc. *See* Complaint and First Amended Complaint.

Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

ELLEN EFROS
Deputy Attorney General
Public Interest Division

GRACE GRAHAM, D.C. Bar No. 472878
Chief, Equity Section
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Direct Dial: (202) 442-9784
Receptionist: (202) 727-6295
Facsimile: (202) 741-8892
Email: grace.graham@dc.gov

DANIEL A. REZNECK, D.C. Bar No. 31625
Senior Assistant Attorney General
441 Fourth Street, N.W., Suite 600S
Washington, D.C. 20001
Direct Dial: (202) 724-5691
Receptionist: (202) 727-6295
Fax: (202) 727-3625
Email: daniel.rezneck@dc.gov

JACQUES P. LERNER, D.C. Bar No. 440998
Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Direct Dial:  (202) 724-1342
Receptionist:  (202) 727-6295
Facsimile:  (202) 741-5908
Email: jacques.lerner@dc.gov

**OCTOBER 12, 2011**          **COUNSEL FOR DEFENDANTS**

# Exhibit 1

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

D.C. PROFESSIONAL TAXICAB DRIVERS )
    ASSOCIATION, )
2417 Evarts Street, NE, Second Floor )
Washington, D.C. 20018, )
     )
  and )
     )
DOMINION OF CAB DRIVERS )
P.O. Box 15068 )
Washington, DC 20003, )
     )
             *Plaintiffs,* )
     )
     )
       **v.** )
DISTRICT OF COLUMBIA )
MAYOR VINCENT C. GRAY, )
1350 Pennsylvania Avenue, N.W. )
Suite 316 )
Washington, DC 20004, )
OFFICE OF ATTORNEY GENERAL FOR DC )
441 4th St, NW )
Washington, DC 20001 )
  RON LINTON, )
2041 Martin Luther King Jr. Avenue, S.E. )
Suite 204 )
Washington, DC 20020, )
     )
  and )
     )
D.C. TAXICAB COMMISSION )
2041 Martin Luther King Jr. Avenue, S.E. )
Suite 204 )
Washington, DC 20020 )
     )
             *Defendants.* )
     )

RECEIVED
Civil Clerk's Office
SEP 2 0 2011
Superior Court of the
District of Columbia
Washington, D.C.

0007477-11

Civil Action No. _____

## **COMPLAINT**

### I.   INTRODUCTION

1.      Taxicabs are an important pillar of the transportation infrastructure in the District of Columbia. The overwhelming majority of Washington, D.C. taxicab drivers are independent small business owners who own and drive their own vehicles. They are men and women – many of whom are minorities or immigrants – who have invested their own money to purchase and operate a taxicab and work extremely hard to provide clean, safe, reliable transportation around the District of Columbia. The Mayor, the D.C. Taxicab Commission ("DCTC" or "Commission") – the D.C. government agency charged with regulating the taxicab industry – along with its chairperson, have abdicated their duties to ensure that drivers are treated fairly and consistent with the law.

2.      In particular, since the transition from a zone to a meter system in 2008, the Mayor has failed to appoint any proper representatives of the taxicab industry to the Commission as required by law. The Mayor has refused to allow the Commission to function, usurping its authority to set rates properly and instead setting them at levels that are completely arbitrary, contrary to law, and deeply harmful to the men and women who operate taxicabs. The Commission and its chairperson have acted in an arbitrary and unlawful manner in numerous respects, including failing to conduct a rate study that would show that taxicab rates in the District of Columbia are among the lowest of any comparable jurisdiction, failing to establish rates at levels that are fair and reasonable as required by law, conducting public meetings in an unlawful way designed to exclude input from drivers who are adversely affected by the current rate structure, and among other things, directing or allowing harassing and unlawful inspections of taxicab drivers that improperly interfere with drivers' ability to earn a livelihood.

3.      Even though a majority of the Commission has repeatedly acknowledged that the current rate schedule needs upward adjustment, the rate schedule has not changed since 2008. In

the three years since the current rate schedule was established – a time of rising prices and increasing cost-of-living expenses – drivers have seen their incomes fall by as much as 30%.

4. In order to make ends meet, drivers are increasingly working longer hours – often as long as 12- to 16-hours per shift – for less pay. The current rate structure is breaking families, forcing drivers to spend increased time away from their spouses and children, as well as putting hundreds of middle class families under increasing financial strain.

5. The current arbitrary rate structure and the Commission's failure to act to ameliorate its effects have also had a significant negative impact on driver health. Drivers working longer shifts are unable to eat properly or exercise and must sit for hours on end. As a result, instances of potentially fatal conditions such as heart attacks, strokes, and diabetes are on the rise among drivers, as well as stress-related ailments.

6. Plaintiffs have repeatedly petitioned the Commission and its chairperson, and the Mayor and his representatives, to show a measure of humanity for the plight of drivers and to conform their conduct to the law by allowing a properly-composed Commission to carry out its required mission. But each has refused. This Court is the drivers' last line of defense.

## II. JURISDICTION AND VENUE

7. The subject matter jurisdiction of this Court is invoked pursuant to the provisions of the D.C. Code § 11-921(a) (2010). This Court has jurisdiction over all matters in equity. *Id.*

8. Personal jurisdiction is invoked pursuant to the provisions of D.C. Code § 13-423(a) (2010); all parties to the dispute are citizens of the District of Columbia or conduct business entirely or primarily within the District of Columbia, and the actions giving rise to the suit occurred therein.

9.     Venue is proper in this court, as the relevant events took place in the District of Columbia.

### III. THE PARTIES

10.     This action is brought by the D.C. Professional Taxicab Drivers Association and the Dominion of Cab Drivers (collectively, "Plaintiffs") against Mayor Vincent C. Gray; Ron Linton ("Linton"), in his capacity as Chairman of the D.C. Taxicab Commission; and the D.C. Taxicab Commission (collectively, "Defendants"). This dispute arises out of unlawful actions by Defendants, which began under the previous administration and have continued to the present.

11.     Plaintiff D.C. Professional Taxicab Drivers Association is an association of D.C. taxicab drivers incorporated under the laws of the District of Columbia.

12.     Plaintiff Dominion of Cab Drivers is an association of D.C. taxicab drivers incorporated under the laws of Virginia.

13.     Plaintiff Dominion of Cab Drivers represents approximately 380 taxicab drivers in the District of Columbia. Plaintiff D.C. Professional Taxicab Drivers Association of Cab Drivers represents approximately 250 D.C. taxicab drivers. The individual members of the Plaintiff associations, who are citizens of the District of Columbia or conduct business entirely or primarily within the District of Columbia, have individually suffered, and continue to suffer, from the various violations of law and harms described herein.

14.     Plaintiffs have standing to obtain relief on an associational basis because (1) the individual members of the Plaintiff associations would have standing to sue in their own right, (2) the interest Plaintiffs seek to protect is germane to the associations' purposes (representing the interests of D.C. taxicab drivers), and (3) neither the claims asserted nor the relief requested

require the participation of individual members. *See Dupont Circle Citizens Assoc. v. Barry*, 455 A.2d 417, 421 n.18 (D.C. Ct. App. 1983).

15. Defendant Gray is the current Mayor of Washington, D.C.

16. Defendant Linton is the Chairman of the D.C. Taxicab Commission.

17. Defendant D.C. Taxicab Commission is the D.C. regulatory body charged with oversight and regulation of the taxicab industry. When fully staffed, it consists of a chairperson and eight members, three of which must represent the taxicab industry. The Commission regulates the District's taxicab industry through two panels – the Panel on Consumer & Industry Concerns and the Panel on Rates & Rules – and an administrative department tasked with licensing and enforcement.

## IV. FACTUAL ALLEGATIONS

### A. Background and Transition to Time-and-Distance Meters

18. The D.C. Taxicab Commission Establishment Act of 1985 ("the DCTC Establishment Act") was passed "[t]o promote the public interest in taxicab transportation by insuring that all rules, regulations, and laws specifically relating to taxicabs be vigorously and fairly enforced; that discrimination in taxicab passenger service be strictly proscribed and penalized; and that adequate and high quality taxi passenger service be provided to all quadrants and neighborhoods of the District; . . . [and t]o maintain a taxicab transportation system which provides owners and operators of taxicabs with reasonable and just compensation for their services . . ." D.C. Code § 50-302 (2010). Additionally, the Act aims to assure the meaningful participation of minorities, healthy competition between companies and associations, and access to the ownership of taxicabs by taxicab operators. *Id.*

19.     The 2005 District of Columbia Omnibus Authorization Act included a short provision inserted by Sen. Carl Levin (D-MI) requiring "all taxicabs licensed in the District of Columbia to charge fares by a metered system" within one year of the date of passage. Pub. L. No. 109-356, Sec. 105, *codified at* D.C. Code § 50-381 (2010)). The Levin provision further provided that the Mayor could opt out of the transition to the metered system, and thus exempt the District from the requirement to adopt a taxicab meter system.

20.     On October 17, 2007, pursuant to the explicit authority providing for mayoral opt-out, then-Mayor Adrian Fenty elected not to opt out of establishing a metered system and issued Mayor's Order No. 2007-231 "to immediately implement the new time and meter distance system." The Mayor's order delegated all implementation authority to then-DCTC Chairman Leon Swain, who issued rules implementing the meter system, including a taxicab rate structure, as well as other rules not related to the implementation of the meter system.

21.     The Levin provision did not explicitly state whether the Commission, the D.C. City Council, or the Mayor had the authority to impose a time-and-distance meter system. The District of Columbia Superior Court ruled that Mayor Fenty possessed the authority to implement the metered system under the Levin provision. *D.C. Prof'l Taxicab Drivers Assoc. v. Swain*, 2008 CA 001993 B, slip op. at 23 (D.C. Super. Ct. Apr. 21, 2008).

22.     In setting forth mayoral implementation authority under the Levin provision, the Court also noted that "the DCTC Establishment Act explicitly vests exclusive jurisdiction over taxicabs in the Commission" and that the Levin provision "d[id] not purport to amend the DCTC Establishment Act." *D.C. Prof'l Taxicab Drivers Assoc. v. Swain*, 2008 CA 001993 B, slip op. at 15-16, 21 (D.C. Super. Ct. Apr. 21, 2008).

6

23.     The Court also noted that the mayoral implementation authority was not exclusive and that the Levin provision would allow the Commission to adopt a meter system itself if it chose to do so. *D.C. Prof'l Taxicab Drivers Assoc. v. Swain*, 2008 CA 001993 B, slip op. at 21 (D.C. Super. Ct. Apr. 21, 2008). Implementation of the system of time-and-distance meters in D.C. taxicabs was complete by June 2008. At the direction of the Fenty Administration, the Commission began installing time-and-distance meters into D.C. taxicabs in early 2008 and then-DCTC Chairman Swain promulgated new taxicab regulations specific to time-and-distance meters, including a fare schedule, prior to the DCTC Full Commission Meeting on November 14, 2007. Installation of meters was complete by June 1, 2008.

## B. **Mayoral Control of Taxicab Industry**

24.     The current rate structure for taxicab fares was established by then-Taxicab Commission Chairman Leon Swain in 2008 pursuant to Mayor's Order 2007-231, issued October 17, 2007 by former Mayor Fenty, upon implementation of a metered taxicab system for Washington, D.C. Under this arbitrary fare structure, drivers receive $3.00 for the first sixth of a mile and $0.25 for every sixth of a mile afterward or $1.50 per mile, with a maximum fare of $19 for rides within the District. With the exception of a wholly inadequate gasoline surcharge added March 25, 2011, and extended on July 26, 2011 through November 17, 2011, this fare structure has not changed since its implementation. Taxicab fares under this rate structure are significantly lower than surrounding jurisdictions in Virginia and Maryland, lower than the inter-jurisdictional rates set by the Washington Metropolitan Area Transit Commission ("WMATC"), and are among the lowest of major U.S. cities.

25.     Despite the limited scope of this Court's ruling in *D.C. Prof'l Taxicab Drivers Assoc. v. Swain*, 2008 CA 001993 B (D.C. Super. Ct. Apr. 21, 2008), Mayor Fenty claimed

7

unilateral authority to regulate the taxicab industry through the end of his term, more than two-and-a-half years after the implementation of the meter system. *See* Mayoral Review of Bill 18-443 (Oct. 20, 2009). His continued use of unilateral authority to regulate the District's taxicab industry contravened actions of both the Commission and the City Council and exacerbated the problems currently facing taxicab owners and operators.

26.     On June 15, 2009, Mayor Fenty issued an executive order purporting to return control over taxicab rates to the Commission, but limited the Commission's power to act without his consent. Specifically the order states, among other things, that the DCTC may not:  (1) implement more than one rate increase per year; (2) implement any single increase of more than 5% without the Mayor's approval; or (3) establish any additional charge beyond the fare rate without Mayoral approval. *See* Mayor's Order 2009-104 (Jun. 15, 2009).

27.     In 2009, the D.C. City Council passed, and Mayor Fenty signed, the Fiscal Year 2010 Budget Support Second Emergency Act of 2009 into law, which purported to remove the $19 maximum fare cap, among other things.

28.     Relying on an opinion of then-Attorney General Peter Nickels that the Levin provision overrode the D.C. City Council's ability to regulate the District's taxicab industry, Mayor Fenty issued a signing statement refusing to enforce the bill's provision lifting the $19 maximum fare. *See* Comments of Attorney General Peter J. Nickels on Enrolled Bill 18-443, in Mayoral Review of Bill 18-443 (Oct. 20, 2009) (claiming that the DCTC Establishment Act does "not apply to the taximeter system, which the Mayor was authorized by Congress to establish and implement").

29.     As of filing, the $19 maximum fare cap remains in force. In the face of arbitrarily low fares, the $19 cap thereby forces drivers to work for free.

30.     On July 11, 2011, Mayor Gray issued Mayor's Order 2011-116, which partially repealed Mayor's Order 2009-104 (Jun. 15, 2009).  Rather than returning rate-setting authority to the DCTC, however, he unlawfully delegated all rate-setting authority to Defendant Linton alone.

31.     In preventing the Commission from carrying out its statutory authority, Mayor Gray has continued the Fenty Administration's high-handed and unfair approach to regulating the District's taxicab industry.  Mayor Gray has declined to repeal Mayor's Order 2007-231 (Oct. 17, 2007) and only partially repealed Mayor's Order 2009-104 (Jun. 15, 2009), which limited the regulatory authority of the Commission.  Nor has Mayor Gray repealed the authority claimed in Mayoral Review of Bill 18-443 (Oct. 20, 2009).

32.     Mayor Gray, in fact, has relied on the unilateral authority claimed by Mayor Fenty in issuing Mayor's Order 2011-64 (Mar. 25, 2011).  Rather than clarify the Commission's existing authority to issue a gas surcharge pursuant to the D.C. Code, Mayor Gray issued a gas surcharge through mayoral order, delegating authority for the gas surcharge to then-DCTC Chairman Leon Swain.  That gas surcharge was extended through November 17, 2011 on July 26, 2011.  In impliedly relying on Mayor Fenty's orders and opinions limiting the authority of the DCTC, Mayor Gray created limited exceptions to the Fenty orders rather than revoking them entirely.

33.     Previously, in a March 17, 2011 DCTC meeting, Swain sought feedback on a fuel surcharge from those in attendance, including District taxicab drivers and members of the general public.  At the meeting, Swain announced that the Commission would request that Mayor Gray issue a gas surcharge of $1.50.

34.     Although Mayor's Order 2011-64 purported to delegate Swain the authority to issue a gas surcharge, upon information and belief, Mayor Gray rejected the Commission's

9

recommendation of a $1.50 gas surcharge, instead directing Swain to issue a gas surcharge of $1.00.

**C. Failure to Conduct Rate Studies and Adjust Rates**

35.    D.C. Code § 50-317 (2010) requires the Commission to undertake a taxicab fare study every twenty-four months.  The Commission failed to complete such a study between June 2007 and late 2010.

36.    The last rate study conducted for the Commission by an independent consultant, George Washington University, began on October 1, 2005 and was presented on June 1, 2007 ("GWU Study").

37.    The GWU Study had significant methodology problems and self-reported data-collection problems.

38.    In April 2009, then-DCTC Chairperson Swain promised to seek an expedited rate study within 45 days.  No such study occurred because, as then-Chairperson Swain stated, the Office of the Attorney General ordered the Commission to cease and desist from completing its 2009 rate study.

39.    The Commission did present a rate study in late 2010, but that study largely recycled the flawed data from the three-year-old GWU Study.

40.    Upon information and belief, the Commission sent Mayor Gray a recommendation for a fare increase in January 2011 based on the flawed 2010 rate study.  As of filing, Mayor Gray has not acted on the recommendation and the Commission (which remains illegal in its composition because it lacks any representatives of the taxicab industry) has failed to conduct the legally required rate study to formulate an updated recommendation.  The Commission has refused to make public this recommendation.

41.     Nor has Mayor Gray returned rate-setting authority to the DCTC, instead arbitrarily delegating sole authority over rates to Defendant Linton.  Mayor's Order 2011-116 (July 11, 2011).

42.     Several DCTC commissioners, as well as DCTC General Counsel Reed (who previously served as Interim Chairperson of the Commission), have claimed that the Commission cannot act on its own recommendation or otherwise implement a rate increase without Mayor Gray's approval.  Reed and various commissioners have noted that they believe that the DCTC cannot act until Mayor Gray repeals Mayor Fenty's orders, which prevent the Commission from directly issuing a new taxicab fare schedule.

43.     These actions have prevented the Commission from issuing a rate adjustment bringing the District's taxicab rate schedule in line with surrounding localities and other major U.S. cities.

### D.  Misuse of Drivers' Assessment Fund

44.     The DCTC Establishment Act established a fiduciary drivers' assessment fund. The law states that "[t]he Fund shall be used to pay the costs of the Commission, including the costs of operating and administering programs, investigations, proceedings, and inspections, and any costs including any costs for improving the District's taxicab fleet."  D.C. Code § 50-320(b) (2010).

45.     When completing prior rate studies, the Commission has traditionally sought independent expert analysts to study taxi-rates and make recommendations.  These experts have been, as the law requires, paid out of the assessment fund.

46.     Since 2007, the Commission has not completed a proper rate study by an independent consultant.

11

47.     The Commission declined to hire an independent analyst for the 2010 rate study,

instead relying on a governmental agency – the District Department of Transportation ("DDOT").

48.     A November 2010 assessment by the D.C. Auditor found irregularities and

mismanagement of the drivers' assessment fund.  D.C. Auditor, Review of the D.C. Taxicab

Commission's Assessment/Commission Fund for Fiscal Years 2005 Through 2009 (Nov. 10,

2010) ("D.C. Auditor's Report").  The D.C. Auditor's Report concluded that the DCTC failed to

manage and maintain public records effectively and efficiently, including records relating to the

drivers' assessment fund, and failed to maintain an effective system of public records related to

licensed owners and operators of taxicabs and taxicab companies, associations, and fleets.  D.C.

Auditor's Report, at 13.

49.     The D.C. Auditor's Report cited the Commission for repeatedly ignoring D.C.

law by failing to submit annual reports to the City Council concerning the status of the

assessment fund for fiscal years 2005 through 2009 (including accounting for fund collections

into and disbursements).  *Id.*

50.     The D.C. Auditor's Report further noted that, despite the presence of significant

irregularities in record-keeping and management of the assessment fund, including spending

repeatedly outpacing collections between fiscal years 2005 and 2009, "[a]s of September 30,

2009, the balance in the Fund totaled $255,917."  *Id.*

51.     Upon information and belief, a proper rate study conducted by an independent

contractor can be completed for substantially less than $255,917.  Yet Defendants improperly

have failed and refused to allow the use of assessment funds for the completion of the required

rate study.

**E.  The Dysfunctional D.C. Taxicab Commission**

12

52.    The problems facing the District's taxicab drivers are further exacerbated by an improperly-constituted Commission, which has acted and continues to act in an arbitrary and unlawful manner.

53.    The Commission is tasked with "promot[ing] and maintain[ing] a healthy and viable taxicab industry" and "maintain[ing] a taxicab transportation system which provides owners and operators of taxicabs with reasonable and just compensation for their services." D.C. Code § 50-302 (2010).

54.    Under the DCTC Establishment Act, the rate structure implemented in the District must "balance equitably the interest of owners and operators of taxicabs, the taxicab companies and associations, and dispatch services in procuring a maximum rate of return on investment and labor against the public interest in maintaining a taxicab system affordable to a broad cross section of the public." D.C. Code § 50-317(b) (2010).

55.    Since the implementation of the taxicab meter system, the DCTC and its panels have not held regular meetings.  The Commission held no meetings whatsoever between May 2009 and January 2010.

56.    The Commission's two main panels, the Panel on Rates & Rules and the Panel on Consumer & Industry Concerns, have not held meetings since the implementation of the meter system.  Instead, the Commission has held joint "Combined Panel" meetings that are indistinguishable from full-DCTC meetings.

57.    These meetings have featured well-documented actions by the Commission that exceed the scope of the law and its authority, including attempts to deny recording of the public meetings and arrests of reporters covering meetings.

**F.   Lack of Industry Representation on D.C. Taxicab Commission**

13

58.     The DCTC Establishment Act requires that the Commission have three "industry representatives" with, "experience in taxicab industry operations in the District." D.C. Code § 50-305(a) (2010).  D.C. Code § 50-303(12) (2010) defines the taxicab industry as those individuals "directly involved in the provision of taxicab services in the district."

59.     The Commission currently consists of Defendant Linton and Commissioners Ralph Burns, Paul Cohn, Bart Lasner and Inder Pahwa.

60.     Of the three Commissioners identified as industry members on the DCTC website – Cohn, Lasner, and Pahwa – none are currently involved in the provision of taxicab services in the District.  Paul Cohn is a restaurateur.  Bart Lasner is a hotel executive.  Inder Pahwa is a civil engineer who has admitted in a DCTC meeting that he does not consider himself a representative of the taxicab industry.  Accordingly, there are no qualified representatives of the taxicab industry on the DCTC.

61.     The lack of industry representation on the Commission invalidates recent rulemaking actions taken by the DCTC.

62.     The DCTC Establishment Act requires the Panel on Rates & Rules to establish regulations governing taxicab licensing and services.  D.C. Code § 50-307(b)(1) (2010).

63.     On May 3, 2011, the Commission published proposed amendments to Chapter 6 (Taxicab Parts and Equipment) and Chapter 8 (Operation of Taxicabs) of Title 31 (Taxicabs and Public Vehicles for Hire) of the DCMR.  On May 11, 2011, the Commission held a public meeting to receive comments on the proposed amendments to Chapters 6 and 8.

64.     On June 1, 2011, the Commission published proposed amendments to Chapters 5 (Taxicab Companies, Associations and Fleets) and 9 (Taxicab Insurance) of Title 31 of the

14

DCMR.  On June 22, 2011, the Commission held a second public meeting to receive comments on the amendments to Chapters 5 and 9.

65.     Soon after it began, the June 22, 2011 meeting ended in disarray after the Acting Commissioner permitted the arrests of two members of the press for recording or photographing the meeting.  This event highlights the arbitrary and high-handed way the Commission has acted, seeking to quell dissent or input from stakeholders, rather than encouraging their input as required by law.

66.     On August 12, 2011, the Commission published updated proposed amendments to the Chapters 6 and 8.  No public meeting has been held to discuss those proposed amendments in their current form.

67.     The proposed regulations include a number of changes that threaten the livelihood and working conditions of D.C. taxicab drivers, including those represented by Plaintiffs.

68.     The absence of any industry members on the Commission negatively impacted the proposed regulations.  Legally-required input from qualified industry representatives would have given the District's taxicab drivers a voice in the process and identified particularly problematic regulations.  Absent the appointment of industry members to the Commission, a properly-constituted Panel on Rates & Rules will be unavailable to establish final regulations.

69.     Plaintiffs Dominion of Cab Drivers and D.C. Professional Taxicab Drivers Association objected to each set of proposed regulations and submitted written comments to the DCTC on May 31, 2011, June 27, 2011, and August 25, 2011.  Despite these objections, the DCTC has scheduled a final vote on the proposed amendments to Chapters 6 and 8 on September 21, 2011.

**G. Ineligible Commissioner Serving on the D.C. Taxicab Commission**

70.     D.C. Code § 50-305(c)(1) (2010) limits commissioners to two consecutive terms.

71.     Commissioner Pahwa is currently serving his third consecutive term in violation of the DCTC Establishment Act.  Upon information and belief, Pahwa completed two full terms on the Commission after being nominated and confirmed for terms in 2001 and 2005.  He was confirmed for a third consecutive term on the Commission on June 29, 2010.

## H. Driver Independence and Licensing Issues

72.     The District's taxicab drivers are independent operators, many of whom choose to associate with various companies and fleets.  As independent operators, the District's drivers have traditionally been able to have their own name on the door of their taxicabs, or associate with the company of their choice, either through leasing a vehicle from the company or affiliating their owner-operated vehicles.

73.     In recent years, the DCTC has taken steps to vanquish independent ownership of taxicabs in the District through unlegislated changes in its licensing policies, contrary to the purposes of the D.C. Taxicab Establishment Act.  *See* D.C. Code § 50-302(b)(1)(C).

74.     Under D.C. Code § 47-2829 (2010) and DMCR 814.1, drivers are required to possess a DCTC license, which functions as a vehicle identification license and a business license.

75.     For many years, each of the District's taxicab drivers was issued a hard copy DCTC license.  This hard copy license included a driver-specific permanent license registration number that drivers carried with them year-to-year, vehicle-to-vehicle, and served as proof of ownership for their independent businesses.

76.     Upon information and belief, the DCTC converted the hard-copy DCTC license to a registration number within the last decade.  The conversion was made without any formal

16

rulemaking or public explanation.  Following the conversion, drivers' registration numbers were subject to change each renewal period, meaning that the drivers no longer possessed continuing, individual registration numbers.  Despite the elimination of the continuing registration number, drivers are generally able to transfer registration numbers to new vehicles, as new vehicles replace old.

77.     The elimination of the hard copy DCTC license and the continuing registration number, however, has imperiled drivers' ability to own and operate their taxicabs as independent businessmen, specifically when coupled with limitations on the issuance and transferability of registration numbers.

78.     On November 23, 2010, then-DCTC Chairman Leon Swain issued moratoriums halting the issuance of a) new taxicab registration numbers to individual drivers, and b) new licenses to operators of taxicab companies, associations, or fleets.  The moratoriums, if not extended, are to remain in place until September 30, 2011.

79.     The amendments to Title 31 of the DCMR proposed by the DCTC in mid-2011 would forbid the transfer of the registration number from one taxicab to another and would prohibit the reissuance of numbers revoked by the DCTC or voluntarily surrendered by drivers. These proposed regulations, combined with the current moratorium against issuing new taxicab vehicle numbers, would prevent drivers from transferring their registration numbers to change vehicles, including newly-purchased vehicles.

**I.   Residency Requirements**

80.     In 2007 and 2008, the D.C. City Council passed the Non-Resident Taxi Drivers Registration Temporary Amendment Act of 2007 and the Non-Resident Taxi Drivers Registration Amendment Act of 2008 ("Non-Resident Acts"), which provided for the continued

17

licensing of licensed non-resident taxicab owners and operators who resided outside the District on March 1, 2006. D.C. Code § 50-1501.02 (2010).

81.     The Non-Resident Acts establish a strict residency requirement for the issuance of vehicle registrations to taxicab owners and operators within the District. Under the Non-Resident Acts, previously unlicensed non-resident taxicab drivers are unable to obtain a vehicle registration required to operate within the District. D.C. Code § 50-1501.02(c)(5)(B)(ii), (iv) (2010). Similarly, former District residents previously operating their taxicabs under District vehicle registrations, but who have moved outside the District after March 1, 2006, are not eligible to renew their vehicle registrations. D.C. Code § 50-1501.02(c)(5)(B)(iii) (2010).

82.     Citizens of the United States possess a constitutional right to travel freely between the states. U.S. Const., Amds. V, XIV.

83.     Additionally, the commerce clause of the U.S. Constitution prohibits state or municipal laws whose object is local economic protectionism. U.S. Const. Art. I, Sec. 8, Cl. 3.

84.     Under certain conditions, states and municipalities may impose reasonable residency requirements on government employees without violating U.S. Const. Art. I, Sec. 8, Cl. 3 or U.S. Const., Amds. V, XIV. District taxicab owners and operators are not government employees.

85.     The Non-Resident Acts violate non-residents' constitutional right to travel and the commerce clause of the U.S. Constitution.

**J. Hack Inspector Abuses**

86.     The District's hack inspectors, the public safety officials charged with inspecting taxicabs and enforcing taxicabs regulations, have committed numerous systematic abuses against

the District's taxicab drivers, including racial profiling, unlawful searches, and improper ticketing.

87.     Although hack inspectors used to be police officers in the District's Metropolitan Police Department ("MPD"), they were spun off into a separate agency several years ago and are no longer part of the MPD.  Currently hack inspectors need no police training and Plaintiffs believe that their de-professionalization has fostered a climate of abuse.

88.     Upon information and belief, hack inspectors are only required to complete a sixty (60) hour "Hack License Training Course" offered by the University of the District of Columbia and pass an examination administered by the Commission.  Hack inspectors may complete their licensing requirements in as little as nine days or, if they choose to take classes only on Saturdays, as long as seven weeks.

89.     The Fourth Amendment of the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  *See* U.S. Const., Amd. IV.

90.     Upon information and belief, in recent months, officials with the Commission have instructed hack inspectors and law enforcement officers that they may pull over and inspect taxicabs without probable cause or reasonable suspicion of wrongdoing.  Hack inspectors have increasingly utilized this power to stop and conduct improper searches and inspections in the absence of probable cause or reasonable suspicion of wrongdoing, harassing taxicab drivers in violation of their constitutional rights.  Recently, the Commission has sought to formalize this practice through proposed changes to Chapter 6 of Title 31 of the DCMR,  *See Proposed Regulations of the D.C. Taxicab Commission Regarding DCMR Title 31 Chapters 6*, 58-32 D.C. Reg. 7170-71, 7177 (Aug. 12, 2011) (specifically §§ 600.4 & 608.2).

19

91.     The Commission's practice of encouraging or permitting hack inspectors and law enforcement officers to pull over and inspect taxicabs without probable cause or reasonable suspicion of wrongdoing is in violation of the Fourth Amendment rights of taxicab drivers. *See* U.S. Const., Amd. IV.

## V.  STATEMENT OF CLAIMS

### COUNT ONE

(Continuing Mayoral Control Over the District's Taxicab Industry Violates the D.C. Taxicab Commission Establishment Act)

92.     The allegations of Paragraphs 1-91 of this Complaint are by reference incorporated herein as allegations of this Count.

93.     D.C. Code § 50-304 (2010), establishes the D.C. Taxicab Commission and vests in it, "exclusive authority for intrastate regulation of the taxicab industry as provided herein."

94.     Contravening the DCTC Establishment Act, Mayor Fenty asserted unilateral authority to regulate the District's taxicab industry indefinitely.  Upon taking office, Mayor Gray has continued to assert unilateral authority over the industry, even though more than three years have passed since implementation of the meter system.  These actions have prevented the Commission from carrying out its responsibilities to regulate the industry under the DCTC Establishment Act.

95.     The DCTC has failed to carry out its statutory duties under the DCTC Establishment Act, ceding near-complete authority to Mayor Gray (and before him, Mayor Fenty) to regulate the industry.

96.     The Mayor's assertion of unilateral authority is in violation of the DCTC Establishment Act, exceeding the limited authority provided under the Levin provision to implement a meter system, consistent with prior rulings of this Court.

97.     Mayor's Order 2007-231 (Oct. 17, 2007), Mayor's Order 2009-104 (Jun. 15, 2009), Mayor's Order 2011-116 (July 11, 2011), and Mayoral Review of Bill 18-443 (Oct. 20, 2009) continue to prevent the Commission from implementing rate adjustments that would establish parity between the District and rates in surrounding jurisdictions and comparable metropolitan areas.  Instead, the Commission has issued non-binding rate recommendations to Mayor Gray, and before him Mayor Fenty, claiming to lack authority to implement rate adjustments itself under this mayoral authority.

98.     After announcing that the Commission would conduct a rate study in April 2009, then-Chairman Swain halted the study because then-Attorney General Nickels ordered the DCTC to cease and desist from completing its 2009 rate study, in violation of D.C. Code § 50-317 (2010).  The Commission did not conduct a rate study at that time.

99.     Plaintiffs are entitled to injunctive relief, pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*, vacating Mayor's Order 2007-231 (Oct. 17, 2007), Mayor's Order 2009-104 (Jun. 15, 2009), Mayor's Order 2011-116 (July 11, 2011), and Mayoral Review of Bill 18-443 (Oct. 20, 2009).

## COUNT II

(The DCTC's Lack of Industry Representation Violates the D.C. Taxicab Commission Establishment Act)

100.     The allegations of Paragraphs 1-99 of this Complaint are by reference incorporated herein as allegations of this Count.

101.     Under the DCTC Establishment Act, the Commission is required to have three industry representatives with "experience in taxicab industry operations in the District."  D.C. Code § 50-305(a) (2010).

102. D.C. Code § 50-303(12) (2010) defines the taxicab industry to include those who are *"directly involved* in the provision of taxicab services in the district." (emphasis added).

103. None of the current DCTC commissioners are directly involved in the provision of taxicab services in the District – there are no qualified representatives of the taxicab industry on the Commission. Absent industry representation, acts of the Commission and the Panel on Rates & Rules are invalid.

104. According to the DCTC website, the Commission's designated industry representatives are Commissioners Cohn, Lasner, and Pahwa.

105. Commissioner Cohn is a restaurateur.

106. Commissioner Lasner is a hotel executive.

107. Commissioner Pahwa is civil engineer.

108. Commissioners Cohn, Lasner, and Pahwa have no direct connection to the District's taxicab industry aside from their service on the DCTC.

109. None of the aforementioned commissioners, nor any others, are directly involved in the provision of taxicab services within the District, in violation of the requirements set forth in the DCTC Establishment Act. *See* D.C. Code §§ 50-301(7), 50-303(12), 50-305(a) (2010).

110. Plaintiffs are entitled to injunctive relief, pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*, requiring Mayor Gray to appoint qualified industry members to three of the four existing vacancies on the Commission.

<u>COUNT III</u>

(The Service of an Ineligible Commissioner on the DCTC Violates the D.C. Taxicab Commission Establishment Act)

111. The allegations of Paragraphs 1-110 of this Complaint are by reference incorporated herein as allegations of this Count.

22

112.    Commissioner Pahwa continues to serve as a Commissioner despite being ineligible to serve on the DCTC because of term limits established by the DCTC Establishment Act.

113.    D.C. Code § 50-305(c)(1) (2010), states that "[n]o member shall serve more than 2 consecutive terms."

114.    Upon information and belief, Commissioner Pahwa was nominated for full terms in 2001 and 2005 before being confirmed for a third consecutive term on June 29, 2010.

115.    Plaintiffs are entitled to injunctive relief removing Pahwa from the Commission.

## COUNT IV

(The DCTC Has Failed to Conduct a Proper Rate Study in Violation of the D.C. Taxicab Commission Establishment Act)

116.    The allegations of Paragraphs 1-115 of this Complaint are by reference incorporated herein as allegations of this Count.

117.    D.C. Code § 50-317 (2010), requires the DCTC Panel on Rules & Rates to "undertake a review of the taxicab rate structure" every 24 months.

118.    The Commission has not coordinated a rate study by an outside analyst since the issuance of the GWU Study, which was presented on June 1, 2007.  The GWU study had significant methodology problems and self-reported data-collection problems.

119.    In April 2009, then-DCTC Chairperson Swain promised to seek an expedited rate study within 45 days.  No such study occurred because, as then-Chairperson Swain stated, the Office of the Attorney General ordered the Commission to cease and desist from completing its 2009 rate study.  Transcript of April 14, 2010 DCTC Combined Panel Meeting, at 25.

120.     The Commission did present an analysis of rates in late 2010, but that study was improper and flawed, relying primarily on three-year-old data from the GWU Study, and was conducted by DDOT rather than an independent analyst.

121.     Plaintiffs are entitled to injunctive relief, pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*, ordering the DCTC to carry out a rate study expeditiously. This rate study should be conducted by an independent consultant, based upon current and properly-collected data, and paid out of the drivers' assessment fund.

## COUNT V

(Defendants Have Failed to Set Rates That Are Reasonable, Fair and Just in Violation of the D.C. Taxicab Commission Establishment Act)

122.     The allegations of Paragraphs 1-121 of this Complaint are by reference incorporated herein as allegations of this Count.

123.     The Commission has a duty to "[e]stablish reasonable rates for taxicab service for the transportation of passengers and their property within the District, including all charges incidental and directly related to the provision of taxicab services." *See* D.C. Code § 50-307 (2010).

124.     The Commission has not adjusted taxicab fare rates since the current structure was established by then-Taxicab Commission Chairman Leon Swain in 2008, pursuant to Mayor's Order 2007-231, issued October 17, 2007 by former Mayor Adrian Fenty, upon implementation of a metered taxicab system for Washington D.C.

125.     Under this arbitrary fare structure, taxicab drivers receive $3.00 for the first sixth of a mile and $0.25 for every sixth of a mile afterward or $1.50 per mile, with a maximum fare of $19 for rides within the District.

126.   Despite repeated recognition by a majority of the Commission that the current rate schedule should be raised, it has not changed with the exception of a $1.00 fuel surcharge added March 25, 2011 and extended on July 26, 2011 through November 17, 2011.

127.   In the three years since the current rate schedule was established, drivers have seen their incomes fall by as much as 30%.

128.   Due to the Commission's ongoing failure to carry out its rate-setting responsibilities, rates for taxicab services are not reasonable and have not been reasonable for the past several years.  The rates violate District of Columbia law and the District's drivers have found it increasingly difficult to operate as independent owner-operators, in contravention of the purposes of the D.C. Taxicab Establishment Act.

129.   Plaintiffs are entitled to injunctive relief, pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*, ordering the DCTC perform its duties and set reasonable taxicab rates providing drivers "reasonable and just compensation for their services," as prescribed in D.C. Code § 50-302 (2010).

130.   Plaintiffs are also entitled to injunctive relief, pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*, ordering implementation an interim rate adjustment consistent with the WMATC taxicab fare rates during the pendency of the rate study. This interim relief is appropriate given Defendants' failure to comply with D.C. Code § 50-307 (2010) by failing to conduct proper rate studies and adjust taxicab rates accordingly since 2007.

<u>COUNT VI</u>

(Defendants Have Misappropriated Funds Obtained from Taxicab Drivers for the Drivers'
Assessment Fund in Violation of the D.C. Taxicab Commission Establishment Act)

131.   The allegations of Paragraphs 1-130 of this Complaint are by reference incorporated herein as allegations of this Count.

25

132.    The DCTC Establishment Act and governing regulations provide for the drivers' assessment fund to be used to pay for the costs of the Commission, including the costs of a conducting fair and independent rate studies. *See* D.C. Code § 50-320(b) (2010).

133.    The D.C. Auditor has cited Defendant DCTC for significant irregularities in record-keeping and management of the drivers' assessment fund, noting the Commissions' failure to manage and maintain public records effectively and efficiently and to submit annual reports to the City Council concerning the status of the assessment fund for fiscal years 2005 through 2009. D.C. Auditor's Report, at 13.

134.    Despite these irregularities, and despite spending outpacing collections between fiscal year 2005 and 2009, the D.C. Auditor concluded that over $250,000 remained in the assessment fund as of September 30, 2009. *Id.*

135.    In misappropriating and otherwise redirecting moneys from the drivers' assessment fund, Defendants are in violation of D.C. Code § 50-320(b) (2010).

136.    Plaintiffs are entitled to injunctive relief, pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*, ordering Defendants to restore all moneys misappropriated or otherwise directed to other budgetary priorities.

<u>COUNT VII</u>

(The DCTC Improperly Issued Regulations and Published Proposed Regulations)

137.    The allegations of Paragraphs 1-136 of this Complaint are by reference incorporated herein as allegations of this Count.

138.    During his time as DCTC Chairman, Leon Swain unilaterally issued a series of amendments to Title 31, purportedly pursuant to  Mayor's Order No. 2007-231 (October 17, 2007), which granted him authority to implement meter system.

26

139.    Several of these amendments exceeded the grant of authority in Mayor's Order No. 2007-231, as explained in *D.C. Prof'l Taxicab Drivers Assoc. v. Swain*, 2008 CA 001993 B (D.C. Super. Ct. Apr. 21, 2008).  These regulations did not relate to the meter system and/or were enacted after the implementation of the meter system was complete.

140.    These amendments departed from the standard notice-and-comment rulemaking process set forth in the D.C. Administrative Procedures Act, D.C. Code § 2-505 (2010).

141.    Plaintiffs are entitled to injunctive relief, pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*, vacating all amendments to Title 31 pursuant to Mayor's Order 2007-231 (Oct. 17, 2007), that are not connected to the implementation of the meter system.

## COUNT VIII

(The DCTC Improperly Eliminated Hard-Copy DCTC Licenses, Imposed Restrictions on DCTC License Issuance and Transferability)

142.    The allegations of Paragraphs 1-141 of this Complaint are by reference incorporated herein as allegations of this Count.

143.    An explicit purpose of the D.C. Taxicab Establishment Act is to "assure access to the ownership of taxicabs by taxicab operators."  *See* D.C. Code § 50-302(b)(1)(C).

144.    D.C. Code § 47-2829 (2010) and DMCR 814.1 require District taxicab drivers to possess a DCTC license.  For many years, the DCTC license was issued in hard copy form and carried a permanent, transferrable license registration number.

145.    The DCTC converted the hard-copy DCTC license to a registration number within the last decade.  Following the conversion, drivers' registration numbers were subject to change each renewal period, meaning that the drivers no longer possessed continuing, individual registration numbers.

146.   On November 23, 2010, then-DCTC Chairman Leon Swain issued moratoriums halting the issuance of a) new taxicab registration numbers to individual drivers, and b) new licenses to operators of taxicab companies, associations, or fleets.  The moratoriums are to remain in place until September 30, 2011.

147.   The elimination of the hard copy DCTC license and the continuing registration number has imperiled drivers' ability to own and operate their taxicabs as independent businessmen, specifically when coupled with limitations on the issuance and transferability of registration numbers.

148.   Plaintiffs are entitled to injunctive relief, pursuant to D.C. Code § 50-302(b)(1)(C) (2010) and D.C. Code § 47-2829 (2010), ordering Defendants to reinstitute the issuance of hard copy DCTC licenses and removing undue restrictions on the issuance and transferability of DCTC license registration numbers.

## COUNT IX

(The District's Residency Requirements Violate the Right to Travel and the Commerce Clause of the U.S. Constitution)

149.   The allegations of Paragraphs 1-148 of this Complaint are by reference incorporated herein as allegations of this Count.

150.   The Non-Resident Acts establish a strict residency requirement for the issuance of vehicle registrations to taxicab owners and operators within the District, barring non-residents from obtaining vehicle registrations to own and operate taxicabs within the District, including all former residents who moved out of the District after March 1, 2006.

151.   The Non-Resident Acts violate the commerce clause of the U.S. Constitution and non-residents' constitutional right to travel.  *See* U.S. Const., Art. I, Sec. 8, Cl. 3; Amds. V, XIV.

152.     Plaintiffs are entitled to injunctive relief invalidating D.C. Code § 50-1501.02(c)(5)(B)(ii)-(iv) (2010) and all other improper residency requirements imposed against non-resident taxicab owners and operators.

## COUNT X

(The Commission's Policy of Encouraging Unlawful Traffic Stops and Inspections by Hack Inspectors and Law Enforcement Officers Violates Drivers' Constitutional Rights)

153.     The allegations of paragraphs 1-152 of this Complaint are by reference incorporated herein as allegations of this Count.

154.     The Fourth Amendment to the U.S. Constitution provides for "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." *See* U.S. Const. Amd. IV.  This right extends to the vehicles of individuals and requires some level of reasonable suspicion or probable cause to justify traffic stops of drivers. *See Delaware v. Prouse*, 440 U.S. 648 (1979) (stops solely to check a driver's license and registration are unconstitutional); *Terry v. Ohio*, 392 U.S. 1 (1968).

155.     The actions of the DCTC in promulgating and promoting a policy encouraging traffic stops and inspections without probable cause or reasonable suspicion of wrongdoing, indeed "for any reason," violate this constitutional right.  *See Proposed Regulations of the D.C. Taxicab Commission Regarding DCMR Title 31 Chapters 6*, 58-32 D.C. Reg. 7177 (Aug. 12, 2011) (specifically § 608.2).  And the actions of hack inspectors and other law enforcement officials adhering to the DCTC's advice, carrying out unlawful traffic stops and inspections of taxicab drivers, also violate this constitutional right.

156.     Plaintiffs therefore ask the court for injunctive relief barring the DCTC from promoting a policy encouraging traffic stops and inspections of taxicabs without probable cause or reasonable suspicion of wrongdoing.

## COUNT XI

### (Declaratory Judgment)

157.    The allegations of paragraphs 1-156 of this Complaint are by reference incorporated herein as allegations of this Count.

158.    Plaintiffs are entitled to a declaratory judgment, pursuant to D.C. Superior Court Rule of Civil Procedure 57.

159.    Plaintiffs ask the Court to declare that the Commission retains authority to regulate the District's taxicab industry including, but not limited to, the conduct of rate studies and the adjustment of fares, pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq*, and that all contrary mayoral or Commission orders, signing statements, or decrees are hereby invalid.

160.    Plaintiffs ask this Court to declare that the current taxicab rate schedule is unreasonable and violates the DCTC Establishment Act.  Plaintiffs ask this Court to further declare that the taxicab rate schedule has been unreasonable since 2008, in violation of the DCTC Establishment Act.

161.    Plaintiffs ask the Court to declare that, having already completed two consecutive terms as a commissioner, Commissioner Inder Pahwa is ineligible to continue to serve on the DCTC pursuant to the DCTC Establishment Act, D.C. Code § 50-305(c)(1) (2010).

162.    Plaintiffs ask the Court to declare that all moneys paid into the drivers' assessment fund are for the benefit of the District's taxicab drivers pursuant to the DCTC Establishment Act, and cannot be diverted to other purposes.  *See* D.C. Code § 50-320(b).

## VI. PRAYER FOR RELIEF

**Wherefore**, the Plaintiffs pray that this Court enter judgment against the Defendants Mayor Vincent Gray, Ron Linton, and the D.C. Taxicab Commission, order and award:

(1) Injunctive Relief:

    a.  Vacating Mayor's Order 2007-231 (Oct. 17, 2007), Mayor's Order 2009-104 (Jun. 15, 2009), Mayor's Order 2011-116 (July 11, 2011), and Mayoral Review of Bill 18-443 (Oct. 20, 2009);

    b.  Requiring Defendant Mayor Gray to appoint three qualified industry members to the four existing vacancies on the Commission;

    c.  Removing Commissioner Pahwa from the Commission;

    d.  Ordering the DCTC to carry out expeditiously a rate study conducted by an independent consultant, based upon current and properly-collected data, and paid out of the drivers' assessment fund;

    e.  Implementing an interim rate adjustment consistent with the WMATC taxicab fare rates during the pendency of the rate study;

    f.  Ordering the Commission to establish a reasonable rate schedule for taxicab services following, and based upon, the results of a properly-conducted rate study;

    g.  Vacating all amendments to Title 31 issued pursuant to Mayor's Order 2007-231 (Oct. 17, 2007), that are not connected to the implementation of the meter system;

    h.  Ordering Defendants to restore all moneys misappropriated or otherwise directed to other budgetary priorities;

    i.   Ordering Defendants to reinstitute the issuance of hard copy DCTC licenses and removing undue restrictions on the issuance and transferability of DCTC license registration numbers;

    j.   Invalidating D.C. Code § 50-1501.02(c)(5)(B)(ii)-(iv) (2010) and all other improper residency requirements imposed against non-resident taxicab owners and operators; and

    k.   Requiring the DCTC to abandon its policy of advising or directing the District's hack inspectors and law enforcement agencies to engage in traffic stops and inspections of taxicabs absent probable cause or reasonable suspicion of wrongdoing.

(2) A Declaratory Judgment:

    a.   Clarifying that the Mayor no longer possesses unilateral authority over the District's taxicab industry and that the Commission retains authority to regulate the industry pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*;

    b.   Declaring that the current taxicab rate schedule is unreasonable in violation of the DCTC Establishment Act and that the taxicab rate schedule has been unreasonable since 2008, in violation of the same.

    c.   Declaring that Commissioner Pahwa is ineligible to serve on the Commission;

    d.   Reiterating that all moneys paid into the drivers' assessment must be for the benefit of the District's taxicab drivers and not to be diverted to other purposes;

(3) Reasonable costs, expenses, and attorneys' fees; and

(4) An Order awarding any other relief as the Court deems just, equitable, and proper.

Dated:  September 19, 2011

Respectfully submitted,

Robert G. Lian, Jr. (#446313)
Akin, Gump, Strauss, Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Ave., NW
Washington, DC  20036-1564
Tel: (202) 887-4000
Fax: (202) 887-4288
E-mail: blian@akingump.com

*Counsel for Plaintiffs D.C. Professional Taxicab*
*Drivers Association and Dominion of Cab Drivers*

# Exhibit 2

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **D.C. PROFESSIONAL TAXICAB DRIVERS**<br>    **ASSOCIATION,**<br>**2417 Evarts Street, NE, Second Floor**<br>**Washington, D.C. 20018,**<br><br>    **and**<br><br>**DOMINION OF CAB DRIVERS**<br>**P.O. Box 15068**<br>**Washington, DC 20003,**<br><br>                        *Plaintiffs,*<br><br>    **v.**<br><br>**THE DISTRICT OF COLUMBIA**<br>**Mayor Vincent C. Gray**<br>**In His Official Capacity**<br>**1350 Pennsylvania Avenue, N.W.**<br>**Suite 316**<br>**Washington, DC 20004,**<br><br>**The Office of the Attorney General**<br>**For the District of Columbia**<br>**441 4th Street, N.W.**<br>**Washington, DC 20001,**<br><br>    **and**<br><br>**D.C. TAXICAB COMMISSION**<br>**Commissioner Ron Linton**<br>**In His Official Capacity**<br>**2041 Martin Luther King Jr. Avenue, S.E.**<br>**Suite 204**<br>**Washington, DC 20020**<br><br>                        *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **Civil Action No.**   __0007477-11__<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FIRST AMENDED COMPLAINT**

## I.  INTRODUCTION

1.      Taxicabs are an important pillar of the transportation infrastructure in the District of Columbia.  The overwhelming majority of Washington, D.C. taxicab drivers are independent small business owners who own and drive their own vehicles.  They are men and women – many of whom are minorities or immigrants – who have invested their own money to purchase and operate a taxicab and work extremely hard to provide clean, safe, reliable transportation around the District of Columbia.  The Mayor, the D.C. Taxicab Commission ("DCTC" or "Commission") – the D.C. government agency charged with regulating the taxicab industry – along with its chairperson, have abdicated their duties to ensure that drivers are treated fairly and consistent with the law.

2.      In particular, since the transition from a zone to a meter system in 2008, the Mayor has failed to appoint any proper representatives of the taxicab industry to the Commission as required by law.  The Mayor has refused to allow the Commission to function, usurping its authority to set rates properly and instead setting them at levels that are completely arbitrary, contrary to law, and deeply harmful to the men and women who operate taxicabs.  The Commission and its chairperson have acted in an arbitrary and unlawful manner in numerous respects, including failing to conduct a rate study that would show that taxicab rates in the District of Columbia are among the lowest of any comparable jurisdiction, failing to establish rates at levels that are fair and reasonable as required by law, conducting public meetings in an unlawful way designed to exclude input from drivers who are adversely affected by the current rate structure, and among other things, directing or allowing harassing and unlawful inspections of taxicab drivers that improperly interfere with drivers' ability to earn a livelihood.

2

3.      Even though a majority of the Commission has repeatedly acknowledged that the current rate schedule needs upward adjustment, the rate schedule has not changed since 2008.  In the three years since the current rate schedule was established – a time of rising prices and increasing cost-of-living expenses – drivers have seen their incomes fall by as much as 30%.

4.      In order to make ends meet, drivers are increasingly working longer hours – often as long as 12- to 16-hours per shift – for less pay.  The current rate structure is breaking families, forcing drivers to spend increased time away from their spouses and children, as well as putting hundreds of middle class families under increasing financial strain.

5.      The current arbitrary rate structure and the Commission's failure to act to ameliorate its effects have also had a significant negative impact on driver health.  Drivers working longer shifts are unable to eat properly or exercise and must sit for hours on end.  As a result, instances of potentially fatal conditions such as heart attacks, strokes, and diabetes are on the rise among drivers, as well as stress-related ailments.

6.      Plaintiffs have repeatedly petitioned the Commission and its chairperson, and the Mayor and his representatives, to show a measure of humanity for the plight of drivers and to conform their conduct to the law by allowing a properly-composed Commission to carry out its required mission.  But each has refused.  This Court is the drivers' last line of defense.

## II.  JURISDICTION AND VENUE

7.      The subject matter jurisdiction of this Court is invoked pursuant to the provisions of the D.C. Code § 11-921(a) (2010).  This Court has jurisdiction over all matters in equity.  *Id.*

8.      Personal jurisdiction is invoked pursuant to the provisions of D.C. Code § 13-423(a) (2010); all parties to the dispute are citizens of the District of Columbia or conduct

business entirely or primarily within the District of Columbia, and the actions giving rise to the suit occurred therein.

9.      Venue is proper in this court, as the relevant events took place in the District of Columbia.

### III. THE PARTIES

10.     This action is brought by the D.C. Professional Taxicab Drivers Association and the Dominion of Cab Drivers (collectively, "Plaintiffs") against the District of Columbia (the "District"), a municipal corporation that is authorized to sue and be sued; Mayor Vincent C. Gray, in his official capacity as Mayor of the District; the D.C. Taxicab Commission, the agency within the District that is responsible for regulating the taxicab industry; and Ron Linton ("Linton"), in his capacity as Chairman of the D.C. Taxicab Commission (collectively, "Defendants"). This dispute arises out of unlawful actions by Defendants, which began under the previous administration and have continued to the present.

11.     Plaintiff D.C. Professional Taxicab Drivers Association is an association of D.C. taxicab drivers incorporated under the laws of the District of Columbia.

12.     Plaintiff Dominion of Cab Drivers is an association of D.C. taxicab drivers incorporated under the laws of Virginia.

13.     Plaintiff Dominion of Cab Drivers represents approximately 380 taxicab drivers in the District of Columbia. Plaintiff D.C. Professional Taxicab Drivers Association of Cab Drivers represents approximately 250 D.C. taxicab drivers. The individual members of the Plaintiff associations, who are citizens of the District of Columbia or conduct business entirely or primarily within the District of Columbia, have individually suffered, and continue to suffer, from the various violations of law and harms described herein.

4

14.     Plaintiffs have standing to obtain relief on an associational basis because (1) the individual members of the Plaintiff associations would have standing to sue in their own right, (2) the interest Plaintiffs seek to protect is germane to the associations' purposes (representing the interests of D.C. taxicab drivers), and (3) neither the claims asserted nor the relief requested require the participation of individual members. *See Dupont Circle Citizens Assoc. v. Barry*, 455 A.2d 417, 421 n.18 (D.C. Ct. App. 1983).

15.     Defendant D.C. Taxicab Commission is the D.C. regulatory body charged with oversight and regulation of the taxicab industry.  When fully staffed, it consists of a chairperson and eight members, three of which must represent the taxicab industry.  The Commission regulates the District's taxicab industry through two panels – the Panel on Consumer & Industry Concerns and the Panel on Rates & Rules – and an administrative department tasked with licensing and enforcement.

## IV. FACTUAL ALLEGATIONS

### A. Background and Transition to Time-and-Distance Meters

16.     The D.C. Taxicab Commission Establishment Act of 1985 ("the DCTC Establishment Act") was passed "[t]o promote the public interest in taxicab transportation by insuring that all rules, regulations, and laws specifically relating to taxicabs be vigorously and fairly enforced; that discrimination in taxicab passenger service be strictly proscribed and penalized; and that adequate and high quality taxi passenger service be provided to all quadrants and neighborhoods of the District; . . . [and t]o maintain a taxicab transportation system which provides owners and operators of taxicabs with reasonable and just compensation for their services . . ." D.C. Code § 50-302 (2010).  Additionally, the Act aims to assure the meaningful

participation of minorities, healthy competition between companies and associations, and access to the ownership of taxicabs by taxicab operators. *Id.*

17.     The 2005 District of Columbia Omnibus Authorization Act included a short provision inserted by Sen. Carl Levin (D-MI) requiring "all taxicabs licensed in the District of Columbia to charge fares by a metered system" within one year of the date of passage. Pub. L. No. 109-356, Sec. 105, *codified at* D.C. Code § 50-381 (2010)). The Levin provision further provided that the Mayor could opt out of the transition to the metered system, and thus exempt the District from the requirement to adopt a taxicab meter system.

18.     On October 17, 2007, pursuant to the explicit authority providing for mayoral opt-out, then-Mayor Adrian Fenty elected not to opt out of establishing a metered system and issued Mayor's Order No. 2007-231 "to immediately implement the new time and meter distance system." The Mayor's order delegated all implementation authority to then-DCTC Chairman Leon Swain, who issued rules implementing the meter system, including a taxicab rate structure, as well as other rules not related to the implementation of the meter system.

19.     The Levin provision did not explicitly state whether the Commission, the D.C. City Council, or the Mayor had the authority to impose a time-and-distance meter system. The District of Columbia Superior Court ruled that Mayor Fenty possessed the authority to implement the metered system under the Levin provision. *D.C. Prof'l Taxicab Drivers Assoc. v. Swain*, 2008 CA 001993 B, slip op. at 23 (D.C. Super. Ct. Apr. 21, 2008).

20.     In setting forth mayoral implementation authority under the Levin provision, the Court also noted that "the DCTC Establishment Act explicitly vests exclusive jurisdiction over taxicabs in the Commission" and that the Levin provision "d[id] not purport to amend the DCTC

Establishment Act." *D.C. Prof'l Taxicab Drivers Assoc. v. Swain*, 2008 CA 001993 B, slip op. at 15-16, 21 (D.C. Super. Ct. Apr. 21, 2008).

21.     The Court also noted that the mayoral implementation authority was not exclusive and that the Levin provision would allow the Commission to adopt a meter system itself if it chose to do so. *D.C. Prof'l Taxicab Drivers Assoc. v. Swain*, 2008 CA 001993 B, slip op. at 21 (D.C. Super. Ct. Apr. 21, 2008). Implementation of the system of time-and-distance meters in D.C. taxicabs was complete by June 2008. At the direction of the Fenty Administration, the Commission began installing time-and-distance meters into D.C. taxicabs in early 2008 and then-DCTC Chairman Swain promulgated new taxicab regulations specific to time-and-distance meters, including a fare schedule, prior to the DCTC Full Commission Meeting on November 14, 2007. Installation of meters was complete by June 1, 2008.

**B. <u>Mayoral Control of Taxicab Industry</u>**

22.     The current rate structure for taxicab fares was established by then-Taxicab Commission Chairman Leon Swain in 2008 pursuant to Mayor's Order 2007-231, issued October 17, 2007 by former Mayor Fenty, upon implementation of a metered taxicab system for Washington, D.C. Under this arbitrary fare structure, drivers receive $3.00 for the first sixth of a mile and $0.25 for every sixth of a mile afterward or $1.50 per mile, with a maximum fare of $19 for rides within the District. With the exception of a wholly inadequate gasoline surcharge added March 25, 2011, and extended on July 26, 2011 through November 17, 2011, this fare structure has not changed since its implementation. Taxicab fares under this rate structure are significantly lower than surrounding jurisdictions in Virginia and Maryland, lower than the inter-jurisdictional rates set by the Washington Metropolitan Area Transit Commission ("WMATC"), and are among the lowest of major U.S. cities.

7

23.     Despite the limited scope of this Court's ruling in *D.C. Prof'l Taxicab Drivers Assoc. v. Swain*, 2008 CA 001993 B (D.C. Super. Ct. Apr. 21, 2008), Mayor Fenty claimed unilateral authority to regulate the taxicab industry through the end of his term, more than two-and-a-half years after the implementation of the meter system. *See* Mayoral Review of Bill 18-443 (Oct. 20, 2009).  His continued use of unilateral authority to regulate the District's taxicab industry contravened actions of both the Commission and the City Council and exacerbated the problems currently facing taxicab owners and operators.

24.     On June 15, 2009, Mayor Fenty issued an executive order purporting to return control over taxicab rates to the Commission, but limited the Commission's power to act without his consent.  Specifically the order states, among other things, that the DCTC may not:  (1) implement more than one rate increase per year; (2) implement any single increase of more than 5% without the Mayor's approval; or (3) establish any additional charge beyond the fare rate without Mayoral approval.  *See* Mayor's Order 2009-104 (Jun. 15, 2009).

25.     In 2009, the D.C. City Council passed, and Mayor Fenty signed, the Fiscal Year 2010 Budget Support Second Emergency Act of 2009 into law, which purported to remove the $19 maximum fare cap, among other things.

26.     Relying on an opinion of then-Attorney General Peter Nickels that the Levin provision overrode the D.C. City Council's ability to regulate the District's taxicab industry, Mayor Fenty issued a signing statement refusing to enforce the bill's provision lifting the $19 maximum fare.  *See* Comments of Attorney General Peter J. Nickels on Enrolled Bill 18-443, in Mayoral Review of Bill 18-443 (Oct. 20, 2009) (claiming that the DCTC Establishment Act does "not apply to the taximeter system, which the Mayor was authorized by Congress to establish and implement").

27.     As of filing, the $19 maximum fare cap remains in force.  In the face of arbitrarily low fares, the $19 cap thereby forces drivers to work for free.

28.     On July 11, 2011, Mayor Gray issued Mayor's Order 2011-116, which partially repealed Mayor's Order 2009-104 (Jun. 15, 2009).  Rather than returning rate-setting authority to the DCTC, however, he unlawfully delegated all rate-setting authority to Defendant Linton alone.

29.     In preventing the Commission from carrying out its statutory authority, Mayor Gray has continued the Fenty Administration's high-handed and unfair approach to regulating the District's taxicab industry.  Mayor Gray has declined to repeal Mayor's Order 2007-231 (Oct. 17, 2007) and only partially repealed Mayor's Order 2009-104 (Jun. 15, 2009), which limited the regulatory authority of the Commission.  Nor has Mayor Gray repealed the authority claimed in Mayoral Review of Bill 18-443 (Oct. 20, 2009).

30.     Mayor Gray, in fact, has relied on the unilateral authority claimed by Mayor Fenty in issuing Mayor's Order 2011-64 (Mar. 25, 2011).  Rather than clarify the Commission's existing authority to issue a gas surcharge pursuant to the D.C. Code, Mayor Gray issued a gas surcharge through mayoral order, delegating authority for the gas surcharge to then-DCTC Chairman Leon Swain.  That gas surcharge was extended through November 17, 2011 on July 26, 2011.  In impliedly relying on Mayor Fenty's orders and opinions limiting the authority of the DCTC, Mayor Gray created limited exceptions to the Fenty orders rather than revoking them entirely.

31.     Previously, in a March 17, 2011 DCTC meeting, Swain sought feedback on a fuel surcharge from those in attendance, including District taxicab drivers and members of the general public.  At the meeting, Swain announced that the Commission would request that Mayor Gray issue a gas surcharge of $1.50.

9

32.     Although Mayor's Order 2011-64 purported to delegate Swain the authority to issue a gas surcharge, upon information and belief, Mayor Gray rejected the Commission's recommendation of a $1.50 gas surcharge, instead directing Swain to issue a gas surcharge of $1.00.

### C. Failure to Conduct Rate Studies and Adjust Rates

33.     D.C. Code § 50-317 (2010) requires the Commission to undertake a taxicab fare study every twenty-four months.  The Commission failed to complete such a study between June 2007 and late 2010.

34.     The last rate study conducted for the Commission by an independent consultant, George Washington University, began on October 1, 2005 and was presented on June 1, 2007 ("GWU Study").

35.     The GWU Study had significant methodology problems and self-reported data-collection problems.

36.     In April 2009, then-DCTC Chairperson Swain promised to seek an expedited rate study within 45 days.  No such study occurred because, as then-Chairperson Swain stated, the Office of the Attorney General ordered the Commission to cease and desist from completing its 2009 rate study.

37.     The Commission did present a rate study in late 2010, but that study largely recycled the flawed data from the three-year-old GWU Study.

38.     Upon information and belief, the Commission sent Mayor Gray a recommendation for a fare increase in January 2011 based on the flawed 2010 rate study.  As of filing, Mayor Gray has not acted on the recommendation and the Commission (which remains illegal in its composition because it lacks any representatives of the taxicab industry) has failed

10

to conduct the legally required rate study to formulate an updated recommendation. The Commission has refused to make public this recommendation.

39.     Nor has Mayor Gray returned rate-setting authority to the DCTC, instead arbitrarily delegating sole authority over rates to Defendant Linton. Mayor's Order 2011-116 (July 11, 2011).

40.     Several DCTC commissioners, as well as DCTC General Counsel Reed (who previously served as Interim Chairperson of the Commission), have claimed that the Commission cannot act on its own recommendation or otherwise implement a rate increase without Mayor Gray's approval. Reed and various commissioners have noted that they believe that the DCTC cannot act until Mayor Gray repeals Mayor Fenty's orders, which prevent the Commission from directly issuing a new taxicab fare schedule.

41.     These actions have prevented the Commission from issuing a rate adjustment bringing the District's taxicab rate schedule in line with surrounding localities and other major U.S. cities.

### D. Misuse of Drivers' Assessment Fund

42.     The DCTC Establishment Act established a fiduciary drivers' assessment fund. The law states that "[t]he Fund shall be used to pay the costs of the Commission, including the costs of operating and administering programs, investigations, proceedings, and inspections, and any costs including any costs for improving the District's taxicab fleet." D.C. Code § 50-320(b) (2010).

43.     When completing prior rate studies, the Commission has traditionally sought independent expert analysts to study taxi-rates and make recommendations. These experts have been, as the law requires, paid out of the assessment fund.

44.     Since 2007, the Commission has not completed a proper rate study by an independent consultant.

45.     The Commission declined to hire an independent analyst for the 2010 rate study, instead relying on a governmental agency – the District Department of Transportation ("DDOT").

46.     A November 2010 assessment by the D.C. Auditor found irregularities and mismanagement of the drivers' assessment fund.  D.C. Auditor, Review of the D.C. Taxicab Commission's Assessment/Commission Fund for Fiscal Years 2005 Through 2009 (Nov. 10, 2010) ("D.C. Auditor's Report").  The D.C. Auditor's Report concluded that the DCTC failed to manage and maintain public records effectively and efficiently, including records relating to the drivers' assessment fund, and failed to maintain an effective system of public records related to licensed owners and operators of taxicabs and taxicab companies, associations, and fleets.  D.C. Auditor's Report, at 13.

47.     The D.C. Auditor's Report cited the Commission for repeatedly ignoring D.C. law by failing to submit annual reports to the City Council concerning the status of the assessment fund for fiscal years 2005 through 2009 (including accounting for fund collections into and disbursements).  *Id.*

48.     The D.C. Auditor's Report further noted that, despite the presence of significant irregularities in record-keeping and management of the assessment fund, including spending repeatedly outpacing collections between fiscal years 2005 and 2009, "[a]s of September 30, 2009, the balance in the Fund totaled $255,917."  *Id.*

49.     Upon information and belief, a proper rate study conducted by an independent contractor can be completed for substantially less than $255,917.  Yet Defendants improperly

12

have failed and refused to allow the use of assessment funds for the completion of the required rate study.

### E. The Dysfunctional D.C. Taxicab Commission

50.     The problems facing the District's taxicab drivers are further exacerbated by an improperly-constituted Commission, which has acted and continues to act in an arbitrary and unlawful manner.

51.     The Commission is tasked with "promot[ing] and maintain[ing] a healthy and viable taxicab industry" and "maintain[ing] a taxicab transportation system which provides owners and operators of taxicabs with reasonable and just compensation for their services." D.C. Code § 50-302 (2010).

52.     Under the DCTC Establishment Act, the rate structure implemented in the District must "balance equitably the interest of owners and operators of taxicabs, the taxicab companies and associations, and dispatch services in procuring a maximum rate of return on investment and labor against the public interest in maintaining a taxicab system affordable to a broad cross section of the public." D.C. Code § 50-317(b) (2010).

53.     Since the implementation of the taxicab meter system, the DCTC and its panels have not held regular meetings.  The Commission held no meetings whatsoever between May 2009 and January 2010.

54.     The Commission's two main panels, the Panel on Rates & Rules and the Panel on Consumer & Industry Concerns, have not held meetings since the implementation of the meter system.  Instead, the Commission has held joint "Combined Panel" meetings that are indistinguishable from full-DCTC meetings.

55.     These meetings have featured well-documented actions by the Commission that exceed the scope of the law and its authority, including attempts to deny recording of the public meetings and arrests of reporters covering meetings.

**F.   Lack of Industry Representation on D.C. Taxicab Commission**

56.     The DCTC Establishment Act requires that the Commission have three "industry representatives" with, "experience in taxicab industry operations in the District." D.C. Code § 50-305(a) (2010). D.C. Code § 50-303(12) (2010) defines the taxicab industry as those individuals "directly involved in the provision of taxicab services in the district."

57.     The Commission currently consists of Defendant Linton and Commissioners Ralph Burns, Paul Cohn, Bart Lasner and Inder Pahwa.

58.     Of the three Commissioners identified as industry members on the DCTC website – Cohn, Lasner, and Pahwa – none are currently involved in the provision of taxicab services in the District. Paul Cohn is a restaurateur. Bart Lasner is a hotel executive. Inder Pahwa is a civil engineer who has admitted in a DCTC meeting that he does not consider himself a representative of the taxicab industry. Accordingly, there are no qualified representatives of the taxicab industry on the DCTC.

59.     The lack of industry representation on the Commission invalidates recent rulemaking actions taken by the DCTC.

60.     The DCTC Establishment Act requires the Panel on Rates & Rules to establish regulations governing taxicab licensing and services. D.C. Code § 50-307(b)(1) (2010).

61.     On May 3, 2011, the Commission published proposed amendments to Chapter 6 (Taxicab Parts and Equipment) and Chapter 8 (Operation of Taxicabs) of Title 31 (Taxicabs and

Public Vehicles for Hire) of the DCMR. On May 11, 2011, the Commission held a public meeting to receive comments on the proposed amendments to Chapters 6 and 8.

62.     On June 1, 2011, the Commission published proposed amendments to Chapters 5 (Taxicab Companies, Associations and Fleets) and 9 (Taxicab Insurance) of Title 31 of the DCMR. On June 22, 2011, the Commission held a second public meeting to receive comments on the amendments to Chapters 5 and 9.

63.     Soon after it began, the June 22, 2011 meeting ended in disarray after the Acting Commissioner permitted the arrests of two members of the press for recording or photographing the meeting. This event highlights the arbitrary and high-handed way the Commission has acted, seeking to quell dissent or input from stakeholders, rather than encouraging their input as required by law.

64.     On August 12, 2011, the Commission published updated proposed amendments to the Chapters 6 and 8. No public meeting has been held to discuss those proposed amendments in their current form.

65.     The proposed regulations include a number of changes that threaten the livelihood and working conditions of D.C. taxicab drivers, including those represented by Plaintiffs.

66.     The absence of any industry members on the Commission negatively impacted the proposed regulations. Legally-required input from qualified industry representatives would have given the District's taxicab drivers a voice in the process and identified particularly problematic regulations. Absent the appointment of industry members to the Commission, a properly-constituted Panel on Rates & Rules will be unavailable to establish final regulations.

67.     Plaintiffs Dominion of Cab Drivers and D.C. Professional Taxicab Drivers Association objected to each set of proposed regulations and submitted written comments to the

DCTC on May 31, 2011, June 27, 2011, and August 25, 2011. Despite these objections, the DCTC has scheduled a final vote on the proposed amendments to Chapters 6 and 8 on September 21, 2011.

### G. Ineligible Commissioner Serving on the D.C. Taxicab Commission

68.    D.C. Code § 50-305(c)(1) (2010) limits commissioners to two consecutive terms.

69.    Commissioner Pahwa is currently serving his third consecutive term in violation of the DCTC Establishment Act. Upon information and belief, Pahwa completed two full terms on the Commission after being nominated and confirmed for terms in 2001 and 2005. He was confirmed for a third consecutive term on the Commission on June 29, 2010.

### H. Driver Independence and Licensing Issues

70.    The District's taxicab drivers are independent operators, many of whom choose to associate with various companies and fleets. As independent operators, the District's drivers have traditionally been able to have their own name on the door of their taxicabs, or associate with the company of their choice, either through leasing a vehicle from the company or affiliating their owner-operated vehicles.

71.    In recent years, the DCTC has taken steps to vanquish independent ownership of taxicabs in the District through unlegislated changes in its licensing policies, contrary to the purposes of the D.C. Taxicab Establishment Act. *See* D.C. Code § 50-302(b)(1)(C).

72.    Under D.C. Code § 47-2829 (2010) and DMCR 814.1, drivers are required to possess a DCTC license, which functions as a vehicle identification license and a business license.

73.    For many years, each of the District's taxicab drivers was issued a hard copy DCTC license. This hard copy license included a driver-specific permanent license registration

number that drivers carried with them year-to-year, vehicle-to-vehicle, and served as proof of ownership for their independent businesses.

74.     Upon information and belief, the DCTC converted the hard-copy DCTC license to a registration number within the last decade.  The conversion was made without any formal rulemaking or public explanation.  Following the conversion, drivers' registration numbers were subject to change each renewal period, meaning that the drivers no longer possessed continuing, individual registration numbers.  Despite the elimination of the continuing registration number, drivers are generally able to transfer registration numbers to new vehicles, as new vehicles replace old.

75.     The elimination of the hard copy DCTC license and the continuing registration number, however, has imperiled drivers' ability to own and operate their taxicabs as independent businessmen, specifically when coupled with limitations on the issuance and transferability of registration numbers.

76.     On November 23, 2010, then-DCTC Chairman Leon Swain issued moratoriums halting the issuance of a) new taxicab registration numbers to individual drivers, and b) new licenses to operators of taxicab companies, associations, or fleets.  The moratoriums, if not extended, are to remain in place until September 30, 2011.

77.     The amendments to Title 31 of the DCMR proposed by the DCTC in mid-2011 would forbid the transfer of the registration number from one taxicab to another and would prohibit the reissuance of numbers revoked by the DCTC or voluntarily surrendered by drivers.  These proposed regulations, combined with the current moratorium against issuing new taxicab vehicle numbers, would prevent drivers from transferring their registration numbers to change vehicles, including newly-purchased vehicles.

17

## I.  Residency Requirements

78.     In 2007 and 2008, the D.C. City Council passed the Non-Resident Taxi Drivers Registration Temporary Amendment Act of 2007 and the Non-Resident Taxi Drivers Registration Amendment Act of 2008 ("Non-Resident Acts"), which provided for the continued licensing of licensed non-resident taxicab owners and operators who resided outside the District on March 1, 2006.  D.C. Code § 50-1501.02 (2010).

79.     The Non-Resident Acts establish a strict residency requirement for the issuance of vehicle registrations to taxicab owners and operators within the District.  Under the Non-Resident Acts, previously unlicensed non-resident taxicab drivers are unable to obtain a vehicle registration required to operate within the District.   D.C. Code § 50-1501.02(c)(5)(B)(ii), (iv) (2010).  Similarly, former District residents previously operating their taxicabs under District vehicle registrations, but who have moved outside the District after March 1, 2006, are not eligible to renew their vehicle registrations.  D.C. Code § 50-1501.02(c)(5)(B)(iii) (2010).

80.     Citizens of the United States possess a constitutional right to travel freely between the states.  U.S. Const., Amds. V, XIV.

81.     Additionally, the commerce clause of the U.S. Constitution prohibits state or municipal laws whose object is local economic protectionism.  U.S. Const. Art. I, Sec. 8, Cl. 3.

82.     Under certain conditions, states and municipalities may impose reasonable residency requirements on government employees without violating U.S. Const. Art. I, Sec. 8, Cl. 3 or U.S. Const., Amds. V, XIV.  District taxicab owners and operators are not government employees.

83.     The Non-Resident Acts violate non-residents' constitutional right to travel and the commerce clause of the U.S. Constitution.

## J. Hack Inspector Abuses

84.     The District's hack inspectors, the public safety officials charged with inspecting

taxicabs and enforcing taxicabs regulations, have committed numerous systematic abuses against

the District's taxicab drivers, including racial profiling, unlawful searches, and improper

ticketing.

85.     Although hack inspectors used to be police officers in the District's Metropolitan

Police Department ("MPD"), they were spun off into a separate agency several years ago and are

no longer part of the MPD.  Currently hack inspectors need no police training and Plaintiffs

believe that their de-professionalization has fostered a climate of abuse.

86.     Upon information and belief, hack inspectors are only required to complete a

sixty (60) hour "Hack License Training Course" offered by the University of the District of

Columbia and pass an examination administered by the Commission.  Hack inspectors may

complete their licensing requirements in as little as nine days or, if they choose to take classes

only on Saturdays, as long as seven weeks.

87.     The Fourth Amendment of the U.S. Constitution protects "[t]he right of the

people to be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures."  *See* U.S. Const., Amd. IV.

88.     Upon information and belief, in recent months, officials with the Commission

have instructed hack inspectors and law enforcement officers that they may pull over and inspect

taxicabs without probable cause or reasonable suspicion of wrongdoing.  Hack inspectors have

increasingly utilized this power to stop and conduct improper searches and inspections in the

absence of probable cause or reasonable suspicion of wrongdoing, harassing taxicab drivers in

violation of their constitutional rights.  Recently, the Commission has sought to formalize this

practice through proposed changes to Chapter 6 of Title 31 of the DCMR, *See Proposed Regulations of the D.C. Taxicab Commission Regarding DCMR Title 31 Chapters 6*, 58-32 D.C. Reg. 7170-71, 7177 (Aug. 12, 2011) (specifically §§ 600.4 & 608.2).

89.     The Commission's practice of encouraging or permitting hack inspectors and law enforcement officers to pull over and inspect taxicabs without probable cause or reasonable suspicion of wrongdoing is in violation of the Fourth Amendment rights of taxicab drivers. *See* U.S. Const., Amd. IV.

## V.  STATEMENT OF CLAIMS

### COUNT ONE

(Continuing Mayoral Control Over the District's Taxicab Industry Violates the D.C. Taxicab Commission Establishment Act)

90.     The allegations of Paragraphs 1-89 of this Complaint are by reference incorporated herein as allegations of this Count.

91.     D.C. Code § 50-304 (2010), establishes the D.C. Taxicab Commission and vests in it, "exclusive authority for intrastate regulation of the taxicab industry as provided herein."

92.     Contravening the DCTC Establishment Act, Mayor Fenty asserted unilateral authority to regulate the District's taxicab industry indefinitely.  Upon taking office, Mayor Gray has continued to assert unilateral authority over the industry, even though more than three years have passed since implementation of the meter system.  These actions have prevented the Commission from carrying out its responsibilities to regulate the industry under the DCTC Establishment Act.

93.     The DCTC has failed to carry out its statutory duties under the DCTC Establishment Act, ceding near-complete authority to Mayor Gray (and before him, Mayor Fenty) to regulate the industry.

94.     The Mayor's assertion of unilateral authority is in violation of the DCTC Establishment Act, exceeding the limited authority provided under the Levin provision to implement a meter system, consistent with prior rulings of this Court.

95.     Mayor's Order 2007-231 (Oct. 17, 2007), Mayor's Order 2009-104 (Jun. 15, 2009), Mayor's Order 2011-116 (July 11, 2011), and Mayoral Review of Bill 18-443 (Oct. 20, 2009) continue to prevent the Commission from implementing rate adjustments that would establish parity between the District and rates in surrounding jurisdictions and comparable metropolitan areas.  Instead, the Commission has issued non-binding rate recommendations to Mayor Gray, and before him Mayor Fenty, claiming to lack authority to implement rate adjustments itself under this mayoral authority.

96.     After announcing that the Commission would conduct a rate study in April 2009, then-Chairman Swain halted the study because then-Attorney General Nickels ordered the DCTC to cease and desist from completing its 2009 rate study, in violation of D.C. Code § 50-317 (2010).  The Commission did not conduct a rate study at that time.

97.     Plaintiffs are entitled to injunctive relief, pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*, vacating Mayor's Order 2007-231 (Oct. 17, 2007), Mayor's Order 2009-104 (Jun. 15, 2009), Mayor's Order 2011-116 (July 11, 2011), and Mayoral Review of Bill 18-443 (Oct. 20, 2009).

<u>COUNT II</u>

(The DCTC's Lack of Industry Representation Violates the D.C. Taxicab Commission Establishment Act)

98.     The allegations of Paragraphs 1-97 of this Complaint are by reference incorporated herein as allegations of this Count.

99.     Under the DCTC Establishment Act, the Commission is required to have three industry representatives with "experience in taxicab industry operations in the District."  D.C. Code § 50-305(a) (2010).

100.    D.C. Code § 50-303(12) (2010) defines the taxicab industry to include those who are "*directly involved* in the provision of taxicab services in the district." (emphasis added).

101.    None of the current DCTC commissioners are directly involved in the provision of taxicab services in the District – there are no qualified representatives of the taxicab industry on the Commission.  Absent industry representation, acts of the Commission and the Panel on Rates & Rules are invalid.

102.    According to the DCTC website, the Commission's designated industry representatives are Commissioners Cohn, Lasner, and Pahwa.

103.    Commissioner Cohn is a restaurateur.

104.    Commissioner Lasner is a hotel executive.

105.    Commissioner Pahwa is civil engineer.

106.    Commissioners Cohn, Lasner, and Pahwa have no direct connection to the District's taxicab industry aside from their service on the DCTC.

107.    None of the aforementioned commissioners, nor any others, are directly involved in the provision of taxicab services within the District, in violation of the requirements set forth in the DCTC Establishment Act.  *See* D.C. Code §§ 50-301(7), 50-303(12), 50-305(a) (2010).

108.    Plaintiffs are entitled to injunctive relief, pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*, requiring Mayor Gray to appoint qualified industry members to three of the four existing vacancies on the Commission.

<u>COUNT III</u>

22

(The Service of an Ineligible Commissioner on the DCTC Violates the D.C. Taxicab
Commission Establishment Act)

109.   The allegations of Paragraphs 1-108 of this Complaint are by reference
incorporated herein as allegations of this Count.

110.   Commissioner Pahwa continues to serve as a Commissioner despite being
ineligible to serve on the DCTC because of term limits established by the DCTC Establishment
Act.

111.   D.C. Code § 50-305(c)(1) (2010), states that "[n]o member shall serve more than
2 consecutive terms."

112.   Upon information and belief, Commissioner Pahwa was nominated for full terms
in 2001 and 2005 before being confirmed for a third consecutive term on June 29, 2010.

113.   Plaintiffs are entitled to injunctive relief removing Pahwa from the Commission.

<u>COUNT IV</u>

(The DCTC Has Failed to Conduct a Proper Rate Study in Violation of the D.C. Taxicab
Commission Establishment Act)

114.   The allegations of Paragraphs 1-113 of this Complaint are by reference
incorporated herein as allegations of this Count.

115.   D.C. Code § 50-317 (2010), requires the DCTC Panel on Rules & Rates to
"undertake a review of the taxicab rate structure" every 24 months.

116.   The Commission has not coordinated a rate study by an outside analyst since the
issuance of the GWU Study, which was presented on June 1, 2007.  The GWU study had
significant methodology problems and self-reported data-collection problems.

117.   In April 2009, then-DCTC Chairperson Swain promised to seek an expedited rate
study within 45 days.  No such study occurred because, as then-Chairperson Swain stated, the

Office of the Attorney General ordered the Commission to cease and desist from completing its 2009 rate study. Transcript of April 14, 2010 DCTC Combined Panel Meeting, at 25.

118.   The Commission did present an analysis of rates in late 2010, but that study was improper and flawed, relying primarily on three-year-old data from the GWU Study, and was conducted by DDOT rather than an independent analyst.

119.   Plaintiffs are entitled to injunctive relief, pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*, ordering the DCTC to carry out a rate study expeditiously. This rate study should be conducted by an independent consultant, based upon current and properly-collected data, and paid out of the drivers' assessment fund.

COUNT V

(Defendants Have Failed to Set Rates That Are Reasonable, Fair and Just in Violation of the D.C.<br>Taxicab Commission Establishment Act)

120.   The allegations of Paragraphs 1-119 of this Complaint are by reference incorporated herein as allegations of this Count.

121.   The Commission has a duty to "[e]stablish reasonable rates for taxicab service for the transportation of passengers and their property within the District, including all charges incidental and directly related to the provision of taxicab services." *See* D.C. Code § 50-307 (2010).

122.   The Commission has not adjusted taxicab fare rates since the current structure was established by then-Taxicab Commission Chairman Leon Swain in 2008, pursuant to Mayor's Order 2007-231, issued October 17, 2007 by former Mayor Adrian Fenty, upon implementation of a metered taxicab system for Washington D.C.

123.    Under this arbitrary fare structure, taxicab drivers receive $3.00 for the first sixth of a mile and $0.25 for every sixth of a mile afterward or $1.50 per mile, with a maximum fare of $19 for rides within the District.

124.    Despite repeated recognition by a majority of the Commission that the current rate schedule should be raised, it has not changed with the exception of a $1.00 fuel surcharge added March 25, 2011 and extended on July 26, 2011 through November 17, 2011.

125.    In the three years since the current rate schedule was established, drivers have seen their incomes fall by as much as 30%.

126.    Due to the Commission's ongoing failure to carry out its rate-setting responsibilities, rates for taxicab services are not reasonable and have not been reasonable for the past several years.  The rates violate District of Columbia law and the District's drivers have found it increasingly difficult to operate as independent owner-operators, in contravention of the purposes of the D.C. Taxicab Establishment Act.

127.    Plaintiffs are entitled to injunctive relief, pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*, ordering the DCTC perform its duties and set reasonable taxicab rates providing drivers "reasonable and just compensation for their services," as prescribed in D.C. Code § 50-302 (2010).

## COUNT VI

(Plaintiffs Are Entitled to a Preliminary Injunction Ordering Implementation of an Interim Rate Adjustment Consistent with WMATC Taxicab Fare Rates)

128.    The allegations of Paragraphs 1-127 of this Complaint are by reference incorporated herein as allegations of this Count.

129.    District of Columbia law requires a moving party seeking a preliminary injunction to demonstrate (1) that there is a substantial likelihood it will prevail on the merits; (2) that it is

in danger of suffering irreparable harm during the pendency of the action; (3) that more harm will result to it from the denial of the injunction than will result to the defendant from its grant; and, in appropriate cases, (4) that the public interest will not be disserved by the issuance of the requested order. *District of Columbia v. Eastern Trans-Waste of Md., Inc.*, 758 A.2d 1, 14-15 (D.C. 2000) (citations omitted).

130.    Defendants are in violation of the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*, ordering implementation an interim rate adjustment consistent with the WMATC taxicab fare rates during the pendency of the rate study. Accordingly, Plaintiffs have demonstrated a substantial likelihood of prevailing on the merits of their claims.

131.    Plaintiffs have demonstrated that they will suffer irreparable economic and physical harm if a preliminary injunction is not granted. The Commission's continued refusal to establish an appropriate rate adjustment in compliance the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*, ordering implementation an interim rate adjustment consistent with the WMATC taxicab fare rates during the pendency of the rate study, makes it clear that the Commission will take no action unless the requested relief is granted.

132.    . Plaintiffs have demonstrated that more harm will result to plaintiffs from the denial of the injunction than to the Defendants from its grant of the injunction. Plaintiffs' requested relief is simply compliance with D.C. Code § 50-307 (2010). Defendants' failure to comply with the law by conducting proper rate studies and adjusting taxicab rates accordingly will continue to harm Plaintiffs as it has since 2008, whereas comparatively, Defendants will simply be carrying out their legal obligations by implementing the interim rate adjustment and will suffer no harm from doing so.

133.     Plaintiffs have demonstrated that the public interest will not be disserved by the issuance of the requested injunction.  Rather, the injunction would serve the public interest by enforcing the DCTC Establishment Act and ensuring that the public is served by a healthy and viable taxicab industry.

134.     Accordingly, Plaintiffs are entitled to a preliminary injunction ordering implementation of an interim rate adjustment consistent with WMATC taxicab fare rates.

COUNT VII

(Defendants Have Misappropriated Funds Obtained from Taxicab Drivers for the Drivers'
Assessment Fund in Violation of the D.C. Taxicab Commission Establishment Act)

135.     The allegations of Paragraphs 1-134 of this Complaint are by reference incorporated herein as allegations of this Count.

136.     The DCTC Establishment Act and governing regulations provide for the drivers' assessment fund to be used to pay for the costs of the Commission, including the costs of a conducting fair and independent rate studies.  *See* D.C. Code § 50-320(b) (2010).

137.     The D.C. Auditor has cited Defendant DCTC for significant irregularities in record-keeping and management of the drivers' assessment fund, noting the Commissions' failure to manage and maintain public records effectively and efficiently and to submit annual reports to the City Council concerning the status of the assessment fund for fiscal years 2005 through 2009.  D.C. Auditor's Report, at 13.

138.     Despite these irregularities, and despite spending outpacing collections between fiscal year 2005 and 2009, the D.C. Auditor concluded that over $250,000 remained in the assessment fund as of September 30, 2009.  *Id.*

139.     In misappropriating and otherwise redirecting moneys from the drivers' assessment fund, Defendants are in violation of D.C. Code § 50-320(b) (2010).

27

140.    Plaintiffs are entitled to injunctive relief, pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*, ordering Defendants to restore all moneys misappropriated or otherwise directed to other budgetary priorities.

### COUNT VIII

(The DCTC Improperly Issued Regulations and Published Proposed Regulations)

141.    The allegations of Paragraphs 1-140 of this Complaint are by reference incorporated herein as allegations of this Count.

142.    During his time as DCTC Chairman, Leon Swain unilaterally issued a series of amendments to Title 31, purportedly pursuant to Mayor's Order No. 2007-231 (October 17, 2007), which granted him authority to implement meter system.

143.    Several of these amendments exceeded the grant of authority in Mayor's Order No. 2007-231, as explained in *D.C. Prof'l Taxicab Drivers Assoc. v. Swain*, 2008 CA 001993 B (D.C. Super. Ct. Apr. 21, 2008). These regulations did not relate to the meter system and/or were enacted after the implementation of the meter system was complete.

144.    These amendments departed from the standard notice-and-comment rulemaking process set forth in the D.C. Administrative Procedures Act, D.C. Code § 2-505 (2010).

145.    Plaintiffs are entitled to injunctive relief, pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*, vacating all amendments to Title 31 pursuant to Mayor's Order 2007-231 (Oct. 17, 2007), that are not connected to the implementation of the meter system.

### COUNT IX

(The DCTC Improperly Eliminated Hard-Copy DCTC Licenses, Imposed Restrictions on DCTC License Issuance and Transferability)

146.    The allegations of Paragraphs 1-145 of this Complaint are by reference incorporated herein as allegations of this Count.

147.    An explicit purpose of the D.C. Taxicab Establishment Act is to "assure access to the ownership of taxicabs by taxicab operators." *See* D.C. Code § 50-302(b)(1)(C).

148.    D.C. Code § 47-2829 (2010) and DMCR 814.1 require District taxicab drivers to possess a DCTC license.  For many years, the DCTC license was issued in hard copy form and carried a permanent, transferrable license registration number.

149.    The DCTC converted the hard-copy DCTC license to a registration number within the last decade.  Following the conversion, drivers' registration numbers were subject to change each renewal period, meaning that the drivers no longer possessed continuing, individual registration numbers.

150.    On November 23, 2010, then-DCTC Chairman Leon Swain issued moratoriums halting the issuance of a) new taxicab registration numbers to individual drivers, and b) new licenses to operators of taxicab companies, associations, or fleets.  The moratoriums are to remain in place until September 30, 2011.

151.    The elimination of the hard copy DCTC license and the continuing registration number has imperiled drivers' ability to own and operate their taxicabs as independent businessmen, specifically when coupled with limitations on the issuance and transferability of registration numbers.

152.    Plaintiffs are entitled to injunctive relief, pursuant to D.C. Code § 50-302(b)(1)(C) (2010) and D.C. Code § 47-2829 (2010), ordering Defendants to reinstitute the issuance of hard copy DCTC licenses and removing undue restrictions on the issuance and transferability of DCTC license registration numbers.

29

## COUNT X

#### (The District's Residency Requirements Violate the Right to Travel and the Commerce Clause of the U.S. Constitution)

153.    The allegations of Paragraphs 1-152 of this Complaint are by reference incorporated herein as allegations of this Count.

154.    The Non-Resident Acts establish a strict residency requirement for the issuance of vehicle registrations to taxicab owners and operators within the District, barring non-residents from obtaining vehicle registrations to own and operate taxicabs within the District, including all former residents who moved out of the District after March 1, 2006.

155.    The Non-Resident Acts violate the commerce clause of the U.S. Constitution and non-residents' constitutional right to travel. *See* U.S. Const., Art. I, Sec. 8, Cl. 3; Amds. V, XIV.

156.    Plaintiffs are entitled to injunctive relief invalidating D.C. Code § 50-1501.02(c)(5)(B)(ii)-(iv) (2010) and all other improper residency requirements imposed against non-resident taxicab owners and operators.

## COUNT XI

#### (The Commission's Policy of Encouraging Unlawful Traffic Stops and Inspections by Hack Inspectors and Law Enforcement Officers Violates Drivers' Constitutional Rights)

157.    The allegations of paragraphs 1-156 of this Complaint are by reference incorporated herein as allegations of this Count.

158.    The Fourth Amendment to the U.S. Constitution provides for "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." *See* U.S. Const. Amd. IV.  This right extends to the vehicles of individuals and requires some level of reasonable suspicion or probable cause to justify traffic stops of

drivers. *See Delaware v. Prouse*, 440 U.S. 648 (1979) (stops solely to check a driver's license and registration are unconstitutional); *Terry v. Ohio*, 392 U.S. 1 (1968).

159.    The actions of the DCTC in promulgating and promoting a policy encouraging traffic stops and inspections without probable cause or reasonable suspicion of wrongdoing, indeed "for any reason," violate this constitutional right. *See Proposed Regulations of the D.C. Taxicab Commission Regarding DCMR Title 31 Chapters 6*, 58-32 D.C. Reg. 7177 (Aug. 12, 2011) (specifically § 608.2). And the actions of hack inspectors and other law enforcement officials adhering to the DCTC's advice, carrying out unlawful traffic stops and inspections of taxicab drivers, also violate this constitutional right.

160.    Plaintiffs therefore ask the court for injunctive relief barring the DCTC from promoting a policy encouraging traffic stops and inspections of taxicabs without probable cause or reasonable suspicion of wrongdoing.

COUNT XII

(Declaratory Judgment)

161.    The allegations of paragraphs 1-160 of this Complaint are by reference incorporated herein as allegations of this Count.

162.    Plaintiffs are entitled to a declaratory judgment, pursuant to D.C. Superior Court Rule of Civil Procedure 57.

163.    Plaintiffs ask the Court to declare that the Commission retains authority to regulate the District's taxicab industry including, but not limited to, the conduct of rate studies and the adjustment of fares, pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq*, and that all contrary mayoral or Commission orders, signing statements, or decrees are hereby invalid.

31

164.    Plaintiffs ask this Court to declare that the current taxicab rate schedule is unreasonable and violates the DCTC Establishment Act.  Plaintiffs ask this Court to further declare that the taxicab rate schedule has been unreasonable since 2008, in violation of the DCTC Establishment Act.

165.    Plaintiffs ask the Court to declare that, having already completed two consecutive terms as a commissioner, Commissioner Inder Pahwa is ineligible to continue to serve on the DCTC pursuant to the DCTC Establishment Act, D.C. Code § 50-305(c)(1) (2010).

166.    Plaintiffs ask the Court to declare that all moneys paid into the drivers' assessment fund are for the benefit of the District's taxicab drivers pursuant to the DCTC Establishment Act, and cannot be diverted to other purposes.  *See* D.C. Code § 50-320(b).

## VI. PRAYER FOR RELIEF

**Wherefore,** the Plaintiffs pray that this Court enter judgment against the Defendants the District of Columbia,  Mayor Vincent Gray in his official capacity, the D.C. Taxicab Commission, and Ron Linton in his official capacity order and award:

(1) Injunctive Relief:

    a.  Vacating Mayor's Order 2007-231 (Oct. 17, 2007), Mayor's Order 2009-104 (Jun. 15, 2009), Mayor's Order 2011-116 (July 11, 2011), and Mayoral Review of Bill 18-443 (Oct. 20, 2009);

    b.  Requiring Defendant Mayor Gray to appoint three qualified industry members to the four existing vacancies on the Commission;

    c.  Removing Commissioner Pahwa from the Commission;

d.  Ordering the DCTC to carry out expeditiously a rate study conducted by an independent consultant, based upon current and properly-collected data, and paid out of the drivers' assessment fund;

e.  Ordering the Commission to establish a reasonable rate schedule for taxicab services following, and based upon, the results of a properly-conducted rate study;

f.  Vacating all amendments to Title 31 issued pursuant to Mayor's Order 2007-231 (Oct. 17, 2007), that are not connected to the implementation of the meter system;

g.  Ordering Defendants to restore all moneys misappropriated or otherwise directed to other budgetary priorities;

h.  Ordering Defendants to reinstitute the issuance of hard copy DCTC licenses and removing undue restrictions on the issuance and transferability of DCTC license registration numbers;

i.  Invalidating D.C. Code § 50-1501.02(c)(5)(B)(ii)-(iv) (2010) and all other improper residency requirements imposed against non-resident taxicab owners and operators; and

j.  Requiring the DCTC to abandon its policy of advising or directing the District's hack inspectors and law enforcement agencies to engage in traffic stops and inspections of taxicabs absent probable cause or reasonable suspicion of wrongdoing.

(2) A preliminary injunction implementing an interim rate adjustment consistent with WMATC taxicab fare rates during the pendency of the rate study;

33

(3) A Declaratory Judgment:

  a.  Clarifying that the Mayor no longer possesses unilateral authority over the District's taxicab industry and that the Commission retains authority to regulate the industry pursuant to the DCTC Establishment Act, D.C. Code § 50-301 (2010), *et seq.*;

  b.  Declaring that the current taxicab rate schedule is unreasonable in violation of the DCTC Establishment Act and that the taxicab rate schedule has been unreasonable since 2008, in violation of the same.

  c.  Declaring that Commissioner Pahwa is ineligible to serve on the Commission;

  d.  Reiterating that all moneys paid into the drivers' assessment must be for the benefit of the District's taxicab drivers and not to be diverted to other purposes;

(4) Reasonable costs, expenses, and attorneys' fees; and

(5) An Order awarding any other relief as the Court deems just, equitable, and proper.


Dated:  September 21, 2011

                                Respectfully submitted,


                                   */s/ Robert G. Lian, Jr.*
                                Robert G. Lian, Jr. (#446313)
                                Akin, Gump, Strauss, Hauer & Feld LLP
                                Robert S. Strauss Building
                                1333 New Hampshire Ave., NW
                                Washington, DC  20036-1564
                                Tel: (202) 887-4000
                                Fax: (202) 887-4288
                                E-mail: blian@akingump.com


                                       34

*Counsel for Plaintiffs D.C. Professional Taxicab*
*Drivers Association and Dominion of Cab Drivers*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing First Amended Complaint will be served upon opposing counsel as follows:

**Copies to be sent via USPS Registered Mail, return receipt requested, to:**

THE DISTRICT OF COLUMBIA
The Office of the Attorney General
For the District of Columbia
441 4th Street, N.W.
Washington, DC 20001
oag@dc.gov

D.C. TAXICAB COMMISSION
General Counsel Dena Reed
2041 Martin Luther King Jr. Avenue, S.E.
Suite 204
Washington, DC 20020
dena.reed@dc.gov

_/s/ Robert G. Lian, Jr._
Robert G. Lian, Jr.

36