UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **D.C. PROFESSIONAL TAXICAB** | ) | |
| **DRIVERS ASSOCIATION,** | ) | |
| | ) | |
| **AND** | ) | |
| | ) | |
| **DOMINION OF CAB DRIVERS** | ) | **Civil Action No. 1802-11 (BAH)** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **V.** | ) | |
| | ) | |
| **THE DISTRICT OF COLUMBIA,** *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS THE FIRST AMENDED COMPLAINT**

# Table of Contents

Table of Authorities ........................................................................................................ ii

I.      Plaintiffs Have Standing to Sue and Defendants Are Properly Before the Court .............. 2
        A.      Plaintiffs Have General Standing to Seek Relief Under the Court's Broad
                Equity Powers. .............................................................................................. 2
        B.      Defendants' Actions and Omissions Are Not Shielded by Sovereign
                Immunity ...................................................................................................... 7
        C.      Mayor Gray and Chairman Linton Are Proper Defendants ................................. 13
        D.      Plaintiffs Have Suffered a Specific Injury and Have Article III Standing
                for Count I .................................................................................................... 16
        E.      Plaintiffs Have Exhausted Their Administrative Remedies ................................ 18
                1.      To the Extent Plaintiffs Were Required to Do So, They Exhausted
                        Their Administrative Remedies. ............................................................ 18
                2.      The Instant Action Preceded the Announcement of the November
                        29, 2011 Rate Hearing by Nearly Two Months ....................................... 21

II.     Plaintiffs' Claims Are Not Precluded by *Res Judicata* or Collateral Estoppel ................ 23
        A.      Plaintiffs' Claims Are Not Precluded by Prior Litigation .................................... 23

III.    Plaintiffs' Substantive Claims Survive Dismissal .......................................................... 26
        A.      Defendants Are in Violation of the Establishment Act. ..................................... 26
        B.      The Mayor Does Not Have Rate-Setting Authority Over D.C.'s Taxicab
                Industry ........................................................................................................ 26
                1.      The D.C. Superior Court Rejected the Mayor's Claims of
                        Authority Arising Under the Establishment Act ..................................... 26
                2.      The D.C. Superior Court Rejected the Mayor's Claims of Inherent
                        Authority as Chief Executive ................................................................ 28
                3.      *DCPTDA* Limited the Mayor's Authority in Implementing of Taxi
                        Meters ................................................................................................ 28
        C.      The Mayor Has Not Delegated Rate-Setting to the Commission ........................ 30
        D.      The Establishment Act Requires that There Be Three Industry Members
                Who Have Been Directly Involved in Taxicab Operations in the District ........... 32
        E.      The DCTC Has Failed to Carry Out Its Obligations to Conduct Rate
                Studies ......................................................................................................... 34
        F.      Defendants Have Misappropriated Monies in the Drivers' Assessment
                Fund in Violation of Their Fiduciary Responsibilities ........................................ 36

IV.     Defendants' Post Hoc Actions Do Not Moot Plaintiffs' Claims ...................................... 38
        A.      Count II, Plaintiffs' Claim Regarding Lack of Industry Representation Is
                Not Moot ...................................................................................................... 38
        B.      Count V, Plaintiffs' Claim Concerning the DCTC's Failure to Engage in
                Ratemaking, Is Not Moot ............................................................................... 39
        C.      Count XI, Plaintiffs' Claim Concerning Hack Inspector Stops and
                Inspections, Is Not Moot ............................................................................... 40

V.      Plaintiffs' Request for a Declaratory Judgment Is Valid .................................................. 41

# Table of Authorities

**Page(s)**

## CASES

*Abbott Labs v. Gardner,*
387 U.S. 136 (1967) ..................................................................................6

*Aguehounde v. District of Columbia,*
666 A.2d 443 (D.C. 1995) ............................................................... 9, 10, 11, 12

*Am. Sch. of Magnetic Healing v. McAnnulty,*
187 U.S. 94 (1902) ....................................................................................6

*Amador County, Cal. v. Salazar,*
640 F.3d 373 (D.C. Cir. 2011) ....................................................................3

*Baumann v. District of Columbia,*
744 F. Supp. 2d 216 (D.D.C. 2010) .........................................................3, 4

*Bender v. Jordan,*
515 F. Supp. 2d 10 (D.D.C. 2007) ..............................................................38

*Berkovitz v. United States,*
486 U.S. 531 (1988) ..................................................................................8

*Bowen v. Mich. Acad. of Family Physicians,*
476 U.S. 667 (1986) ..................................................................................5

*Brandon v. Holt,*
469 U.S. 464 (1985) ..................................................................................13

*Carlin v. McKean,*
823 F.2d 620 (D.C. Cir. 1987) ....................................................................5

*Chicago v. Int'l College of Surgeons,*
522 U.S. 156 (1997) ..................................................................................3

*Citizens to Pres. Overton Park v. Volpe,*
401 U.S. 402 (1971) ..................................................................................6

*Connors v. Tanoma Mining Co., Inc.,*
953 F.2d 682 (D.C. Cir. 1990) ....................................................................24

*D.C. Professional Taxi Drivers Ass'n, Inc. v. District of Columbia,*
No. 96 CA 6990, slip op. (D.C. Sup. Ct. Dec. 10, 1997) .....................................11

*D.C. Professional Taxicab Drivers Ass'n v. District of Columbia,*
    No. 1993-08 (D.C. Sup. Ct. Apr. 21, 2008) ................................................................ *passim*

*Dial A Car, Inc. v. Transp., Inc.,*
    132 F.3d 743 (D.C. Cir. 1998) ................................................................................................. 4

*District of Columbia v. Sierra Club,*
    670 A.2d 354 (D.C. 1996) ............................................................................................ *passim*

*Doe v. Harris,*
    696 F.2d 109 (D.C. Cir. 1982) ............................................................................................. 38

*Dominion Cogen, D.C., Inc. v. District of Columbia,*
    878 F. Supp. 258 (D.D.C. 1995) .......................................................................................... 16

*El Paso Natural Gas Co. v. United States,*
    632 F.3d 1272 (D.C. Cir. 2011) .................................................................................... 3, 5, 8

*Friends of the Earth, Inc. v. Laidlaw Envntl. Servs., Inc.,*
    528 U.S. 167 (2000) ................................................................................................... 16, 17

*Heckler v. Chaney,*
    470 U.S. 821 (1985) .............................................................................................................. 6

*Johnson v. District of Columbia,*
    572 F. Supp. 2d 94 (D.D.C. 2008), *amended by* 632 F. Supp. 2d 20 (D.D.C. 2009) ....... 15, 16

*Kentucky v. Graham,*
    473 U.S. 159 (1985) ................................................................................................... 13, 14

*Lake Mohave Boat Owners Ass'n v. Nat'l Park Service,*
    78 F.3d 1360 (9th Cir. 1995) ............................................................................................... 10

*Lewis v. DEA,*
    777 F. Supp. 2d 151 (D.D.C. 2011) .................................................................................... 24

*Mistick PBT v. Chao,*
    440 F.3d 503 (D.C. Cir. 2006) ............................................................................................... 3

*Monell v. Dep't of Social Servs. of New York,*
    436 U.S. 658 (1978) ............................................................................................................ 13

*New Process Steel, L.P. v. NLRB,*
    130 S. Ct. 2635 (2010) .................................................................................................. 32, 35

*Orthopaedic Hosp. v. Belshe,*
    103 F.3d 1491 (9th Cir. 1997) ............................................................................................. 10

*People's Counsel v. Public Serv. Comm'n of D.C.*,
   474 A.2d 1274 (D.C. 1984) ...................................................................6

*Pharm. Care Mgmt. Ass'n v. District of Columbia*,
   522 F.3d 443 (D.C. Cir. 2008) .............................................................25

*Porter v. Shah*,
   606 F.3d 809 (D.C. Cir. 2010) .......................................................24, 25

*Simpson v. District of Columbia Office of Human Rights*,
   597 A.2d 392 (D.C. 1991) ....................................................................6

*Thaler v. Stern*,
   253 N.Y.S.2d 622 (N.Y. Sup. Ct. 1964)..............................................10

*Trimble v. District of Columbia*,
   779 F. Supp. 2d 54 (D.D.C. 2011) ......................................................14

*Tucci v. District of Columbia*,
   956 A.2d 684 (D.C. 2008) ..........................................................3, 5, 6

*USPS v. American Postal Workers Union*,
   553 F.3d 686 (D.C. Cir. 2009)............................................................25

*Washington Metro. Area Transit Auth. v. Barksdale-Showell*,
   965 A.2d 16 (D.C. 2009) .................................................................7, 8

*Winder v. Erste*,
   No. 03-CV-2623, 2005 WL 736639 (D.D.C. Mar. 31, 2005) ..................14, 15, 16

**STATUTES**

2005 District of Columbia Omnibus Authorization Act, Pub. L. No. 109-356
   § 105 ......................................................................25, 28, 29

42 U.S.C.
   § 1983 .......................................................................13, 15

D.C. Administrative Procedures Act, D.C. Code
   § 2-501 – 511 .....................................................................23

D.C. Code
   §§ 8-1001—1023 .....................................................................5
   § 11-921 (2010)......................................................................4
   § 47-2829 (2010)....................................................................12
   § 50-381 (2010)....................................................................29
   § 50-381 (2010)....................................................................29

Establishment Act, D.C. Code

§ 50-301 ...............................................................................................33
§ 50-302(b)(1)(C) ...............................................................................12
§ 50-303 ...............................................................................................33
§ 50-303(6) .........................................................................................27
§ 50-303(12) ................................................................................. 33, 39
§ 50-305 (2010) ...........................................................32, 33, 35, 38, 39
§ 50-306 .......................................................................................... 9, 22
§ 50-307 ...........................................................10, 11, 22, 27, 30
§ 50-308 ......................................................................................... 27, 31
§ 50-313 .................................................................................. 26, 27, 28
§ 50-317 (2010) ...........................................................................passim
§ 50-320 (2010) ................................................................. 11, 34, 36, 37

## OTHER AUTHORITIES

D.C. Auditor, "Review of the D.C. Taxicab Commission's Assessment/Commission Fund for Fiscal Years 2005 Through 2009, As of June 30, 2009," at 13 (Nov. 10, 2010) .............37

D.C. Municipal Regulations Title 31 ("DCMR") ...............................................passim

Mayor's Order 2007-231 (Oct. 17, 2007) .................................................................29

Mayor's Order 2009-104 (Jun. 15, 2009) .................................................................31

Mayor's Order 2011-116 (Jul. 11, 2011) ............................................... 21, 22, 31, 35

## INTRODUCTION

Taxicab rates in the District of Columbia are lower than any other comparable city in the country and lower than in any of the surrounding jurisdictions.  These low rates, combined with an array of other arbitrary acts and decisions carried out by the Defendants in this case, have severely jeopardized the ability of taxicab drivers in D.C. to earn a living.  For the past several years, D.C. Professional Taxicab Drivers Association and the Dominion of Cab Drivers (collectively, "Plaintiffs") – two associations of representing more than 600 individual D.C. taxicab drivers – have been attempting through the regulatory process to secure fair and legal treatment by the District, the Mayor, and the D.C. Taxicab Commission ("DCTC" or "Commission").  In particular, they have repeatedly petitioned the Defendants in this case to set taxicab rates in a fair and appropriate manner, as required by law, to cease arbitrary and unconstitutional searches of taxicab drivers by inspectors, and to implement other reforms necessary to comply with the law.  On September 20, 2011, after years of attempts, and after having been spurned repeatedly by the Mayor and Commission, Plaintiffs filed this lawsuit seeking judicial relief for the Defendants' persistent and ongoing failure to comply with their legal obligations.  Since that date, Defendants have purportedly implemented changes which they now argue render many of Plaintiffs' claims "moot."  They also assert, among other arguments, that, notwithstanding the drivers' repeated and well-documented efforts to achieve rate increase and other changes in the regulatory process, Plaintiffs "jumped the gun" and failed to exhaust their administrative remedies.  These and Defendants arguments are entirely lacking in merit and their motion to dismiss must be denied.

First, Plaintiffs have standing to seek relief under the broad equitable powers of this Court to remedy illegal government action.  Contrary to Defendants' argument, judicial review of Defendants' actions is available.  A statutory private right of action is not necessary.  Nor does

1

sovereign immunity insulate Defendants from review.  Further, Plaintiffs allege sufficient harms

to satisfy the requirements of Article III standing, they have exhausted their administrative

remedies to the extent required by law, and Defendants Gray and Linton are subject to suit in

their official capacities.

Second, Plaintiffs' claims are not barred by collateral estoppel or *res judicata*.  The

claims set forth in the Complaint and the factual circumstances giving rise to those claims are

distinct from those raised in prior litigation.  Significant factual and legal developments

occurring since prior litigation have considerably changed the environment of the taxicab

industry, further distinguishing Plaintiffs' claim and defeating any argument of preclusion.

Third, the Complaint raises substantive claims which survive dismissal based on factual

and legal merit.  Defendants' current delegation of power over the taxicab industry and

dereliction of statutory duty over recent years directly violate the District of Columbia Taxicab

Commission Establishment Act ("Establishment Act") and various aspects of D.C. Municipal

Regulations, Title 31 ("DCMR").

Finally, while Plaintiffs acknowledge that Defendants have taken recent steps to address

issues raised in this lawsuit, these post hoc actions generally do not meet the legal standard to

moot Plaintiffs' claims.

## ARGUMENT

I.    <u>Plaintiffs Have Standing to Sue and Defendants Are Properly Before the Court</u>

A.    *Plaintiffs Have General Standing to Seek Relief Under the Court's Broad Equity Powers.*

Defendants argue that all counts in the First Amended Complaint ("Complaint"), aside

from the Constitutional claims (Counts X and XI), fail because Plaintiffs have no private right of

action under local law.  The Court should reject Defendants' argument because it rests on a misapplication of the law and a mischaracterization of Plaintiffs' claims.

Plaintiffs bring their claims pursuant to the Court's general equitable powers to review government agency action; the existence of a private right of action is not relevant to Plaintiffs' claims.  Courts in this Circuit, applying both D.C. and federal law, have recognized repeatedly that private plaintiffs may invoke a court's equitable power to challenge government action without having to show the existence of a private right of action.  *See Amador County, Cal. v. Salazar*, 640 F.3d 373, 379-80 (D.C. Cir. 2011) (strong presumption of legislative intent for judicial review of agency action); *Mistick PBT v. Chao*, 440 F.3d 503, 509 (D.C. Cir. 2006) (same); *Baumann v. District of Columbia*, 744 F. Supp. 2d 216, 227 (D.D.C. 2010) (court's equitable powers provide authority to evaluate plaintiff's claims for injunctive relief against D.C. agency under D.C. law); *See also El Paso Natural Gas Co. v. United States*, 632 F.3d 1272, 1276 (D.C. Cir. 2011) (analysis begins with presumption that review is intended).  *See also Tucci v. District of Columbia,* 956 A.2d 684, 690 (D.C. 2008) (strong presumption under D.C. law that agency action is reviewable); *District of Columbia v. Sierra Club*, 670 A.2d 354, 357-58 (D.C. 1996) (same).

Courts have made clear that a private right of action is not necessary when a party is challenging illegal actions by a government agency.  The D.C. Court of Appeals has previously noted that "[j]udicial reviewability of agency action does not depend on the creation of a private right of action in the statute sought to be enforced." *Id.* at 359 (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986)).  *See also Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 165 (1997) (district court could exercise supplemental jurisdiction over state law challenge of municipal agency's denial of permits to redevelop historic buildings); *Baumann,*

744 F. Supp. 2d at 227 (applying *Sierra Club* standard to review claims for injunctive relief against a D.C. agency).

In seeking declaratory and injunctive relief against Defendants to enforce D.C. law, Plaintiffs invoke the Court's general equity powers to address illegal government action – they need not show that the statutes at issue create a private right of action. *See* D.C. Code § 11-921 (2010)); *see also Sierra Club,* 670 A.2d at 358-59.  Defendants cite to *Dial A Car, Inc. v. Transp., Inc.,* 132 F.3d 743, 744 (D.C. Cir. 1998) for the proposition that D.C. courts have "been reluctant to find a private right of action in a statute that provides for public enforcement." Defs.' Brief at 10.  Defendants then cite *Baumann,* 744 F. Supp. 2d at 227, for the proposition "[t]he D.C. Council knows how to create a private right of action when it wants to . . . ." Defs.' Brief at 10. However, neither proposition is applicable to the instant situation.  In *Dial A Car*, the plaintiff sought to compel enforcement of the Establishment Act against a private, non-governmental actor.  In *Baumann*, the plaintiff sought monetary damages.  Here, Plaintiffs seek no monetary damages and do not sue private actors.   Rather, Plaintiffs attempt merely to require Defendants – governmental actors and officials – to comply with the law.

In *Baumann*, the Court applied implied right of action analysis to bar the plaintiff's claim for damages but not to his claims seeking injunctive relief, explicitly distinguishing the claims based on the type of relief sought.  744 F. Supp. 2d at 227 (plaintiff's request for injunctive relief "is within the Court's equitable powers" but private right of action analysis "is appropriate to bar [his] claim for damages") (citing *Sierra Club*, 670 A.2d at 354).  So while that plaintiff's failure to demonstrate irreparable harm and his inclusion of damage penalties in the proposed injunctive relief ultimately led the court to deny injunctive relief, *id.* at 227-28, neither shortcoming exists in the instant case.  The D.C. Court of Appeals similarly declined to apply private right of action

4

analysis in a suit seeking injunctive relief and damages against the District for its failure to enforce the Litter Control Act. *See Tucci,* 956 A.2d at 690 n.3 (applying *Sierra Club*, 670 A.2d 354). Although the Court eventually rejected injunctive relief on sovereign immunity grounds, it first applied the *Sierra Club* analysis to locate an implied right of action in the relevant statute. *Id.* at 690 n.3.

Further, the Court in *Tucci* distinguished its denial of plaintiff's claim from a contrary holding in *Sierra Club* based on the type of injunctive relief sought. Unlike in *Sierra Club* and the instant case, the plaintiff in *Tucci* demanded enforcement action/prosecution *by* an agency *against* an individual, as opposed to an injunction *against* an agency. *See id.* at 690. The Court held that a specific enforcement/prosecution decision was a "core executive responsibility . . . committed to agency distraction so as to preclude judicial review." *Id.*

In *Sierra Club*, plaintiffs also sought injunctive relief against the District and mayor – relief that would require the collection of metal and glass waste under the District of Columbia Recycling Law, D.C. Code §§ 8-1001—1023 (formerly §§ 6-3401—3423). 670 A.2d 354. The court explicitly rejected private right of action analysis, holding "that the Superior Court may entertain claims for equitable relief from allegedly unlawful action by public officials pursuant to D.C. Code [Section] 11-921(a)(6) (1995), which vests that court with jurisdiction over 'any civil action or other matter, at law or in equity, brought in the District of Columbia." *Id.* at 358-59 (quoting *Speyer v. Barry*, 588 A.2d 1147, 1159-60 (D.C. 1991)). Here, as in *Baumann*, this Court should look to *Sierra Club* in upholding the strong presumption in favor of judicial review of government action. *See id.* at 357-58; *see also Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986) ("[w]e begin with the strong presumption that Congress intends judicial review of administrative action"); *Carlin v. McKean*, 823 F.2d 620, 622 (D.C. Cir. 1987); *El*

*Paso Natural Gas*, 632 F.3d at 1276; *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 398 (D.C. 1991); *People's Counsel v. Public Serv. Comm'n of D.C.*, 474 A.2d 1274, 1278 n. 2 (D.C. 1984).

*Sierra Club* explained that the presumption of reviewability is only defeated in two narrow circumstances: (1) where the legislature commits the challenged action entirely to agency discretion; and (2) where a statute precludes judicial review. 670 A.2d at 357-59 (relying on *Heckler v. Chaney*, 470 U.S. 821, 828 (1985); *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 410 (1971); *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967); *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902); and numerous D.C. cases). *See also Tucci*, 956 A.2d at 690 (citing *Sierra Club*). Neither situation is present here.

The agency discretion exception to judicial review applies "[o]nly upon a showing of clear and convincing legislative intent." *Sierra Club,* 670 A.2d at 358 (internal quotations and citations omitted). This "very narrow exception" is present "only in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Id*. (internal quotations and citations omitted). Under similar facts to the instant case, the court determined that it could evaluate the government's acts or omissions in accordance with existing statutory mandates, and that the agency discretion exception was inapplicable. *See id.*

In the instant case, Plaintiffs allege that Defendants have failed to carry out specific obligations established by the Establishment Act, D.C. Code § 50-301 – 324, and DCMR, Title 31. The Complaint asks this Court to compel the Defendants to comply with the law. It does not seek monetary damages or relief against private, non-governmental actors. Defendants' argument would put their alleged violations of law beyond judicial review and would render the Establishment Act a nullity, applicable only where the Defendants chose to comply with it.

There is no evidence that the legislature sought to commit the functioning of Establishment Act entirely to agency action – the Establishment Act prescribes clear and direct instruction governing the composition and procedures of the Commission and its panels, rate reviews and rate adjustments, and other functions. Accordingly, the legislative intent exception does not apply in this instance.

Nor does the exception for legislative preclusion of judicial review apply. Case authority is clear that the exception for explicit or implicit legislative preclusion of review requires a clear showing of preclusion. *Sierra Club*, 670 A.2d at 358 (citing *Briscoe v. Bell*, 432 U.S. 404 (1977); *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392 (D.C.1991)). Defendants do not argue that the D.C. City Council either explicitly or implicitly precluded courts from reviewing the claims at issue in this litigation, nor do they specifically contend that judicial review of a statute is presumed in the absence of contrary language. Moreover, none of the laws at issue suggest any legislative intent to preclude judicial review. Neither the Establishment Act nor the relevant portions of DCMR, Title 31 contain any language that suggests the laws are insulated from judicial oversight. Thus, an assertion of explicit preclusion warrants no consideration. Consequently, defendants have not made – and cannot make – any clear showing of legislative preclusion under the applicable D.C. laws.

B.      *Defendants' Actions and Omissions Are Not Shielded by Sovereign Immunity*

Defendants argue that Counts V, VII, and IX should be dismissed because they are protected from suit by sovereign immunity. This argument is meritless.

Sovereign immunity is an exception to judicial review and available only when a government entity is exposed to potential liability as a result of acts or omissions that are discretionary in nature. *Washington Metro. Area Transit Auth. v. Barksdale-Showell*, 965 A.2d

16, 20-21 (D.C. 2009). As discussed, *supra*, courts have broad power to review government action. *See, e.g., El Paso Natural Gas*, 632 F.3d at 1276 (strong presumption favoring courts' equitable power to review executive action). Because sovereign immunity puts such action beyond judicial review, courts find official conduct insulated from legal challenge only in the narrowest of circumstances. *See Sierra Club,* 670 A.2d at 358 ("Only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review.") (quoting *Abbott Labs.*, 387 U.S. at 141). Sovereign immunity protects only that government activity which is wholly discretionary, reflecting a "legislative intention to commit an action entirely to agency discretion." *Sierra Club*, 670 A.2d at 358 ("very narrow exception to the governing presumption" of reviewability) (internal quotations omitted); *see also Washington Metro.*, 965 A.2d at 20-21.

Defendants explain that "discretionary acts are generally defined as those acts involving the formulation of policy while ministerial acts are defined as those relating to the execution of policy." Defs' Brief at 28 (quoting *Aguehounde v. District of Columbia*, 666 A.2d 443, 447 (D.C. 1995)). In defining discretion in terms of "formulation of policy," Defendants are overly broad. The Supreme Court has taken a more limited view. Government action is discretionary only if it requires an element of judgment or choice *and* the decision to undertake the action is based on considerations of public policy. *See Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988) ("the discretionary function exception insulates the Government from liability if the action challenged in the case involves the *permissible* exercise of policy judgment") (emphasis added). All other government action is ministerial. Here, the actions and omissions of Defendants as pled in Counts V, VII, and IX of the Complaint are simply not "discretionary." Plaintiffs

challenge clearly ministerial governmental action to which sovereign immunity is wholly inapplicable.

Moreover, even if the Court were to determine that the relevant Commission activity detailed in Counts V, VII, and IX was discretionary, the Court should still reject Defendants' defense of sovereign immunity.  Discretionary action is subject to review if contrary to established governmental policies.  *Aguehounde*, 666 A.2d at 448 (discretionary action is "immune from suit, *unless* the government has adopted a statute, regulation or policy that specifically prescribes a course of action.")  (emphasis added) (quoting *Berkovitz*, 486 U.S. at 536) (internal quotations omitted).  These Counts *all* address Defendants' failure to satisfy discrete duties and responsibilities specifically set forth in the Establishment Act.  Complaint at 24, 27, 29.  Accordingly, they cannot be shielded by sovereign immunity.

Defendants assert that sovereign immunity insulates the Commission's rate setting practices from judicial review.  While the Establishment Act does not prescribe specific rates, it requires the Commission to "[e]stablish reasonable rates for taxicab services."  Complaint at 24 (quoting D.C. Code § 50-307).  Despite repeatedly acknowledging that existing taxicab rates are inadequate, *see, e.g.,* Exhibit 1 (DCTC meeting transcript excerpts), since 2008, the Commission has abdicated its rate-setting responsibility.[1]  Yet Defendants argue that the Commission's failure to undertake *any* reasonable effort to adjust rates for more than three years is discretionary, implying that its abdication of duty is simply a policy choice.  This argument is plainly inaccurate.  Under the Establishment Act, the Commission is charged with *executing* prescribed policy – here, setting a "reasonable" price – an activity that does not implicate the sweeping

---

[1] The November 10, 2011 Commission hearing on taxicab rates, announced after the filing of this action, represents a departure from the Commission's three years of inaction, but still is highly problematic.  Mayor's Order 2011-116 purports to delegate all ratemaking authority to Chairman Linton alone, rendering the Commission powerless.  And were the Commission's rate-setting authority re-established, the absence of taxicab industry representatives on the Commission violates the Establishment Act.  *See* D.C. Code § 50-305 and § 50-306.

policy determinations intended to be protected by sovereign immunity.  The Commission's inaction is accordingly not protected from review.  Under the statute, setting of rates is not a discretionary act.

Defendants argue that the discretion afforded to the Defendants to engage in rate-setting insulates resultant rates from judicial review.  Defs.' Brief at 29.  Under their theory, egregious, arbitrary and extreme rates – $0.01 per mile or $1000.00 per mile – would unreviewable.  Their position is patently absurd and, if accepted, would severely infringe upon the Court's inherent equitable powers to curb or regulate illegal agency conduct.  Courts have repeatedly found government rate-setting activities in other contexts not to be beyond legal challenge.  *See, e.g., Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1496 (9th Cir. 1997) (finding Medicaid reimbursement rates set by California Department of Health Services to be arbitrary and capricious); *Lake Mohave Boat Owners Ass'n v. Nat'l Park Service*, 78 F.3d 1360 (9th Cir. 1995) (exercising jurisdiction over claim that National Park Service violated statutory duty to set "reasonable" rates for marina fees); *Thaler v. Stern*, 253 N.Y.S.2d 622, 625 (N.Y. Sup. Ct. 1964) (exercising jurisdiction over claim that Superintendent of Insurance violated statutory duty to set "reasonable" rates).  Accordingly, the Commission's rate-setting activities and omissions are not protected discretionary actions under sovereign immunity doctrine.

Even if the Court were to find the Commission's rate-making activity to be discretionary, the "course of action" exception set forth in *Aguehounde* makes clear that it would not be shielded by sovereign immunity.  666 A.2d at 448.  The Establishment Act details the responsibility of the Commission to set fair rates "for the transportation of passengers and their property within the District, including all charges incidental and directly related to the provision of taxicab services."  *See* D.C. Code § 50-307.  Not only does the statute leave the Commission

10

with no discretion to abdicate this responsibility, but it affirmatively describes the specific factors the agency should evaluate in making its determination.  D.C. Code § 50-307(b)(1)(A).  Such detailed instruction is clearly a "prescribe[d] course of action," and sovereign immunity is thus inapplicable.  *Aguehounde*, 666 A.2d at 448.

Similarly, in Count VII, Plaintiffs challenge Defendants' handling of the driver's assessment fund.  The Establishment Act and governing regulations prescribe that monies from the fund be allocated to pay the costs of the Commission, including the costs of conducting fair and proper rate studies.  D.C. Code § 50-320(b) (2010).  While the financial needs of the Commission may vary from month to month or year to year, the law leaves Defendants with no discretion in allocating money from the fund – all monies are to be used to cover the costs required for the Commission to operate per the duties set forth in Establishment Act, including conducting rate studies.  *See id.*; *see also* D.C. Code § 50-317(a).  As the Establishment Act's narrow mandate circumvents Defendants' ability to use discretion in allocating fund resources, the activity lacks the "judgment" element required for discretionary activity.  Accordingly, the Commission's spending of monies from the fund is ministerial, and sovereign immunity is inapplicable.

As with rate-making, even if the Court were to determine that Defendants retained a measure of discretion in allocating fund monies, Defendants actions would be precluded from protection under sovereign immunity.  Because the Establishment Act provides explicit guidance as to appropriate allocation of monies from the fund – *i.e.*, that *all* money collected from drivers be allocated to the costs of the Commission, *see D.C. Professional Taxi Drivers Ass'n, Inc. v. District of Columbia*, No. 96 CA 6990, slip op., at 5-6 (D.C. Sup. Ct. Dec. 10, 1997) –

Defendants' actual spending is guided by a "prescribe[d] course of action" and ineligible for sovereign immunity protection. *Aguehounde*, 666 A.2d at 448.

Finally, Count IX of the Complaint alleges that the Commission violated the Establishment Act by improperly eliminating hard-copy DCTC licenses and imposing restrictions on license issuance and transferability. D.C. Code § 47-2829 (2010) and DMCR 814.1 require District drivers to possess a DCTC license. Within the last few years, the Commission, without explanation or rulemaking, ended issuing hard-copy licenses that were transferrable between vehicles and instead began issuing non-transferrable registration numbers subject to change each renewal period. On November 23, 2010, the previous DCTC Chairman issued a moratorium halting the issuance of new taxicab registration numbers to individual drivers. *See* http://newsroom.dc.gov/show.aspx/agency/dctaxi/section/2/release/20805/year /2010/month/11 (last visited Jan. 11, 2012; screen print attached as Exhibit 2). Lacking transferrable hard-copy licenses, drivers associated with fleets or companies are unable to obtain new registration numbers in order to drive independently. The result of these policies directly contradicts an explicit purpose of the Establishment Act, which is to "assure access to the ownership of taxicabs by taxicab operators." *See* D.C. Code § 50-302(b)(1)(C).

Defendants argue that these actions are discretionary and thus shielded by sovereign immunity. Again, Defendants interpret the narrow protection far too broadly. Admittedly, the Establishment Act's mandate that the Commission "assure access to ownership" broad and open to some degree of judgment. However, in requiring drivers to maintain licenses for taxicab ownership, and restricting their ability to obtain a new license (*i.e.*, a registration number) if opting to drive as an independent, these recent policy changes have eliminated certain drivers' ability to fulfill this requirement. These actions represent a breach in the Commission's duty to

protect taxicab ownership by individual taxicab operators.[2]  The decisions to eliminate hard-copy licenses, implement non-transferrable registration numbers, and issue a moratorium against the issuance of new registration numbers to current drivers seeking to drive independently are ministerial actions unshielded by sovereign immunity.

Regardless of how the Court may classify the various government actions in question, Defendants' sovereign immunity theory fails on all counts.

C.      *Mayor Gray and Chairman Linton Are Proper Defendants*

Defendants argue that the Court should dismiss Defendants Gray and Linton because it is "redundant" for Plaintiffs to sue both the individuals  in their official capacities as well as the District and the Commission, the entities which they represent.[3]  Unlike personal-capacity suits, which seek to impose personal liability upon a government official for actions "under color of state law," official-capacity suits are simply another way of "pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citation and internal quotation omitted).  Accordingly, when plaintiff seeks damages, a judgment against a defendant in his or her official capacity imposes liability not on the individual but on the entity he or she represents.  *Brandon v. Holt*, 469 U.S. 464, 465 (1985).

While claims against a local government entity do not *require* naming agents of that entity as official-capacity defendants, the Supreme Court has held that a local government official is an appropriate official-capacity defendant in a § 1983 discrimination claim when the official's agency is sueable under the circumstances.  *Monell v.  Dep't of Social Servs. of New*

---

[2] Even if characterized as discretionary, these actions are ineligible for sovereign immunity protection. The Establishment Act provides a "prescribe[d] course of action" as described under *Aguehounde* – assuring taxicab drivers access to taxicab ownership.  The Commission's policies concerning licensing are inconsistent with that course of action.

[3] Defendants also assert that the District of Columbia Taxicab Commission (DCTC) and the Office of the Attorney General (OAG) are subordinate agencies of the Government of DC and thus non *sui juris*.  Plaintiffs consent to the dismissal of both DCTC and OAG as named defendants.

*York*, 436 U.S. 658, 690 n.55 (1978).  This Court adopted the holding in *Monell* when it declined to dismiss an official-capacity defendant despite acknowledging the argument that retaining the defendant was redundant.  *Winder v. Erste*, No. 03-CV-2623, 2005 WL 736639, at *5 (D.D.C. Mar. 31, 2005) ("Although defendant is correct that [the official capacity defendant] creates a redundancy, there is no requirement that, because of the equivalence, the public official defendant must be dismissed.").  In *Winder*, plaintiff, a former city employee, sued the District of Columbia, his former employer – the D.C. Public Schools (DCPS), and officials associated with DCPS, claiming unlawful termination in violation of his Constitutional rights, various federal and local statutes, and D.C. common law.  *Id*. at *1.

In the instant case, Plaintiffs name Mayor Gray and Commission Chairman Linton, who are not only associated with the two government bodies responsible for the violations detailed in the Complaint, but are the respective heads of those entities.  In accordance with *Monell* and *Winder*, Plaintiffs ask that the Court not dismiss Defendants Gray and Linton.

In support of dismissal, Defendants cite *Trimble v. District of Columbia*, 779 F. Supp. 2d 54, 57 n.3 (D.D.C. 2011), which noted that, "[b]ased on the understanding that it is duplicative to name both a government entity and the entity's employees in their official capacity, courts routinely dismiss claims against the officials." (citation and internal quotation omitted).  *Trimble*, however, does not require that the Court dismiss individual defendants sued in their individual capacities.  Additionally, Defendants rely upon *Graham*, 473 U.S. at 166, which clarifies that official-capacity suits are treated as suits against the employing entity, rather than against the official personally.  Like *Trimble*, *Graham* indicates that there is nothing inherently improper about suing an individual in his official capacity.

This Court has repeatedly addressed, and rejected, mandatory dismissal of co-defendants sued in their official capacity along with their agencies or employing entities. *See Johnson v. District of Columbia*, 572 F. Supp. 2d 94, 112 (D.D.C. 2008) ("[E]ven though retaining the Mayor as a party in the suit is redundant, there is no requirement that, because of the equivalence, the public official defendant must be dismissed.") (internal quotations and citations omitted), *amended by* 632 F. Supp. 2d 20 (D.D.C. 2009); *see also Winder*, 2005 WL 736639, at *5 (declining to dismiss Acting Superintendent of the D.C. Public Schools where plaintiff claimed unlawful retaliation in violation of 42 U.S.C. §1983).

Plaintiffs also repeatedly refer to the 2008 litigation between the parties concerning the implementation of taxicab meters in District taxicabs. Defs' Brief at 5, 15-17. There, then-Mayor Fenty and then-DCTC Chairman Swain – but *not* the District of Columbia itself – were named defendants in a suit brought by one of Plaintiff taxicab driver organizations. *See D.C. Professional Taxicab Drivers Ass'n v. District of Columbia*, No. 1993-08 (D.C. Sup. Ct. Apr. 21, 2008) (hereinafter "*DCPTDA*"), Exhibit 3 of Defendants' Motion to Dismiss. There, the D.C. Superior Court presided over a suit against similarly-situated official-capacity defendants that raised familiar issues concerning mayoral control over the District's taxicab industry. In fact, Fenty and Swain were not merely similarly-situated official-capacity defendants but the direct predecessors of Mayor Gray and Chairman Linton in their respective offices.

Similarly here, there is nothing procedurally or substantively improper about the inclusion of Mayor Gray and Chairman Linton. By retaining Defendants Mayor Gray and Chairman Linton, this Court is able to assert its equitable authority to order them to carry out specified steps to remedy the unlawful conduct of the District and the DCTC. Due to the benefit of directly subjecting Mayor Gray and Chairman Linton to the Court's equitable powers, and

because Defendants do not, and cannot, cite any law requiring their dismissal, the Court should retain them as named Defendants as it has so done in the past.  *See Johnson*, 572 F. Supp. 2d at 112; *Winder*, 2005 WL 736639, at *5; *see also Dominion Cogen, D.C., Inc. v. District of Columbia*, 878 F. Supp. 258, 264 n. 5 (D.D.C. 1995) ("[a] suit against a public official in his official capacity is simply a suit against the government entity which he represents . . . . Nevertheless, so far as the parties' findings and this court's research reveals, there is no reason the plaintiffs may not name particular City council members in their official capacities, if they so choose.").

> D.   *Plaintiffs Have Suffered a Specific Injury and Have Article III Standing for Count I*

Defendants assert that the case should be dismissed for lack of standing under Article III because Plaintiffs seek an advisory opinion as to the illegality of the current allocation of authority over the taxi industry between DCTC and Mayor Gray.  Defendants argue further that the Complaint does not allege how, if at all, Plaintiffs might be harmed under Count I's pleaded facts.  Defs' Brief at 12.  Even a cursory reading of the Complaint shows that Defendants' argument lacks factual and legal merit.

The Supreme Court has held that "to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envntl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000); *see also* Defs.' Brief at 13 (citing *Friends of the Earth*).   Plaintiffs' Complaint clearly satisfies these requirements.

Throughout the pleading, Plaintiffs cite specific economic and physical harms arising from surviving under some of the lowest taxicab fare rates in the United States, from being denied industry representation on the DCTC, and from Defendants' actions in preventing the DCTC from carrying out its statutory powers. Complaint at 2, 3, 5-9, 10-11, 13, 14-16, 20-21. Plaintiffs allege that lack of DCTC oversight has resulted in the failure to set a fair and proper rate schedule, causing drivers to lose as much as 30% of their gross income. Complaint at 2-3. In a single paragraph, Plaintiffs allege an actual, concrete injury in fact that is traceable to Defendants' inaction and that would be redressed by the remedies sought in the complaint. Complaint at 2. In so pleading, Plaintiffs satisfy the standard set forth by the Supreme Court for Article III standing. *Friends of the Earth,* 528 U.S. at 180-181.

Plaintiffs also allege in the Complaint that the illegal continuing mayoral control over the District's taxicabs has precluded the DCTC from effectively regulating the industry. Complaint at 7-10, 20-21. As a result, DCTC has been unable to implement rate adjustments that would provide a fair, living wage for the city's taxi drivers. Complaint at 10-11, 21. The absence of rate adjustments has directly caused these drivers approximately 30% reduction in gross income. Complaint at 24-25. Plaintiffs detail this patent economic harm throughout the Complaint. Complaint at 2, 3, 19, 21, 24-25.

Defendants' contention that Plaintiffs fail to plead an injury in fact, and therefore purportedly lack Article III standing to pursue their claims, is baseless and contradicted by the allegations set forth in the Complaint. Complaint at 3, ("[T]he rate schedule has not changed since 2008 . . . drivers have seen their incomes fall by as much as 30%); Complaint at 21, ("Mayor's Order[s]…continue to prevent the Commission from implementing rate adjustments that would establish parity between the District and rates in surrounding jurisdictions and

17

comparable metropolitan areas."). Consistent with *Friends of the Earth, Inc.*, Plaintiffs detail

injuries in fact and have standing to pursue the claims set forth in the Complaint.

> E.    *Plaintiffs Have Exhausted Their Administrative Remedies*

Defendants argue that Plaintiffs have failed to exhaust the administrative remedies

available to them with regard to Counts IV and V of the Complaint, specifically concerning the

failure to conduct a proper rate study and failure to set reasonable rates in compliance with the

D.C. Taxicab Commission Establishment Act.  Defendants attempt to substantiate this argument

by stating:

> [N]owhere in the complaint do [Plaintiffs] mention the pending proceedings
> before the Commission that will both secure the taxicab rate *review* required by
> the Act, D.C. Official Code § 50-317, and consider a rate increase.  The
> Commission will be holding a "Public Hearing on Rate Increase" on November
> 29, 2011, for the purpose of "elicit[ing] factual information that will allow the
> Taxicab Commission to arrive at an evidentiary decision . . ." based on
> "presentations from both proponents and opponents or other views of the rate
> increase."  The third speaker listed as speaking in favor of a rate increase is Mr.
> Nathan Price, a representative of the lead Plaintiff in this case.

Defs.' Brief at 19-20.

As a general rule, a party must exhaust available administrative remedies before

obtaining judicial relief.  Defendants' argument fails on this point for two reasons:  (1) to the

extent they were required to do so, Plaintiffs have exhausted their administrative remedies; and

(2) Defendants rely upon a ratemaking proceeding of dubious legality which was introduced

nearly two months *after* Plaintiffs filed suit.

> **1.    To the Extent Plaintiffs Were Required to Do So, They Exhausted Their
> Administrative Remedies**

Defendants' argument that Plaintiffs have failed to exhaust their administrative remedies

is completely meritless.  Plaintiffs have been attempting to obtain relief from the DCTC for

years, but their efforts have been repeatedly ignored or rebuffed.  As alleged in the Complaint,

the D.C. Taxicab Commission has been largely dysfunctional and failed to hold regular meetings

of the Commission or either Commission Panel in the manner required by their own regulations

in DCMR, Title 31 Chapters 1-3.  Indeed, Between March 2009 and January 2010, the

Commission failed to hold any meetings at all.  To the extent it has had recent meetings, such as

the public rate hearing of November 29, 2011, those meetings have been illegal in that they have

not meet the requirements of a rate hearing under DCMR, Title 31, Chapter 2 §§ 220-255.

Finally, in contravention of D.C. Code § 50-317 and as alleged by plaintiffs in Counts IV and V,

the Commission has failed to carry out its rate making duties since at least 2007.

   Consequently, Plaintiffs have not had administrative remedies of the Establishment Act or

the applicable regulations available to them.  However, despite the Commission's disregard for

the process outlined in its regulations, Plaintiffs, with the aid of undersigned counsel, have

sought administrative remedies for a period of more than a year-and-a-half.  As opportunities

have arisen, Plaintiffs pursued available remedies with the DCTC and Defendants, including

submitting correspondence to the DCTC and Administration officials, as well as submitting

multiple formal comments to the DCTC.

   These efforts have included a June 24, 2010 letter from Plaintiffs to the DCTC with an

attached rate proposal and independent analysis by Edgeworth Economics.  (Exhibit 3).

   On July 23, 2010 plaintiffs submitted a letter to, then-D.C. Attorney General, Peter

Nickles regarding the Mayor's usurpation of the authority vested in the Commission be the

Establishment Act.  (Exhibit 4).

   On October 4, 2010 plaintiffs submitted a letter to D.C. Councilmember Yvette Alexander

regarding objections to a nomination to the Commission.  (Exhibit 5).

On October 19, 2010 the plaintiffs submitted a letter to Commission General Counsel Reed regarding objections to the improper composition of the Commission.  (Exhibit 6).

On November 9, 2010 the plaintiffs submitted objections to Commission General Counsel Reed regarding serious shortcomings in the DCTC's October 13, 2010 summary rate review.  (Exhibit 7).

On June 16, 2010 Dr. Kara Gorski and Dr. John H. Johnson, IV of Edgeworth Economics presented oral testimony to the Commission regarding rates and supplied written testimony on June 24, 2010.  (Exhibits 8 & 9).

Plaintiffs provided the Commission with a memorandum containing information on the supply of potential taxicab drivers in the Washington, D.C. area from Edgeworth Economics from October 15, 2010.  (Exhibit 10).  Plaintiffs also supplied the Commission with an Expert Report of Dr. John H. Johnson, IV and Dr. Kevin W. Christensen from Edgeworth Economics dated November 8, 2010 concerning the Commission's 2010 summary rate review.  (Exhibit 11).

Plaintiffs have participated in every Commission meeting that has occurred from January 2008 to present and have supplied comments as necessary and allowed.  *See* Exhibit 12 (DCTC meeting transcript excerpts).  Plaintiffs have corresponded with the mayor  (Exhibit 13), met with city administrator Allen Lew and generally participated at every available opportunity under the makeshift administrative procedure concocted by the Commission as it went along – with a Commission that until the filing of the suit denied it had the authority to engage in ratemaking, in contravention of the Establishment Act, and stopped a ratemaking at the request of the Office of the Attorney General in 2009.  (Exhibit 14).

After more than eighteen months of proactive and consistent effort to seek administrative relief with assistance of counsel at every opportunity created by a Commission operating outside

of its regulations, Plaintiffs as a last course of action filed suit on September 21, 2011 seeking to compel the Commission to follow the law.  Only after the filing of this action has the Commission begun to address the myriad issues repeatedly raised by Plaintiffs over the previous eighteen-plus months.  Defendants now attempt to rely on these initial, inadequate steps to moot Plaintiffs' valid claims.

Defendants' argument that Plaintiffs have not exhausted administrative remedies is belied by the facts and fails as a matter of law.  Plaintiffs have pursued administrative remedies to the extent possible while suffering economic harm under the defunct administration of the Commission.

**2.     The Instant Action Preceded the Announcement of the November 29, 2011 Rate Hearing by Nearly Two Months.**

Defendants argue that Plaintiffs failed to exhaust their administrative remedies based on a proceeding that was announced on November 10, 2011, two months *after* Plaintiffs filed their lawsuit.  *See* http://newsroom.dc.gov/show.aspx/agency/dctaxi/section/2/release/22662 (last visited Jan. 11, 2012; screen print attached as Exhibit 15).  The argument is meritless on its face – how could Plaintiffs avail themselves of a proceeding that had not occurred, and which the Complaint alleges Defendants refused to initiate, at the time they filed suit?  Their argument also should be rejected because the administrative remedy Plaintiffs allegedly failed to exhaust is not being conducted in accordance with the statute and is therefore illegal.

Additionally, the Commission was either powerless to act or acted unlawfully in holding the November 29, 2011 rate hearing, undermining Defendants' contention that Plaintiffs have not exhausted administrative remedies.  Mayor's Order 2011-116 (Jul. 11, 2011) purports to delegate all ratemaking authority to Chairman Linton alone, leaving the Commission powerless.  And

21

were the Commission's rate-setting authority re-established, the multitude of procedural regularities in the November 29 DCTC rate hearing would render that hearing invalid.

D.C. Code §50-307(b)(1), requires that the Panel on Rates and Rules establish reasonable rates and surcharges for taxicab service and methodologies for the determination of reasonable fares for taxicab service among various other responsibilities.  Due to vacancies on the DCTC, this body does not currently exist.  D.C. Code §50-305 and § 50-306 further require that three industry members serve on the DCTC, one of whom is a member of the Panel on Rates and Rules.  There are currently no industry representatives on the DCTC.  *See* Pl.'s Am. Compl. Count II.  Additionally, under the terms of Mayor's Order 2011-116, the DCTC lacks authority to implement rate adjustments – the Order delegates complete rate authority to Defendant Linton. Plaintiffs continue to dispute that Mayor Gray possessed any such authority to delegate to Chairman Linton – authority that properly rests with the DCTC.  *See* Pl.'s Am. Compl. Count I.

The November 29, 2011 DCTC rate hearing itself also demonstrated a number of irregularities.  First, the hearing departed from the statutory and regulatory requirements set forth in DCMR, Title 31, Chapter 2 §§ 220-255.  Rather than adhering to the judicial process for Rate Hearings set forth in the DCMR – which requires pleadings, service, a pre-hearing conference, formal discovery, briefing and presentations along with cross examination – the November 29 hearing was a make-shift hearing resembling a legislative committee hearing.  *See id.*  Second, while supposedly scheduling this hearing to allow it to "elicit factual information that will allow the Taxicab Commission to arrive at an evidentiary decision" about taxicab rates, the DCTC issued an immediate proposed rule concerning a rate adjustment the following day.  *See* http://newsroom.dc.gov/show.aspx/agency/dctaxi/section/21/release/22722/year/2011 (last visited Jan. 11, 2012; screen print attached as Exhibit 16).  This proposed rule appeared to have

been drafted in advance of November 29, 2011, as both the text announcement and the public notices page included a publication date of November 28, 2011 – the day *before* the supposed evidentiary hearing was held.  *See id.* http://newsroom.dc.gov/list.aspx/agency/dctaxi/section/21/year/2011 (last visited Jan. 11, 2012; screen print attached as Exhibit 17).

Subsequent to the announcement of the initial proposed rule on November 29, Chairman Linton issued a modified proposed rule, which significantly reduced the mileage rate proposed on November 30.[4]  Chairman Linton unilaterally announced the modification during a truncated December 13, 2011 meeting, announcing his findings and determinations and ending the meeting before all the Commission members were even seated.[5]

The plainly unlawful nature of the hearing and procedures therein, and its dubious timing prevent it from mooting Plaintiffs claims and only further substantiates the need for a properly constituted Commission with clear authority to undertake a proper rate review.

## II.    Plaintiffs' Claims Are Not Precluded by *Res Judicata* or Collateral Estoppel

### A.    *Plaintiffs' Claims Are Not Precluded by Prior Litigation*

Defendants assert that Count I – Plaintiffs' claim concerning  unilateral mayoral control over the District's taxicab industry –  are precluded under the doctrines of *res judicata* and collateral estoppel.  Defs' Brief at 13-17.  Because the claims at issue in this litigation are distinct

---

[4] The result of this process was a proposed rate schedule that increases mileage and waiting time rates, but in a way that significantly undercuts driver income gains.  The modified proposal eliminates all surcharges – including an essential $1.00 per trip fuel surcharge – without adequately increasing mileage and waiting time charges to completely account for these changes.  In fact, the proposal *reduces* fares on many trips. *See* Exhibit 9 (Graphical Analysis of Rate Proposal by Edgeworth Economics).  Plaintiffs have supported an approach leaving these surcharges in place while moderately increasing mileage and waiting time rates.  *See* Exhibit 3 (June 24, 2010 Comments).

[5] Linton also departed from established procedures by announcing that the Commission would vote another proposed rule governing vehicle age and mileage limits at the January 11, 2012 Commission meeting.  This provided only nineteen (19) days for public notice and comment, eleven (11) days short of the thirty (30) day period required by the D.C. Administrative Procedures Act, D.C. Code § 2-501 – 511.

from those raised in previous litigation and because of changes in legal context in the interim

time period, Count I is not precluded.[6]

Res judicata bars a subsequent lawsuit "if there has been prior litigation (1) involving the

same claims or cause of action, (2) between the same parties or their privies, and (3) there has

been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." Porter v.

Shah, 606 F.3d 809, 813-14 (D.C. Cir. 2010) (citations and internal quotation marks omitted).

Collateral estoppel requires there be (1) a common issue that is (2) actually litigated, (3) actually

decided, and (4) necessary to the court's judgment. Connors v. Tanoma Mining Co., Inc., 953

F.2d 682, 684 (D.C. Cir. 1990). The party seeking to preclude re-litigation of an issue has the

burden of showing that the same issue is "actually and necessarily determined" in a prior

litigation. Id. at 684. Because the claims at issue in this litigation are distinct from those raised

in previous litigation and because of changes in legal context in the interim time period, Claims I

and X are not precluded.

Plaintiffs' claims concerning mayoral control over the District's taxicab industry arise

from factual circumstances distinct from those addressed in DCPTDA. They do not share a

common nucleus of facts that would indicate they represent the same claims or causes of action

in res judicata analysis, see, e.g., Lewis v. DEA, 777 F. Supp. 2d 151, 160 (D.D.C. 2011),  or

common issues in collateral estoppel analysis.  Plaintiffs' claims address issues that were not

---

[6] After further investigation, Plaintiffs will stipulate to dismiss Count X without prejudice and will be filing
a Notice of Dismissal under Fed. R. Civ. P. 41(a)(1). DCPTDA upheld the Non-Resident Acts to the extent that they
did not prevent the DCTC from issuing DCTC licenses to drivers with vehicles lacking D.C. tags and made
exceptions for drivers residing outside the District on or before March 1, 2006. See id. at *8. Plaintiffs reserve the
right to re-raise this claim to the extent it is found that Defendants have departed from these practices.

actually litigated or decided in prior litigation and with respect to which no final judgment exists.[7]  Accordingly these claims are not precluded by either *res judicata* or collateral estoppel.[8]

The claims at issue under Count I – the Mayor's continuing control over the meter system three years after its implementation – arise out a distinct nucleus of fact, in comparison to the issues in *DCPTDA*.  See *Porter*, 606 F.3d at 813-14.  The intervening three years also represent a change in legal context since *DCPTDA*, undermining the existence of common issues required for collateral estoppel.  *See USPS v. American Postal Workers Union*, 553 F.3d 686, 696 (D.C. Cir. 2009) (collateral estoppel is generally inappropriate when the issue is one of law and there has been a change in the legal context after the first decision); *Pharm. Care Mgmt. Ass'n v. District of Columbia*, 522 F.3d 443, 447 (D.C. Cir. 2008) (same).

*DCPTDA* concerned a challenge by Plaintiff D.C. Professional Taxicab Drivers Association to the Mayor's authority to implement the taxicab industry's changeover to a time-and-distance meter system.  Ultimately, the D.C. Superior Court solely upheld the Mayor's ability to initially implement a metered fare system for D.C. taxicabs.  The court's decision in *DCPTDA* was measured, noting that "the DCTC Establishment Act explicitly vests exclusive jurisdiction over taxicabs in the Commission" and that the 2005 District of Columbia Omnibus Authorization Act, Pub. L. No. 109-356, Sec. 105 ("the Levin provision") "does not purport to amend the DCTC Establishment Act."  *DCPTDA*, at 15-16, 21.  It further stated that the Levin provision does not specify any specific role for the Mayor aside from an ability to opt-out of the

---

[7] Similarly, these differences undercut Defendants' argument that the Court dismiss Count I on stare decisis grounds.

[8] Additionally, Plaintiff Dominion of Taxicabs was not a party to *DCPTDA* and is not subject to *res judicata* or collateral estoppel.  *See Pharm. Care Mgmt. Ass'n*, 522 F.3d 443, 446-47 (application of non-mutual collateral estoppel over matter of law decided in previous action would inappropriately foreclose non-party from obtaining reconsideration of that legal issue).

provision's meter requirement, explaining that the Levin provision "required the Mayor to make an affirmative decision to implement a meter system or not by the opt out provision." *Id.* at 21.

In framing this choice in the context of the initial decision to adopt or reject a metered taxi system, the court is clear that the Mayor's power extended only to the initial implementation decision.  The court made no mention of any continuing mayoral authority to unilaterally operate and regulate the meter system after it was up and running.  Accordingly, the Mayor's current authority over the taxicab industry was not decided by the *DCPTDA* and/or Defendants' assertion of unilateral mayoral authority over the District's taxicabs represents a nucleus of operative facts distinct from those facts relating to the initial implementation of the meter system.  Thus, neither *res judicata* nor collateral estoppel preclude Count I.

## III.    **Plaintiffs' Substantive Claims Survive Dismissal**

### A.     *Defendants Are in Violation of the Establishment Act.*

Defendants contend that it is "clear" that:  "(1) the Mayor has rate-setting authority over the D.C. taxicab industry, and (2) as a result of the series of Mayor's Orders beginning in 2007 attacked by Plaintiffs, the Mayor has progressively and lawfully delegated his rate-setting authority to the Commission." Defs.' Brief at 20.  Neither contention is accurate, let alone "clear."

### B.     *The Mayor Does Not Have Rate-Setting Authority Over D.C.'s Taxicab Industry*

### 1.     **The D.C. Superior Court Rejected the Mayor's Claims of Authority Arising Under the Establishment Act**

Defendants cite D.C. Code § 50-313 as providing the Mayor with "considerable discretion in acting to protect the public" in the regulation of the taxicab industry.  Defs.' Motion at 21-22.  Defendants note that D.C. Code § 50-313(a) permits the Mayor to "issue any reasonable rule relating to the supervision of passenger vehicles for hire he or she considers

necessary to protect the public" and requires operators of such vehicles to "meet[ ] all requirements mandated by the Mayor." Defs.' Brief at 21.  In a footnote, Defendants casually explain that a taxicab is "defined as a passenger vehicle for hire," *id*. at 21 n.16, and that the above-mentioned "authority – alone – defeats Plaintiffs' claim." *Id*. at 21.  Defendants' contentions are misleading, incorrect, and contrary to the D.C. Superior Court's finding in *DCPTDA*.

Upon consideration of the exact same issue, the D.C. Superior Court evaluated and rejected Defendants' argument in *DCPTDA*, explaining that D.C. Code § 50-313 governed vehicles for hire, such as "black car" sedans or limousines, but did not encompass taxicabs.  *See DCPTDA* at 15-16.  Acknowledging that Defendants' argument appears to be "appealing" when read in isolation, the court explained that "the use of the term 'vehicles for hire' in the definition of 'taxicabs' was in the descriptive sense, and not as a term of art" as set forth in D.C. Code §§ 50-303(6) and 50-313(a).  *See id*.  Rather, taxicabs in the District are governed by the specific procedures set forth under other provisions of the Establishment Act, including D.C. Code §§ 50-307 and 50-308, which vest the Commission, via its Panel on Rates and Rules, with jurisdiction over rate setting.

As D.C. Superior Court noted, Defendants' reading, which would place taxicabs under the coverage of D.C. Code § 50-313, "would render a nullity the carefully crafted legislation creating the DCTC and the rules relating to the licensing of taxicabs" and cannot be reconciled with "the fact that the DCTC Establishment Act explicitly vests exclusive jurisdiction over taxicabs in the Commission." *See DCPTDA* at 15-16.  In examining the construction of the Establishment Act, including an examination of its legislative history, the court found no support

for Defendants' argument, concluding that D.C. Code § 50-313 "does not grant the Mayor co-extensive power with the DCTC to regulate taxicabs." *See id.* at 18.

2.    **The D.C. Superior Court Rejected the Mayor's Claims of Inherent Authority as Chief Executive**

Defendants echo another rejected argument from *DCPTDA* in touting the Mayor's inherent authority to regulate taxicabs under the Home Rule Act.  Explaining that the DCTC is a subordinate agency, Defendants contend that the Mayor retains the authority to control its operations, including delegating rate-making powers.  Defs.' Brief at 23-24.

The court in *DCPTDA* evaluated and rejected this argument, noting that the Mayor's powers *vis-a-vis* the taxicab industry are set forth in the Establishment Act, a duly-enacted law passed by City Council.  *DCPTDA* at 18-19.  Through such legislation, "[t]he City Council . . . can limit the Mayor's authority" to regulate the taxicab industry.  *See. id*. at 19.  Under the Establishment Act, the City Council did just this – limiting the Mayor's authority to unilaterally regulate the taxicab industry, reserving only a handful of powers relating to the DCTC, most notably the ability to appoint commissioners and remove them for cause and the power to appoint and remove the Chairperson at will, for the Mayor.  *See id*.  Accordingly, in *DCPTDA*, the D.C. Superior Court concluded "the Mayor has no inherent authority to act in the field [of District taxicab regulation], absent some other statutory provision, because any inherent authority was curtailed by the City Council."  *Id*. (citing *Francis v. Recycling Solutions, Inc*., 695 A.2d 63, 72-73 (D.C. 1997)).

3.    *DCPTDA* **Limited the Mayor's Authority in Implementing of Taxi Meters**

Finally, Defendants reference the 2005 District of Columbia Omnibus Authorization Act, Pub. L. No. 109-356, Sec. 105 ("the Levin provision") as the source of the Mayor's authority to unilaterally regulate the District's taxicab industry.  In *DCPTDA*, the D.C. Superior Court upheld

then-Mayor Fenty's authority to initially implement a metered fare system, pursuant to the Levin provision.  In asserting that the Mayor was granted indefinite, unlimited power over the District's taxicab industry – authority extending to the present day, more than three years since the meter system was put into place – Defendants stretch the Levin provision and *DCPTDA* to unrecognizable lengths.

The Levin provision, which makes no affirmative grant of implementation authority (as opposed to opt-out authority), only provided the Mayor with a limited period of time to opt-out of the meter system, requiring that the District implement a meter system within one year of the provision's enactment if no opt-out was issued within the one-year period.[9]  *See* Pub. L. No. 109-356, Sec. 105, codified at D.C. Code § 50-381 (2010).  Consistent with the one-year limitation on the Mayor's opt-out authority, Mayor Fenty issued Mayor's Order. 2007-231 "to immediately implement the new time and meter distance system" on October 17, 2007, the day before the Mayor's opt-out authority was to expire – exactly one year from the date of the Levin provision's enactment.

Despite Mayor Fenty's acknowledgment of the impending expiration of the only power expressly included in the Levin provision – the mayoral opt-out power in 2007 – Defendants assert that the implied power to implement the meter system is permanent and unlimited. *DCPTDA* contains no support for the Mayor's grant of authority continuing beyond implementation of the system – setting up initial regulations and a rate structure for the system and installing meters into the District's taxicabs.  Now that the meter system is up and running –

---

[9] In a letter to then-Mayor Fenty, Senator Levin, the author of the provision, appeared to indicate that nothing in the Levin provision was intended to override the DCTC's ratemaking and rulemaking authority.  *See* Exhibit 18. (August 4, 2010 letter from Sen. Carl Levin to Mayor Adrian Fenty)   In the letter, Senator Levin also appeared to view implementation of the meter system to be complete.  *See id.*  (after Mayor Fenty declined to opt-out of the Levin provision, "the meter system was implemented").

and has been up and running for more than three years – the implementation phase has ended and the grant of authority to the Mayor has expired.

*DCPTDA* further undermines Defendants' claims that the Levin provision granted the Mayor plenary authority over taxicabs in noting that the Mayor's implementation powers were not necessarily exclusive.  The court explained that although the Levin provision gave the Mayor ultimate implementation power over the metered system, other actors could have carried out implementation:  "Congress knew the DCTC had jurisdiction to make the changes [to adopt a meter system], if it chose to do so."  *See id.* at 21.  Instead, the court noted that the Levin provision simply "required *the District*" rather than the Mayor "to implement taxicab meters within a year's time."  *Id.* at 21 (emphasis added).  The court was clear that "the DCTC Establishment Act explicitly vests exclusive jurisdiction over taxicabs in the Commission," while the Levin provision "[did] not purport to amend the DCTC Establishment Act."  *Id.* at 15-16, 21. Defendants' position cannot be reconciled with the limited grant of authority provided under the Levin provision and explained in *DCPTDA*.

       C.       *The Mayor Has Not Delegated Rate-Setting to the Commission*

Defendants claim that Plaintiffs' claims are merely "academic" because "the Mayor has progressively and lawfully delegated his rate-setting authority to the Commission."  Defs.' Brief at 20.  This contention is false.

Through a series of Mayor's Orders dating back to 2007, the Fenty and Gray Administrations have purported to delegate rate- and rule-making authority they do not possess[10] to the DCTC.  These delegations of authority purport to significantly limit the authority of the Commission, especially when compared to the powers  granted to the Commission under D.C.

---

[10] The authority of Mayors Fenty and Gray to regulate the District's taxicab industry expired upon implementation of the meter system.  As D.C. Superior Court explained in the *DCPTDA*, "unless the Mayor has the authority, he has none to delegate."  *DCPTDA* at 19 (citing *Francis*, 695 A.2d at 75).

Code §§ 50-307 and 50-308.  These orders have prevented the DCTC from taking timely action to keep D.C. taxi rates competitive with surrounding jurisdictions, leaving rates at an unduly low level that threatens the health, livelihood, and well-being of the District's taxicab drivers. Neither mayor has ever delegated full rate authority to the DCTC, instead providing limited grants of authority to the DCTC or delegating broader authority to the Chairman alone.

While *DCPTDA* upheld Mayor Fenty's initial delegation of authority in 2007 to then-DCTC Chairman Leon Swain to establish rules governing the new time-and-distance meter system, including a rate structure, Fenty's subsequent post-implementation delegations of authority were not evaluated by the D.C. Superior Court.  In 2009, more than one year after the meter system had been put into place, Mayor Fenty issued an executive order purporting to return rate authority to the DCTC, but, in reality, denying the DCTC any meaningful role in rate-making.  *See* Mayor's Order 2009-104 (Jun. 15, 2009).  The Mayor retained final authority over taxicab rates, limiting the DCTC's power to act without the Mayor's consent to implement (1) multiple rate increases in one year, (2) any single rate increase of more than 5%, or (3) any additional charges.  *See id.*

Upon entering into office, Mayor Gray declined to return rate-making authority to the DCTC, instead delegating all rate-setting authority to Chairman Linton alone.  Mayor's Order 2011-116.  While Chairman Linton has made public statements pledging to collaborate with the rest of the DCTC in the rate-setting process, salutatory statements about collaboration are far different that the exercise of authority consistent with the law.  Moreover, Mayor's Order 2011-116 would allow Linton to reverse himself at any time and preserve this power for himself. Acting under this authority, Chairman Linton issued proposed rate adjustments following DCTC hearings held on November 29, 2011 and December 13, 2011.

D.     *The Establishment Act Requires that There Be Three Industry Members Who Have Been Directly Involved in Taxicab Operations in the District*

The Establishment Act requires that the DCTC, at all the times, be comprised of nine members: five public members, three industry members, and a chairperson. *See* D.C. Code § 50-305 (2010). Defendants have blatantly flouted this requirement, even before a majority of the DCTC's seats went vacant, characterizing a restaurateur, a hotel executive and a civil engineer (who has since resigned from the DCTC) as industry members. *See* Exhibit 19 (Commission roster from DCTC website). The absence of industry representation contravenes the Establishment Act, denies Plaintiffs a seat at the table in crafting policies relevant to their livelihood, and calls the DCTC's actions into question. *Cf. New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635, 2644 (2010) (voiding decisions of governmental board not in compliance with statutory membership requirements).

Defendants acknowledge that the none of the designated industry members are taxicab operators or company owners that would be directly involved in the provision of taxicabs. According to Defendants, the word "industry" in "industry member" refers to any industry with a tangential connection to taxicabs. As Defendants explain, the hotel and restaurant industries are connected to the taxicab industry because hotels and restaurants "have familiarity and experience with taxicab operations" and use taxicabs "in order to serve their own customers." Defs.' Brief at 27. Defendants' argument proves too much – and is contrary to the text and clear intent of the Establishment Act.

Under Defendants' reading of D.C. Code § 50-305 (2010), a limitless number of industries fall under the "industry member" umbrella. The airline and passenger rail industries would qualify because their customers use taxicabs to and from airports and train stations. Law firms and government agencies would qualify because their employees commonly take taxicabs

to and from work.  Doctors' offices and grocery stores would qualify, as common taxi destinations for individuals without automobiles.  Defendants' definition even possibly could encompass car dealerships and the steel industry, which supply vehicles that become taxicabs and raw materials that become vehicles.  Such a reading of D.C. Code § 50-305 (2010) would be absurd, stripping the term "industry member" of any meaning, and rendering duplicative that provision's requirement that there also be five "public members" on the DCTC.

The findings and definitions sections provide a clearer explanation of the term "industry member."  D.C. Code § 50-301(7) explains that the "taxicab industry . . . is wholly comprised of thousands of individual licensees conducting business on a self-employment basis."  D.C. Code § 50-303(12) further refines the term "taxicab industry," defining it as "all taxicab companies, associations, owners, and operators, or any person who by virtue of employment or office *is directly involved in the provision of taxicab services within the District*," excluding those with tangential or indirect connections to the industry.  (emphasis added).   In providing for three designated industry representatives, and clearly defining the parameters of the taxicab industry, the City Council clearly intended to provide taxicab drivers and companies with seats at the table in the process of policymaking affecting their industry and livelihoods.

"It is well-established that interpreting a statute, all parts should be harmonized, if possible, to implement the policy and intent of the legislature."  Defs.' Brief at 22 (citing 2A Norman J. Singer, Sutherland Statutory Construction § 46.05 at 165 (6th ed. 2000)).  The definition of "taxicab industry" in D.C. Code §§ 50-301 and 50-303 is directly relevant to the meaning of "industry member" in D.C. Code § 50-305.  Plaintiffs' references to D.C. Code §§ 50-301 and 50-303 harmonizes the use of the term throughout the D.C. Taxicab Establishment Act, consistent with the intent of the legislature.  This guidance is clear and demonstrates that

Defendants' definition of "industry member" contradicts the City Council's intent in creating industry members on the DCTC.

E.     *The DCTC Has Failed to Carry Out Its Obligations to Conduct Rate Studies*

Defendants seek to dismiss Count IV, asserting that the DCTC is only required to undertake a "review" of taxicab rates, but need not take any additional affirmative steps to evaluate the industry and its rate structure.  Specifically, Defendants contend that the DCTC has fulfilled its obligations under D.C. Code § 50-317 by conducting a hearing and issuing a proposed rate adjustment in November and December 2011 ("2011 Review"), after the filing of this action.  Plaintiffs disagree.

Contrary to Defendants' contentions, the rate study requirement is rooted in several provisions of the D.C. Taxicab Establishment Act and underlying regulations.  Under D.C. Code § 50-317 (2010), the DCTC is required to "undertake a review of the taxicab rate structure" every twenty-four months through its panel on rates and rules.  The provision requires in-depth analysis that can only be carried out via a formal rate study, as the DCTC must "establish nondiscriminatory rates, charges, matrices, boundaries, and methodologies for the determination of taxicab fares which assure reasonable and adequate compensation."  D.C. Code § 50-317(b) (2010).  The D.C. Taxicab Establishment Act and regulations further provide for a funding mechanism for this in-depth review, designating a specified fund of monies collected from the drivers "for any investigation or proceeding by the Commission concerning taxicab and passenger vehicle for hire rates and regulations."  D.C. Code § 50-320 (2010).  These funds are to be "used by the Commission and its panels for any investigation or proceeding concerning taxicab rates or regulations," including formal rate studies.  D.C. Mun. Regs. tit. 31, §§ 1102.1, 1102.3(a).

Consistent with these requirements, in previous years, prior to the implementation of the meter system in 2008, the DCTC has contracted with an outside consultant to carry out a "rate study" – a survey of D.C. taxicabs, including information concerning distance, price, and time of District taxicab rides. The 2011 Review simply does not satisfy these requirements. By conducting a review consisting of a single public hearing, the DCTC does not comply with these requirements. Indeed, the DCTC has not collected any fare data since 2006 beyond that provided to them by District taxicab drivers, including Plaintiffs. Such data is essential in conducting a review of rates compliant with D.C. Code § 50-317(b) (2010). Only Defendants have the funding to carry out a full and complete rate study that includes such an examination.

Even if the Court accepts Defendants' contention that D.C. Code § 50-317 (2010) requires a minimal level of review and data collection, the 2011 Review would still be non-compliant with the Establishment Act and accompanying regulations for two reasons. First, the current state of the DCTC makes a complete and proper review impossible at this time. The absence of three qualified industry representatives is contrary to the requirements of D.C. Code § 50-305 (2010), and calls all actions of the DCTC as currently composed into question. *Cf. New Process Steel*, 130 S. Ct. 2635. Similarly, the absence of a functioning Panel on Rates and Rules, a result of the numerous vacancies on the DCTC, also departs from the statutory requirements for a review of rates set forth in D.C. Code § 50-317 (2010).

Second, the DCTC has disclaimed any ability to adjust rates in accordance with D.C. Code § 50-317 (2010). Mayor's Order 2011-116 purports to delegate all rate-making authority to Chairman Linton. Defendants have defended this delegation of authority as consistent with the Levin provision implementing the meter system and have argued for its continuing validity. *See* Defs.' Brief at 24-26. This departs from the procedures set forth under D.C. Code § 50-317,

which require the full Commission to ultimately adopt any rate adjustment.  The 2011 Review is

not compliant with statutory and regulatory requirements and represents a continuation of

Defendants' failure to carry out its duties.

> F.      *Defendants Have Misappropriated Monies in the Drivers' Assessment Fund in Violation of Their Fiduciary Responsibilities*

Each year, every licensed D.C. taxicab driver must pay a $50 assessment into the Drivers'

Assessment Fund ("Fund"), a special fund earmarked for the benefit of the District's drivers.

D.C. Code § 50-320(c) establishes the Fund, providing that "Monies deposited into the Fund . . .

shall be used by the Commission for any investigation or proceeding by the Commission

concerning taxicab and passenger vehicle for hire rates and regulations as determined by rules

promulgated by the Commission and submitted to the Council for approval, in whole or in part,

by resolution."  D.C. Superior Court has explained that the legislative history of the legislation

establishing the assessment fund "makes it apparent that the monies collected from the taxicab

drivers are for a fiduciary purpose for which the operators are principal beneficiaries."  *D.C.*

*Professional Taxi Drivers Ass'n, Inc.*, No. 96 CA 6990, at 5-6.  The DCTC's governing

regulations further specify that "Monies in the Fund shall be used by the Commission and its

panels for any investigation or proceeding concerning taxicab rates or regulations."  D.C. Mun.

Regs. tit. 31 § 1102.1.  These proceedings may include rate studies.  D.C. Mun. Regs. tit. 31

§ 1102.3(a).

While the Fund previously has been used to fund independent rate studies analyzing the

District's fare structure, or to help provide taxicab upgrades and equipment, in recent years,

Defendants have claimed that the Fund contains no money for these purposes.  Contrary to

statutory and regulatory requirements, and in violation of the court's directive in *D.C.*

*Professional Taxi Drivers Ass'n, Inc.*, No. 96 CA 6990, Defendants, by information and belief,

have diverted Fund monies into the District's general fund or used it to pay salaries of DCTC

employees.  This is an improper use of the Fund.  The diversion of these monies – which are

provided by the District's taxicab drivers – have prevented Plaintiffs and other D.C. taxicab

drivers from realizing the benefits of rate studies, DCTC adjudications, and equipment upgrades

that would be paid for by the Fund.

Contrary to Defendants' assertions that Plaintiffs advance only "conclusory assertions of

wrongdoing," *see* Defs.' Brief at 31, a recent report by the D.C. Auditor found rampant

mismanagement of the Fund.  *See* Exhibit 20 (D.C. Auditor, "Review of the D.C. Taxicab

Commission's Assessment/Commission Fund for Fiscal Years 2005 Through 2009, As of June

30, 2009," at 13 (Nov. 10, 2010)).  The D.C. Auditor determined that the DCTC managed and

maintained public records "ineffectively and inefficiently" and failed to maintain "an effective

system of public records relating to licensed owners and operators of taxicabs and taxicab

companies, associations and fleets."  *See id.*  Concluding that the DCTC's conduct "is

suggestive of mismanagement and an intentional violation of applicable law," the Auditor found,

among several violations, that the DCTC repeatedly ignored District of Columbia law by failing

to submit annual reports to the City Council concerning the status of the assessment fund for

fiscal years 2005 through 2009 (including accounting for collections into and disbursements

from the fund).  *Id.*  The Auditor's Report belies Defendants' assertion that the DCTC "has no

control" over the fund.  Defs.' Brief at 30.

Plaintiffs are entitled to an accounting[11] of the fund and a restoration of monies diverted

from the Fund, so that those funds can be used for the benefit of the Districts' drivers.  See D.C.

Code § 50-320; *D.C. Professional Taxi Drivers Ass'n, Inc.*, No. 96 CA 6990 at 5-6.

---

[11] The Auditor's Report noted that, although spending outpaced collections to the assessment fund between fiscal year 2005 and 2009, and although there were significant irregularities in record-keeping and management of

**IV.**     **Defendants' Post Hoc Actions Do Not Moot Plaintiffs' Claims**

Since Plaintiffs filed their initial Complaint on September 20, 2011, and filed a First

Amended Complaint on September 21, 2011, Defendants – following years of inaction – appear

to have taken some steps to respond to some of Plaintiffs claims.  Defendants now seek to

portray its various post-filing conduct as mooting Plaintiffs' claims.  While claims may be

subject to dismissal when post-filing interim events rendered them moot, Defendants' subsequent

conduct does not meet this standard.

> For a claim to be considered moot by virtue of post-filing conduct,"[t]]wo
> conditions must be satisfied . . . first,. . . there is *no reasonable expectation that*
> *the alleged violation will recur* and secondly, it must be plain that the interim
> relief or events have *completely* and *irrevocably* eradicated the effects of the
> alleged violations."

*Doe v. Harris,* 696 F.2d 109, 111 (D.C. Cir. 1982) (internal quotations marks and citations

omitted; emphasis added).  Here, Defendants fail to "demonstrate that there is no reasonable

expectation that the wrong will be repeated."  *Bender v. Jordan,* 515 F. Supp. 2d 10, 17 (D.D.C.

2007) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) (citations and internal

quotations omitted)).

   *A.*     *Count II, Plaintiffs' Claim Regarding Lack of Industry Representation Is Not*
            *Moot*

As discussed *supra* in Sec. III.C, Count II of the Complaint asserts that the current

composition of the DCTC – specifically that the Commission lacks the required three industry

members – violates D.C. Code §50-305(a).

On November 18, 2011, after Plaintiffs filed suit, Commissioner Pahwa, whom Plaintiffs

allege was illegally serving a third consecutive term in violation of D.C. Code §50-305(c)(1)

---

the assessment fund, "[a]s of September 30, 2009, the balance in the Fund totaled $255,917."  Exhibit 20 (Auditor's
Report at 13).

resigned from the Commission.  While Plaintiffs acknowledge that Pahwa's removal moots

Count III, which challenged his eligibility, it does not moot Count II, which challenges the

*absence* of the three required industry members, not the presence of any one particular person.[12]

To show mootness with respect to Count II, Defendants must prove that the current

members represent the taxicab industry.  The Complaint alleges that they do not and for the

purposes of the Court's decision at this stage of the case, that is sufficient to defeat Defendants'

motion on the issue.  Further, there is nothing to stop Defendants from simply replacing Pawha

with another individual lacking direct involvement with the taxicab industry, contrary to D.C.

Code §50-305(a).

D.C. law requires three commissioners that are *directly involved* in the provision of

taxicab services for the industry.  D.C. Code §§50-303(12), 305(a) (2010).  The removal of one

commissioner who fails to meet this standard remedies this violation neither completely nor

irrevocably.

B.     *Count V, Plaintiffs' Claim Concerning the DCTC's Failure to Engage in Ratemaking, Is Not Moot*

Under D.C. Code §50-317 (2010), Defendants are obligated to undertake a taxicab fare

rate study every 24 months so as to ensure fair and reasonable rates for the industry.  In failing to

undertake a rate study since the meter system was implemented in 2008, Defendants have not

carried out this duty.

Urging dismissal on mootness grounds, Defendants point to the date October 21, 2011

lifting of the $19 maximum fare cap as mooting Count V.  Insofar as the $19 maximum fare cap

---

[12] Plaintiffs' Complaint identifies Commissioners Cohn and Lasner as a restaurateur and hotel executive, respectively, thus acknowledging that they are qualified to serve on the Commission as *public* representatives, but neither meets the definition of an "industry" representative as defined by D.C. Code §50-303(12).  Complaint at 22.

represented an instance of improper policy by DCTC, Count V is not mooted under *Doe*. The lifting of the cap does not render moot the issue of ratemaking.

In dropping the $19 maximum fare cap, Defendants addressed a single element relating to rates. Defendants' lifting of the $19 maximum fare cap does not completely and irrevocably address Defendants various failures to engage in proper ratemaking. At best, the removal of the $19 maximum fare cap is a single corrective measure amidst a wide universe of the Commission's failures; in no way does this isolated example of post hoc compliance substantiate a complete and irrevocable remedy.

C.      *Count XI, Plaintiffs' Claim Concerning Hack Inspector Stops and Inspections, Is Not Moot*

Similar to the incomplete application of the mootness doctrine to Counts II, III and V, Defendants fail to address all required elements of the legal standard in their assertion that Count XI has been rendered moot by recent policies enacted by Commissioner Linton. While Linton's adoption of a "reasonable suspicion" standard for traffic stops is consistent with the U.S. Constitution and clearly ameliorative in practice, the change still does not satisfy *Doe*.

Because Linton acted swiftly and unilaterally to implement this policy, Linton just as easily could unilaterally withdraw this policy. If this Count were dismissed, there is nothing to prevent Linton from retracting the new policy that same day. Such a remedy is not irrevocable.

Nor does the new policy categorically preclude the legal issues raised in Count XI, lacking the mechanisms for enforcement that would satisfy the requirement of completeness. Notwithstanding Defendants' assertion that it has issued a memo purporting to remedy its illegal conduct, they offer no proof that the illegal conduct alleged in the Complaint has actually abated. While one would hope that hack inspectors adhere to the Chairman's new directive, if it is not enforced or implemented, it will not resolve the myriad violations of the constitutional rights of

40

taxicab operators. Anecdotal evidence from drivers chronicles a wide range of illegal and malicious behavior by hack inspectors. Linton's Order appears to be a step in the right direction, but does not completely remedy the rampant harassment alleged by drivers. Similarly, for the reasons stated above, there is no reasonable expectation that the violations will not be recurring.

At this stage in the case, Plaintiffs' allegations are sufficient to survive a motion to dismiss. There is not a sufficient record before the Court for it to decide as a matter of law that the harms alleged in the Complaint have ceased. Plaintiffs are entitled to an opportunity to prove that, notwithstanding the memorandum Linton issued after Plaintiffs sued him, the unlawful practices set forth in the Complaint have persisted and Defendants' violations of the constitutional rights of Plaintiffs' members have continued. Plaintiffs are confident that their evidence – which they are not required to present in response to a motion to dismiss – will show violations of the law. Count XI should not be dismissed.

## V. Plaintiffs' Request for a Declaratory Judgment Is Valid

Highlighting an issue of form over substance, Defendants contend that Plaintiffs' request for declaratory relief is not itself a cause of action. Defs.' Brief at 34. Plaintiffs are willing to forgo Count XII as a separate cause of action, but reiterate that they continue seek the same declaratory relief as is currently outlined in the Prayer for Relief in the Complaint.

## CONCLUSION

For the reasons set forth above, Plaintiffs D.C. Professional Taxicab Drivers Association and the Dominion of Cab Drivers request that Defendants' Motion to Dismiss the First Amended Complaint be denied in its entirety.

Dated:  January 11, 2012

Respectfully submitted,

___/s/ Robert G. Lian, Jr._____
Robert G. Lian, Jr. (#446313)
Akin, Gump, Strauss, Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Ave., NW
Washington, DC  20036-1564
Tel: (202) 887-4000
Fax: (202) 887-4288
E-mail: blian@akingump.com

**Counsel for Plaintiffs D.C. Professional Taxicab Drivers Association and Dominion of Cab Drivers**

42

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2012, I electronically filed a copy of the foregoing Memorandum of Points and Authorities in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the First Amended Complaint with the Clerk of the Court using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system upon the following:

THE DISTRICT OF COLUMBIA
Daniel Albert Rezneck
The Office of the Attorney General
441 4th Street, N.W.
Washington, DC 20001
Daniel.rezneck@dc.gov

Grace Graham
The Office of the Attorney General
441 4th Street, N.W.
Washington, DC 20001
Grace.graham@dc.gov

Jacques P. Lerner
The Office of the Attorney General
441 4th Street, N.W.
Washington, DC 20001
Jacques.lerner@dc.gov

                                        _/s/ Robert G. Lian, Jr._____
                                        Robert G. Lian, Jr.