UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| D.C. PROFESSIONAL TAXICAB DRIVERS ASSOCIATION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>Defendants. | Civil Action No. 11-01802 (BAH)<br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

Two associations, representing approximately 630 taxicab drivers in the District of Columbia, brought this lawsuit in D.C. Superior Court against the District and various municipal officials[1] (collectively, "the defendants"), alleging multiple grievances with the regulation of the local taxicab industry since the transition from a "zone" to a meter fare system in 2008. Specifically, in the twelve-count complaint, the plaintiffs allege nine separate violations of the D.C. Taxicab Commission Establishment Act ("the Act"), D.C. CODE § 50-302, *et seq.*, for which they seek declaratory relief, *see* First Amended Complaint ("Am. Compl."), ECF No. 1, Ex. 2, Counts I-IX, XII,[2] and two federal constitutional claims, which provided the basis for the defendants' removal of the case to this Court. Defs.' Notice of Removal, ECF No. 1, at 2.

Pending before the Court is the defendants' motion to dismiss the plaintiff's First Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon

---

[1] The plaintiffs have also named as defendants: Mayor Vincent Gray, the Office of the Attorney General for the District of Columbia, the District of Columbia Taxicab Commission, which is the regulatory commission charged with oversight and regulation of the taxicab industry, and Ron Linton, Chairman of the District of Columbia Taxicab Commission.

[2] The First Amended Complaint, filed on September 21, 2011, is the operative complaint in this action. *See* ECF No. 1.

1

which relief can be granted.  Following the plaintiffs' voluntary dismissal of one of their federal constitutional claims,[3] the only federal claim remaining in the case is that the District of Columbia Taxicab Commission's ("DCTC") "Policy of Encouraging Unlawful Traffic Stops and Inspections by Hack Inspectors and Law Enforcement Officers," violates the Fourth Amendment.  Am. Compl., Count XI.  Since the Court finds that Count XI must be dismissed as moot, no federal claims remain in this case.  The defendants' Motion to Dismiss will therefore be granted in part and denied in part, and the Court will remand the remaining non-federal claims to the D.C. Superior Court, where the plaintiffs initially filed this action.

## I.     BACKGROUND

In 2005, Congress passed the District of Columbia Omnibus Authorization Act, which included a short provision sponsored by Senator Carl Levin requiring "all taxicabs licensed in the District of Columbia to charge fares by a metered system" within one year of the date of passage. Am. Compl. ¶ 17 (quoting Pub. L. No. 109-356, Sec. 105 (codified at D.C. CODE § 50-381 (2010))).  The provision further provided that the Mayor of the District of Columbia could choose to opt out of moving to a metered system.  *Id*. ¶¶ 17-18.  On October 17, 2007, then-Mayor Adrian Fenty issued Mayor's Order No. 2007-231 "to immediately implement the new time and meter distance system."  *Id*. ¶ 18.  The Mayor delegated "implementation authority" to then-DCTC Chairman Leon Swain, who subsequently issued rules implementing the current meter fare system to replace the system of calculating fares by "zones."  *Id*. ¶ 18.

The gravamen of the plaintiffs' complaint is that the current metered fare system has resulted in arbitrarily low fares, which "are significantly lower than surrounding jurisdictions in Virginia and Maryland, lower than the inter-jurisdictional rates set by the Washington

---

[3] On January 11, 2012, the plaintiffs voluntarily dismissed without prejudice Count X, which alleged that the District had violated the plaintiffs' right to travel and the Commerce Clause of the U.S. Constitution.  *See* Notice of Dismissal, ECF No. 12; Pls.' Mem. in Opp'n to Defs.' Mot. To Dismiss ("Pls.' Mem."), ECF No. 11, at 24 n.6.

Metropolitan Area Transit Commission ("WMATC") and are among the lowest of major U.S. cities. *Id*. ¶ 22. In particular, the plaintiffs allege that rates have remained unchanged since 2008 and taxicab driver income has "fall[en] by as much as 30%." *Id*. ¶ 3. As a consequence, the plaintiffs allege that taxicab drivers must work longer hours to make their previous wages, often to the detriment of their health and their families. *Id.* ¶ 5; *see also* ¶ 4 ("The current rate structure is breaking families, forcing drivers to spend increased time away from their spouses and children, as well as putting hundreds of middle class families under increasing financial strain."). Efforts by the plaintiffs to obtain relief from the DCTC and other governmental authorities have been unavailing, leaving the plaintiffs to turn to the Court as the "last line of defense." *Id*. ¶ 6.

The plaintiffs allege that the defendants have violated the D.C. Taxicab Commission Establishment Act, D.C. CODE § 50-302 *et seq*., in multiple ways, including by the Mayor improperly asserting unilateral authority over the taxicab industry, improper composition of the DCTC, the DCTC failing to conduct a rate study and to set reasonable and fair rates, and the DCTC's elimination of hard copies of DCTC licenses.[4] As noted, the plaintiffs also assert one federal constitutional claim that the DCTC's policy of encouraging unlawful traffic stops and inspections by hack inspectors and law enforcement officers violates the drivers' Fourth Amendment rights. *Id.* ¶¶ 157-160 (Count XI). In support of this single federal claim, the plaintiffs allege that hack inspectors, who are "the [non-police] public safety officials charged with inspecting taxicabs and enforcing taxicab regulations . . . have committed numerous systematic abuses against the District's taxicab drivers, including racial profiling, unlawful searches, and improper ticketing." *Id*. ¶ 84. The plaintiffs claim that "[u]pon information and

---

[4] The plaintiffs provide many additional factual allegations in support of their numerous claims. Since the Court is remanding this case to the D.C. Superior Court, the Court will not elaborate on all of the factual allegations relevant to the plaintiffs' claims.

3

belief, in recent months, officials with the [DCTC] have instructed hack inspectors and law enforcement officers that they may pull over and inspect taxicabs without probable cause or reasonable suspicion of wrongdoing." *Id*. ¶ 88.

Shortly after removing this case from the D.C. Superior Court, the defendants filed the pending motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* Defs.' Mot to Dismiss ("Defs.' Mot."), ECF No. 8.

## II.   STANDARD OF REVIEW

On a motion to dismiss for lack of subject matter jurisdiction, under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.[5] FED. R. CIV. P. 12(b)(1); *Mostofi v. Napolitano*, No. 11-0727, 2012 U.S. Dist. LEXIS 9563, at *4 (D.D.C. Jan. 27, 2012) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)); *Kim v. United States*, No. 08-01660, 2012 U.S. Dist. LEXIS 2094, at *8 (D.D.C. Jan. 9, 2012); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002). As the Supreme Court has explained "many times," the "district courts of the United States . . . are 'courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute.'" *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)) (internal citations omitted); *see also Micei Int'l v. Dep't of Commerce*, 613 F.3d 1147, 1151 (D.C. Cir. 2010) ("[T]wo things are necessary to create jurisdiction in an Article III tribunal other than the Supreme Court . . . . The Constitution must have given to the court the capacity to take it, and an act of Congress must have supplied it.") (internal citations and quotation marks omitted).  For this reason, a "federal

---

[5] The Court notes that the burden of establishing federal subject matter jurisdiction rests on the defendant when the plaintiff moves to remand the case, which is not the context here. *See Busby v. Capital One, N.A.*, No. 10-1025, 2012 U.S. Dist. LEXIS 6376, at *5 (D.D.C. Jan. 20, 2012) ("When the plaintiff makes a motion to remand, the defendant bears the burden of proving federal jurisdiction.") (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

district court's initial obligation is to ascertain its subject matter jurisdiction." *Malyutin v. Rice*, 677 F. Supp. 2d 43, 45 (D.D.C. 2009) (citation omitted), *aff'd*, No. 10-5015, 2010 U.S. App. LEXIS 13869 (D.C. Cir. July 6, 2010). When a court lacks subject matter jurisdiction, it must dismiss the case. *See Ravulapalli v. Napolitano*, 773 F. Supp. 2d 41, 48 (D.D.C. 2011); *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 62 (D.D.C. 2007).

"When it appears that a district court lacks subject matter jurisdiction over a case that has been removed from a state court, the district court must remand the case." *Republic of Venezuela v. Philip Morris Inc.*, 287 F.3d 192, 196 (D.C. Cir. 2002) (citing 28 U.S.C. § 1447(c)). If "all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

In evaluating whether a complaint sufficiently states a claim for relief to withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must first ascertain whether the complaint contains "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" as well as grounds for the court's jurisdiction and the specific relief sought. FED. R. CIV. P. (8)(a). While "detailed factual allegations" are not required, the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (internal citation and quotation marks omitted). In assessing whether a complaint is sufficient, the "court 'constru[es] the complaint liberally in the plaintiff's favor,' 'accept[ing] as true all of the factual allegations contained in the complaint.'" *Aktieselskabet AF 21. Nov. 2001*

*v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008) (citing *Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 253 (D.C. Cir. 2008)); *see also Atherton v. Dist. of Columbia Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009).

## III.   DISCUSSION

As noted, the defendants removed the case to federal court on the basis of the two federal claims alleged in the plaintiff's Amended Complaint, only one of which, Count XI, remains: that the DCTC's policy of encouraging unlawful traffic stops and inspections by hack inspectors violates the Fourth Amendment.  The defendants claim, however, that Count XI is now moot because the DCTC has issued General Order No. 1, which prohibits hack inspectors from stopping taxicabs without reasonable suspicion or probable cause.  *See* ECF No. 8-1, Ex. 4 ("General Order No. 1, regarding Public Vehicle Enforcement Inspector Traffic Stop Protocol") ("General Order No. 1").  The Court agrees.  Since the Court will dismiss Count XI as moot, leaving no federal claims pending in this lawsuit, the Court will remand the remaining non-federal claims to the D.C. Superior Court.

### A.   Count XI is Moot Due to the DCTC's Promulgation of General Order No. 1.

Count XI of the First Amended Complaint alleges that the DCTC "in promulgating and promoting a policy encouraging traffic stops and inspections without probable cause or reasonable suspicion of wrongdoing, indeed 'for any reason,'" is in violation of the Fourth Amendment.  Am. Compl. ¶ 159.  The plaintiffs cite to a proposed regulation of the DCTC as evidence of this policy.  *See id.* ("*See Proposed Regulations of the D.C. Taxicab Commission Regarding DCMR Title 31 Chapters 6*, 58-32 D.C. Reg. 7177 (Aug. 12, 2011) (specifically § 608.2)").  The proposed regulation to which the plaintiffs cite was intended, *inter alia*, to "clarify the authority of hack inspectors to make traffic stops to enforce regulations" and to "clarify that a

hack inspector may inspect officially required vehicle or operator documents during traffic stops for vehicle safety inspections." Proposed Rulemaking, District of Columbia Taxicab Commission, 58 D.C. Reg. 7170, 7170 (Aug. 12, 2011).[6] The plaintiffs further allege that, in accordance with this policy, hack inspectors and law enforcement officers are encouraged to pull over and inspect taxicabs, even if there is no reasonable suspicion or probable cause. Am. Compl. ¶¶ 84-89. As a remedy for this alleged constitutional violation, the plaintiffs seek injunctive relief "barring the DCTC from promoting a policy encouraging traffic stops and inspections of taxicabs without probable cause or reasonable suspicion of wrongdoing." *Id.* ¶ 160.

The proposed regulation cited by the plaintiffs, however, was never promulgated in the form originally proposed. The proposed regulation was tabled for a period of time and was then the subject of additional public hearings and comment, which prompted revisions. Following publication of the revised proposed rule for a third time on June 22, 2012, at 59 D.C. Reg. 7515 (June 22, 2012), and receipt of "no further comments," the DCTC "adopted the rulemaking as final on July 11, 2012." *See* Final Rulemaking, District of Columbia Taxicab Commission, 59

---

[6] The proposed amended section 608.2, which the plaintiffs reference in their Amended Complaint, reads as follows:

> Hack Inspectors, police officers and other duly appointed law enforcement personnel may conduct vehicle safety traffic stops to inspect and test the lights, brakes, steering assembly, tires, equipment, horn or any other vehicle safety device or standard required under title 18 DCMR and the Commission's rules and regulations, as well as to inspect all original officially required vehicle and operator documentation, at any time a taxicab is on the public streets or public space. Copies of these official documents are not acceptable.

*Id*. at 7177. Also of relevance is the proposed amendment to section 600.4, regarding traffic stops:

> Hack Inspectors, police officers, and other duly appointed law enforcement personnel may make traffic stops in order to enforce the District of Columbia Taxicab Commission Establishment Act of 1985, effective March 25, 1986 (D.C. Law 6-97; D.C. Official Code §§ 50-301, *et seq*. (2009 Repl.)) and its implementing regulations. Traffic stops may include, but are not limited to, stops to verify compliance with license and insurance requirements; stops to inspect vehicles for compliance with safety standards; and stops made in response to observed conduct which may constitute safety and service violations.

*Id*. at 7170-7171.

7

D.C. Reg. 8564, 8565 (July 20, 2012).  The Court may take judicial notice of these governmental agency actions.  *See IKON Global Mkts., Inc. v. CFTC*, No. 11-cv-52, 2012 U.S. Dist. LEXIS 67226, at *3 n.1 (D.D.C. May 15, 2012) (taking notice of a manual "as a matter of general public record"); *Williams v. Chu*, 641 F. Supp. 2d 31, 35 (D.D.C. 2009) (taking judicial notice of EEOC decision).

The final rulemaking, adopted on July 11, 2012 and effective as of July 20, 2012, included the language from the proposed rule with some variation, including, critically, reference to the DCTC's "General Orders" and the addition of language clarifying the manner in which traffic stops must be conducted, namely: "[T]raffic stops shall be conducted in accordance with Commission rules and regulations and General Orders."  *See* 59 D.C. Reg. at 8565.

The addition of this language between the August 12, 2011 proposed rulemaking and the July 11, 2012 final rulemaking is important because of the DCTC's intervening action, on September 29, 2011, in issuing General Order No. 1.  The DCTC issued General Order No. 1 in order to "establish a policy and procedure governing Public Vehicle Enforcement Inspector's traffic stops."  General Order No. 1.  As explained in General Order No. 1, the "policy is intended to promote public safety, safeguard Public Vehicle Enforcement Inspectors (Hack Inspectors) of the DC Taxicab Commission and assure compliance with provisions of Title 31 of the District of Columbia Municipal Regulations (DCMR)."  *Id*.  Critically, General Order No. 1 allows traffic stops only when a hack inspector "has reasonable cause to believe that a driver of a moving Public Vehicle for Hire (Taxi or Limousine) is in violation of a specific provision of Title 31."  General Order No. 1, at 1; *see also id*. at 2 (allowing traffic stop "when a Hack Inspector has reasonable cause to believe that a public vehicle for hire operator is in violation of a specific provision of Title 31 of DCMR").  Thus, when the final regulations state that "traffic

8

stops shall be conducted in accordance with Commission rules and regulations and General Orders," the regulations incorporate the DCTC's policy in General Order No. 1 of requiring reasonable cause for traffic stops. *See* Final Rulemaking, District of Columbia Taxicab Commission, 59 D.C. Reg. 8564, 8565 (July 20, 2012).

The defendants contend that the promulgation of General Order No. 1 renders moot the plaintiff's claim for injunctive relief, which seeks adoption of the same policy now formalized in DCTC's order permitting traffic stops only where there is reasonable cause. *See* Defs.' Mem. at 18; *see also* Am. Compl. ¶ 160 ("Plaintiffs therefore ask the Court for injunctive relief barring the DCTC from promoting a policy encouraging traffic stops and inspections of taxicabs without probable cause or reasonable suspicion of wrongdoing").

The plaintiffs concede that "[the DCTC Acting Chairman's] adoption of a 'reasonable suspicion' standard for traffic stops is consistent with the U.S. Constitution and clearly ameliorative in practice . . . ." Pls.' Opp'n at 40.[7] The plaintiffs contend, however, that the

---

[7] The plaintiffs do not specifically address or rebut the defendants' argument that random inspections need not be predicated on probable cause or reasonable suspicion. *See* Defs.' Mem. at 18. The Court therefore finds that the plaintiffs have conceded that point. *See Hopkins v. Women's Div., Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). In any event, although this issue was not briefed by the parties, limited stops of taxis authorized by General Order No. 1, and other applicable regulations, for the purpose of an administrative inspection are subject to the "pervasively regulated industry" exemption from the warrant and probable cause requirement of the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 812 n.2 (1996) ("An administrative inspection is the inspection of business premises conducted by authorities responsible for enforcing a pervasive regulatory scheme –for example, unannounced inspection of a mine for compliance with health and safety standards.") (citing *Donovan v. Dewey*, 452 U.S. 594, 599-605 (1981)). The taxicab industry in the District of Columbia is indisputably a pervasively regulated industry, in which the government has a substantial interest in ensuring the safety of passengers, pedestrians and other drivers on local roadways. Moreover, the regulations governing inspection contacts with taxicab drivers limit the discretion of hack inspectors as to the "time, place, and scope" of the inspections because they: (1) limit inspections to taxicabs "in the field," General Order No. 1, or "on the public streets or public space," 59 D.C. Reg. at 8572; (2) limit the scope of inspections to "the lights, brakes, steering assembly, tires, equipment, horn or any other vehicle safety device … [and] to original officially required vehicle and operator documentation," *id*.; and (3) apply only to vehicles for hire covered by the relevant regulation. Thus, even if plaintiffs were to dispute this issue, they would have to overcome the applicable law that warrantless taxi inspections in a pervasively regulated industry are not violative of the Fourth Amendment. *See New York v. Burger*, 482 U.S. 691, 702-03 (1987); *United States v. Biswell*, 406 U.S. 311, 315 (1972).

"remedy" of General Order No. 1 does not moot Count XI because it is "not irrevocable," nor is there "proof that the illegal conduct alleged in the Complaint has actually abated." *Id.*; *see also id.* at 41 (plaintiffs acknowledging "Order appears to be a step in the right direction, but does not completely remedy the rampant harassment alleged by drivers"). The Court disagrees and, for the reasons explained below, concludes that General Order No. 1, in combination with newly adopted regulations of the District of Columbia Taxicab Commission, provides the remedy sought in Count XI, which is therefore moot.

"The mootness doctrine limits federal courts to deciding actual, ongoing controversies." *Citizens for Responsibility & Ethics in Wash. v. United States SEC*, No. 11-1732, 2012 U.S. Dist. LEXIS 61014, at *21 (D.D.C. May 2, 2012) (citing *American Bar Ass'n v. F.T.C.*, 636 F.3d 641, 645 (D.C. Cir. 2011)). "'Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies.'" *Matthews v. District of Columbia*, 675 F. Supp. 2d 180, 187 (D.D.C. 2009) (quoting *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008)). "A case is moot when 'the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated' in circumstances where 'it becomes impossible for the court to grant any effectual relief whatever to the prevailing party.'" *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1135 (D.C. Cir. 2009) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)).

Courts have consistently held, however, that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (citation and quotation marks omitted); *see also Gray Panthers Project Fund v. Thompson*, 273 F. Supp. 2d 32, 35 (D.D.C. 2002) ("It is well settled that voluntary cessation of illegal conduct

10

does not, by itself, make an issue moot.") (citation omitted).  "The rationale supporting the defendant's voluntary cessation as an exception to mootness is that, while the defendant's unilateral cessation of the challenged conduct may grant the plaintiff relief, the defendant is free to return to [its] old ways--thereby subjecting the plaintiff to the same harm but, at the same time, avoiding judicial review."  *Qassim v. Bush*, 466 F.3d 1073, 1075 (D.C. Cir. 2006) (citations and internal quotation marks omitted).  Accordingly, a party's voluntary cessation will be found to moot a case only when two factors are met: (1) "there is no reasonable expectation that the alleged wrong(s) will be repeated," and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *Bender v. Jordan,* 515 F. Supp. 2d 10, 16 (D.D.C. 2007) (citing *Doe v. Harris,* 696 F.2d 109, 111 (D.C. Cir. 1982)).  "The 'heavy' burden of persuading the court that the challenged conduct cannot reasonably be expected to resume lies with the party asserting mootness."  *Citizens for Responsibility & Ethics in Wash. v. United States SEC*, No. 11-1732, 2012 U.S. Dist. LEXIS 61014, at *22 (D.D.C. May 2, 2012) (citation omitted).  In this case, the defendants have carried their burden, as explained below.

### 1. No Reasonable Expectation Exists That the DCTC Will Retract General Order No. 1 in the Future.

There is no reasonable expectation that the DCTC will retract General Order No. 1, which provides for the same relief that the plaintiffs are seeking in the Amended Complaint.  *See* Am. Compl. ¶ 31 ("Plaintiffs therefore ask the Court for injunctive relief barring the DCTC from promoting a policy encouraging traffic stops . . . of taxicabs without probable cause or reasonable suspicion of wrongdoing").  "[O]ther Circuits have consistently recognized that where the defendant is a government actor — and not a private litigant — there is less concern about the recurrence of objectionable behavior."  *Citizens for Responsibility & Ethics in Wash.*, 2012 U.S. Dist. LEXIS 61014, at *22; *see, e.g.*, *Sossaman v. Lone Star State of Tex.*, 560 F.3d

316, 325 (5th Cir. 2009) ("[C]ourts are justified in treating a voluntary governmental cessation of possibly wrongful conduct with some solicitude, mooting cases that might have been allowed to proceed had the defendant not been a public entity . . . . Without evidence to the contrary, we assume that formally announced changes to official governmental policy are not mere litigation posturing."); *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988) ("We note additionally that cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties . . . [S]uch self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine.") (citation omitted). Indeed, "[c]hanged policy need not [even] come in the form of a formal revocation of the previous policy, as long as the assurance of discontinuation is sufficient to establish that there is no reasonable expectation that the unauthorized actions will resume." *Citizens for Responsibility & Ethics in Wash.*, 2012 U.S. Dist. LEXIS 61014, at *23-24.

After the onset of litigation, the DCTC promulgated General Order No. 1, which the plaintiffs concede reflects a policy change that would be consistent with the requirements of the Fourth Amendment. The plaintiffs provide no indication that the DCTC has evidenced any intent to revive its previous policy on traffic stops made by hack inspectors. On the contrary, the prior proposed rule issued in August 2011, which the plaintiffs cite in their complaint, was never issued in the original form but was instead revised. *See* 59 D.C. Reg 8564.[8] In its final form, the current regulations state that traffic stops are permitted "in response to observed conduct which may constitute safety and service violations," and only in "accordance with Commission . . .

---

[8] The final version of the regulations, effective on July 20, 2012, provides, in pertinent part: "Traffic stops may include, but are not limited to, stops to verify compliance with license and insurance requirements; stops to inspect vehicles for compliance with safety standards; and stops made in response to observed conduct which may constitute safety and service violations. Such traffic stops shall be conducted in accordance with Commission rules and regulations and General Orders." 59 D.C. Reg. 8549 (July 20, 2012).

General Orders" or, in other words, based on reasonable suspicion. *Id*. Having recently embodied the essential requirement for reasonable suspicion in its regulations, the Court concludes that there is no reasonable expectation that the DCTC will retract General Order No. 1 in the future.

There are, however, certainly cases where a government actor's voluntary cessation will not moot a claim for relief. For example, this Court has recently concluded, in cases challenging special conditions imposed on individuals on parole or supervised release, that voluntary cessation of challenged conditions by a government actor did not moot the claim for relief. In these cases, the government actors voluntarily modified some or all of the challenged conditions after the lawsuits were filed, but did not institute any new policy or procedure that would provide assurance that the voluntary cessation was other than temporary. *See Goings v. Court Servs. & Offender Supervision Agency*, 786 F. Supp. 2d 48, 63 (D.D.C. 2011) (defendants acknowledging that "conditions placed on the plaintiff's probation are assessed on an ongoing basis and under a fluid case management system, which would allow for previously lifted conditions to be re-imposed") (citation and internal quotation marks omitted); *Jackson v. United States Parole Comm'n*, 806 F. Supp. 2d 201, 208 (D.D.C. 2011) ("Defendants do not allege that they have altered their procedures for imposing special parole restrictions or that the type of restrictions they impose have changed. Nor do they promise to refrain from imposing those restrictions on [plaintiff]"). By contrast, in the instant case, the DCTC has made a broad policy change as to the conditions under which traffic stops may be initiated, made clear that these changes apply to all hack inspectors and DCTC employees, and recently adopted formal regulations that state that traffic stops must be conducted in accordance with General Orders. These factors, together with the language of General Order No. 1, which contains nothing to suggest that it is only a

temporary change, satisfy the factors for voluntary cessation to moot a case and confirm that the DCTC has no intention of reverting to a policy of promoting traffic stops conducted without reasonable cause.

### 2. General Order No. 1 Eliminates the Effects of the Alleged Violation.

The plaintiffs claim that, although there is a new policy in place, there is "no proof that the illegal conduct alleged in the Complaint has actually abated." Pls.' Opp'n. at 40. The Amended Complaint, however, merely alleges that "[t]he actions of the DCTC in promulgating and promoting a policy encouraging stops and inspections without probable cause or reasonable suspicion of wrongdoing" violates the Fourth Amendment. Am. Compl. ¶ 159. The plaintiffs have conceded that General Order No. 1's "adoption of a 'reasonable suspicion' standard for traffic stops is consistent with the U.S. Constitution and clearly ameliorative in practice . . . ." Pls.' Opp'n at 40. That concession is sufficient to satisfy the Court that General Order No. 1 has provided sufficiently clear direction to government employees to ameliorate the alleged violation. Accordingly, the Court concludes that the defendants' promulgation of General Order No. 1 moots Count XI. The Court will dismiss the plaintiffs' claim with respect to the DCTC promoting a policy of stopping taxicabs without reasonable suspicion. If the alleged violation recurs, then the plaintiffs may file another claim.

### B. Since the Plaintiffs Have No Remaining Federal Claims, the Case Will Be Remanded to the D.C. Superior Court.

The Court's dismissal of Count XI, combined with the plaintiffs' voluntary dismissal of Count X, leaves the plaintiffs with no remaining federal claims. "Since all of the federal claims are being dismissed, the Court will decline to exercise supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(c)(3)." *Canon v. District of Columbia,* No. 12-0133, 2012 U.S. Dist. LEXIS 93354, at *38 (D.D.C. July 6, 2012); *see also Shekoyan v. Sibley*

*Int'l*, 409 F.3d 414, 423-24 (noting that if "all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction — doctrine judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims") (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). "When it appears that a district court lacks subject matter jurisdiction over a case that has been removed from a state court, the district court must remand the case." *Republic of Venezuela v. Philip Morris Inc.*, 287 F.3d 192, 196 (D.C. Cir. 2002) (citing 28 U.S.C. § 1447(c)). When a case removed from state court no longer contains any basis for federal court jurisdiction, remanding the case to state court is the proper course of action. *See Blue v. Fremont Inv. & Loan*, 584 F. Supp. 2d 10, 12 (D.D.C. 2008); *see also Randolph v. ING Life Ins. & Annuity Co.*, 486 F. Supp. 2d 1, 10 (D.D.C. 2007) (remanding case to the D.C. Superior Court due to lack of subject matter jurisdiction). Accordingly, the Court will remand the remaining claims to the D.C. Superior Court.

## IV.   CONCLUSION

For the reasons set forth above, the defendants' Motion to Dismiss is GRANTED IN PART as to Count XI (Fourth Amendment violation). The remaining non-federal counts shall be REMANDED to the D.C. Superior Court pursuant to 28 U.S.C. § 1447(c) for lack of subject matter jurisdiction. An Order consistent with this Opinion will be issued.

**DATE: JULY 30, 2012**

/s/ *Beryl A. Howell*
BERYL A. HOWELL
United States District Judge